④

Hon. Clancy, if petitioner was ready to proceed with the questioning (engage in a colloquy). Petitioner responded in the affirmative. Yet, petitioner requested that he first be allowed to engage your Hon. into/with 2 questions. Hon. Clancy also responded in the affirmative.

Upon approval, petitioner proceeded with a question of an unequivocal description, deserving an unequivocal answer. Stating: Your Hon. Clancy, if I was to give you a cup of water, and asked you to inspect the contents to see if anything was in the water. Hon. Clancy responded, yes - O.K. And I thereafter stated: if you and I were to leave the court room, with you placing the cup with the water that you testified that there was nothing in the water before we exited the court room. Hon. Clancy responded, yes - O.k. And when we returned a few minutes later, and I request you to inspect the cup of water, and you were to inform me that something is now in the water. Hon. Clancy responded, yes - O.k. I again posed the question: not to discredit anyone in this court room, but how did something all of a sudden appear in the cup, when you previously confirmed that nothing but water was in the cup.

Hon. Clancy declared - - - someone must have put it in there! I return stipulated; that's my point exactly! Then I articulated verbatim, the DNA laboratory report from OCME, Charles S. Hirsch, M.D. chief M.E.; Robert C. Shaler, Ph.D., Dir., Dept. of forensic biology, 520 First Ave, N.Y, N.Y. 10016, dated June 16, 2003. It reads as follows: the DNA of the semen donor from the vaginal swabs of Setula Cooper and Joe Little is the same as the semen donor from the fitted and flat floral sheets.

Bold letters: The DNA results in this case have been entered into the OCME local DNA databack. The DNA results have been entered into the national combined DNA indexing System (CODIS) SEE report dated July 16, 2001.

The analysis reads as follows:

The following sample(s) had an insufficient amount of DNA; therefore, the samples could not be typed:

Mons pubis swab from Joi Little, sperm fraction

The following sample(s) were extracted but PCR DNA typing was not performed:

Vaginal swab from Selina Cooper, swab remains fraction.

Vaginal swab from Joi Little, swab remains fraction.

The hair items from voucher A783401 were not examined The most likely DNA profile of the semen donor could not be determined at this locus.

upon concluding my disription of the 2 DNA analysis, Hon. Clancy ask me when I wanted to proceed to trial, and I stipulated that I wished to start tomorrow, March 29, 2011. Yet, Hon. Clancy informed me that the A.S.A, Ms. Botko was in another trial, so I requested that she pick another date, and when the date was stipulated, I renounced that date because the date and day was on a Friday, and because I am a Muslim, Friday is the day of Jummu'ah, the day for congregational prayer and worship for all Muslims all over the world.

upon hearing that information, Hon. Clancy again rescheduled another court date for mid-April 2011. However, the people exceeded that date, without reason, justification, not

(6)

with a rebuttal to the newly discovered evidence, or the submission of any evidence to refute the newly discovered evidence.

Thereafter, and because it is held that the double jeopardy clause did not permit the trial judge to reconsider the initial ruling of the newly discovered DNA evidence in favor of the petitioner when she considered rescheduling the court date to analyze the newly discovered DNA evidence for it's authenticity. Then, declared that it was authentic, Then rescheduled the court date for a date for petitioner to be questioned (engage in an colloquy) to determine whether his decision to proceed pro se was knowing and voluntary. Then, acknowledgeing that the oral presentation of the comparison of the two DNA results, from Paula Yates, forensic supervisor for cellmark in Germantown, Maryland - date March 14, 2000, no sperm found in Joi Little. And the DNA result from the OCME in New York, by chief med. examiner, Charles S. Hirsch, M.D., and Robert C. Shaler, Ph.D., Dir., sperm donor could not be determined at this locus - date June 16, 2003, on his oral request for a finding of not guilty, once the petitioner had rested his case, in anticipation of proceeding to trial:

1. The initial ruling was a judgement of acquittal for purposes of the double jeopardy clause.

2. Submission of the statement(s) and insufficient assimulated evidence to the jury had subjected petitioner to further factfinding proceedings, going to guilt or innocence, that were generally prohibited by the double jeopardy clause following an acquittal. See: Smith v Massachusetts, 543 US 462 (2005)

④

With respect to petitioner's conviction by A jury for murder 1° - 2 counts, After being Acquitted of RAPE 1°, Sodomy 1° And murder 2° - 2 counts - After the judge had purported to reverse An initial ruling, At the conclusion of the prosecution's case, when the petitioner had rested, And without rebuttal, nor Any resubmission of any evidence to the contrary, in favor of the petitioner, on his oral motion of newly discovered evidence, Along with the request to proceed pro se, under A state rule of criminal procedure, for A required finding of not guilty on RAPE 1°, Sodomy 1° or murder 2° - 2 counts - the double jeopardy clause of the federal constitution's 5th Amendment did not permit the trial judge to reconsider the initial ruling once the petitioner had rested his case, As:

1. The initial ruling on the newly discovered DNA evidence was A judgement of Acquittal for purposes of the double jeopardy clause. SEE: SMITH v MASSACHUSETTES, 543 US 462 (2005).

2. Submission of the statements, insufficient And Assimilated evidence, RAPE 1°, Sodomy 1° And murder 2° - 2 counts to the jury subjected petitioner to further fact-finding proceedings, going to guilt or innocence, that were generally prohibited by the double jeopardy clause following An Acquittal. MASSACHUSETTES supra

3. The case At bar did not meet the requirement for not applying the double jeopardy bar that the availability of reconsideration had been plainly established by pre-existing rule or case Authority expressly Applicable to midtrial rulings on the sufficiency of the evidence, for:

(5)

A. The facts of the newly discovered DNA evidence being submitted, analyzed, approved without any rebuttal or opposition, presented petitioner no reason to doubt the finality of the judge's initial ruling on petitioner's oral declaration and submission of the newly discovered DNA evidence. See: Smith v Massachusettes, 543 US 462 (2005).

B. The state had failed to show that under state procedure, as it existed at the time of petitioner's trial, the trial judge's initial ruling was automatically, or even presumptively nonfinal. See: Smith v Massachusettes, 543 US 462 (2005).

4. At most, the state made a showing, inadequate for purposes of the double jeopardy clause, that the judge's initial ruling was legally wrong on the basis that the prosecution's evidence was, as a matter of law, supposedly sufficient.

5. Pointedly, to be considered is: If the prosecutor had sought a short continuance at the time of petitioner's oral declaration, followed by the submission of the newly discovered evidence, then the matter could have been resolved satisfactory, before petitioner went forward with his case.

Double Jeopardy - Initial ruling as acquittal

For purposes of determining whether the double jeopardy clause of the federal constitution's 5th amendment permitted a trial judge to reconsider an initial ruling at the conclusion of the prosecution's case, in favor of petitioner's motion, under state rule of criminal procedure, for a required finding of not guilty on the charge(s) of rape 1°; sodomy 1° and murder 2° - 2 counts, the initial ruling was a judgement of acquittal as newly

discovered DNA evidence. SEE: SMITH r MASSACHUSETTES, 543 US 462 (2005).

Thereafter, on or about MAY 2011, a court date ensued and plaintiffs CPL § 30.30/30.20 Motions, U.S. Const. AMENDS. 6th, 14th right to speedy trial and prompt prosecution was accepted. Yet, because plaintiff, in haste and over zealousness, submitted two (2) Motions instead of one (1), and as an appreciated gesture, Hon. CLANCY, again adjourned the court date for two (2) MORE Months, to July 17, 2011 for consideration on the merit(s) of the CPL § 30.20, U.S. Const. AMENDS. 6th, 14th right to due process, speedy trial and prompt prosecution, pursuant to People r Singer, 405 NYS2d 17 (1978) Stating: The Court of Appeals has long held that unreasonable delay in prosecuting a defendant constitutes a denial of due process; People r Staley, 41 NY2d 789 (1977) Stating: An untimely prosecution may be subject to dismissal even though, in the interim, the defendant was not formally accused, restrained or incarcerated for the offense. Supra.)

As in the CASE AT BARE, where Murder 2° is charged, there is no Statute of Limitation. It is an understatement that 20 years in the delay of prosecution is untimely. The defense submits that this untimely prosecution is a result of an unreasonable delay on the part of the Bronx District Attorney's office. Furthermore, it was proven during trial that the prosecutor was unable to show good cause for the delay. However, their good faith reason is nevertheless belied by what appears to have been an utter lack of additional investigation. SEE: People r Lesiuk, 600 NYS2d 931 (1993); United States r Marion, 404 US 321-323; People r Anderson, 66 NY2d 529 (

⑩

Pointedly, Absent A sufficient showing of good cause, An unjustifiable delay may necessitate dismissal of the indictment even though no actual prejudice to the defendant is established. See: People v Singer, 405 NYS2d 17(1978); People v Staley, 41 NY2d 789 (1977); United States v Marion, 404 US 321; People v Prosser, 309 NY 353 (1955); People v Anderson, 66 NY2d 529, 537 (   ).

However, on July 17, 2011, Hon. Clancy Acknowledged the merits of the CPL § 30.20 motion, U.S. const. Amend's 6th, 14th right to due process, speedy trial and prompt prosecution, yet she stated for the record that: I Am Adjourning the court date until September 13, 2011, And I will render A decision on your CPL § 30.20 motion, U.S. const. Amend's. 6th, 14th right to due process, speedy trial and prompt prosecution.

Notable, is the fact, point and crux of plaintiff's argument — despite the prosecutor's lack of evidence, Along with the NINE (9) months of the initial ruling in favor of the plaintiff's newly discovered DNA evidence, for which the prosecution never objected, nor rebutted. Under A State rule of criminal procedure, for A required finding of not guilty on the murder 1°-2 counts, the double jeopardy clause of the federal constitution's 5th Amendment did not permit the trial judge to reconsider this initial ruling once plaintiff had rested his case, pursuant to A midtrial ruling that acquitted plaintiff of Rape 1°, Sodomy 1° And Murder 2°-2 counts. For under the double jeopardy clause of the federal constitution's 5th Amendment, A defendant Acquitted, once final, may not be considered on Appeal or

(41)

otherwise in any other proceedings. SEE: SMITH V MASSACHUSETTS, 543 US 462 (2005); PEOPLE V DESSIMONE, 23 MISC3d 402 (2009).

GIVEN that the STATE CRIMINAL procedure rule directed the trial judge to enter A finding of not guilty if the evidence was insufficient as a matter of law to sustain A conviction, An order entering such A finding met the definition of Acquittal that the UNITED STATES SUPREME court'S CASES had consistantly used, for such An order actually represented A resolution, correct or not, of some or all of the factual elements of the offense charged. SEE: SMITH V MASSACHUSETTS, 543 US 462 (2005); HANSEN, Body of Evidence, 81 ABA 5 60 (1995).

However, if the prosecution has not yet obtained A conviction, then further postacquittal proceedings to secure one are impermissible, as subjecting A defendant to postacquittal fact finding proceeding going to guilt or innocence violates the double jeopardy clause. SEE: SMITH V MASSACHUSETTS, 543 US 462 (2005); OSMAN V MASTRANTONIO CATERING, INC., 82 Ad3d 852 (2011).

Similarly stated in A parallel civil And criminal fact matter(s), when A defendant has failed to appear, plead or proceed to trial of An action reached And called for trial, or when the court orders A dismissal for Any other neglect to proceed, the plaintiff may seek A default judgement against him, if the plaintiff's claim is for A sum certain or for A sum which can by computation be made certain, Application may be made to the clerk within one year of the default. The clerk, upon submission of the requisite proof, shall enter judgement for the amount demanded in the complaint or stated in the notice served pursuant to subd(b)

of rule 305, plus cost and interest.

Thereafter, or even sooner, the court, with or without
a jury, may make an assessment or take an account of the
proof, or may direct a reference. When a reference is directed,
the court may direct that the report be returned to it for
further action, or except where otherwise prescribed by law,
that judgement be entered by the clerk in accordance with
the report without further application.

Presumably, in an action upon a contract where the
complaint demands judgement for a sum of money only, if
the answer does not deny plaintiff's claim but sets up a
counterclaim demanding an amount less than plaintiff's claim,
the plaintiff upon filing with the clerk an admission for the
counterclaim may take judgement for the excess as upon
a default.

Accordingly, the affirmation(s) of the prosecutor(s), the
Attorney General, the DMH, the cold case squad (defendant(s))
and the b.o.c. present, which was submitted, conspired, stayed,
continuously delayed, and adjourned without provocation, nor
an appeal to add for it's failure to appear or answer, or
demonstrate a justifiable excuse, or to prove a prima facie
showing, less than a conclusory assertion, that they did not
deviate from good and accepted practice, did not defeat the
presumption of physical abuse and excessive force, 10 cv 3345 (ALE)
(RSS) and malicious prosecution and deprivation of due process, 12
cv 6127 (ASN).

Justifiably, petitioner's conviction should be vacated, the
judgement dismissed, and motion for summary judgement granted.

(13)

SEE: JACKLOVICH & SIMMONS, 392 F3d 420 (2004); SCHROEDER & McDONALD, 55 F3d 454 (1995); JONES & BLANAS, 393 F3d At 930 (2004); WINEGARD & N.Y.U MED. CNTR., 64 N.Y.2d 851 (1985); DALCO MECH. SRVCS., & TOSCANI, 94 A.d3d 1214 (2012); DEMAN & MASTRANTONIO CATERING CO., 82 A.d3d 852 (2011); GRILLO & COUGHLIN, 31 F3d 53 (1994); BRADY & MARYLAND, 373 US 83 (1963); STEMLER & CITY OF FLORENCE, 126 F3d 856 (1997); C.T. KYLES & WHITELY, 514 US 419 (1995); ASSUREDLY, § RULE 3212 - MOTION FOR SUMMARY JUDGEMENT; RULE 3215 - DEFAULT JUDGEMENT, MCKINNEY'S.

Respectfully Submitted

x [signature]

[signature]

April 14, 2014

STATE OF NEW YORK   } ss.:
COUNTY OF CAYUGA
SUBSCRIBED AND SWORN TO BEFORE ME
THIS _19_ DAY OF _March_____, 20 _14_.
_David G. O'H___
    NOTARY PUBLIC
   STATE OF NEW YORK

DAVID G. O'HARA
Notary Public, State of New York
No. 01OH6233984
Qualified in Onondaga County
Commission Expires January 3, 20_15_



(14)

AS A MEANS of preservation, can you willfully make copies of all the submitted documents and return the material back to me, so that I will be in possession of my invaluable work and masterpiece.

Also, if you evaluate and conclude that I have been maliciously prosecuted and wrongly convicted, predicated on my legal efficacy, legal proficiency, persistance, timeliness, diligence within due diligence, along with my independence in research, transcription, chronological arrangements and tactical approach in proving my innocence, I would respectfully, with humility, appreciate your sponsorship with assisting me in getting an application, seeking an interview with the Character and Fitness Committee, who recently approved the application of formerly incarcerated, Mr. Weisner, for admission as an attorney, 943 NY2d 410 (1st Sept. 2012).

Also, I am in the process of formulating a N.Y. Proc. Law §440.20, to appeal my previous convictions by plea (3) because of the new evidence and information (Rosario/Brady/exculpatory) pursuant to: Tanner v Vincent, 44 Ad2d 170 (1974); People v Boston, 75 NY2d 585 (1990); People v Trueluck, 88 NY2d 546 (1996); People v Rivera, 24 Ad3d 367 (2005); People v Donnelly, 23 Ad3d 921 (2005); People v Mayo, 21 Ad3d 1316 (2005); People v McGregor, 44 Ad3d 1089 (2007); To be retroactively applicable to all cases in prosecution or appeal for statute applying harmless error analysis to alleged Rosario violations, as of it's effective date, February 1, 2001; McKinney's CPL §§240.45, 240.75 See: People v Sorbello, 285 Ad2d 88 (2001).

Appreciating your indulgence and effortless assistance in proving my innocence, so I can live a normal productive life.

## Resume

## Robert Fleming

LEGAL RESEARCH AND ORIENTATION

15-15 HAZEN St. E, Elmhurst, N.Y. 11370

Reference - Ms. Caterina Barone (347)-744-7432

Reference - Mr. Anthony Thompson (646)-823-1864

### Current Position:

Pro SE Attorney - Litigations, Legal Research Analyst, Motion Practice;
consultant, Mediation, Networking Specialist, Advocacy.
DNA, Forensics, Chain of Custody, Search And Seizure, Interrogation.
HIV/STI/Hepatitis Prevention Peer Educator, Facilitator, Counselor.

### Education:

December of 2013 - Comprehensive HIV/STI/Hepatitis Prevention Peer
Educator Training, A C R Health (Access Care And Resources for Health.
June of 2013 - Character, Fitness And Competence Fitness Committee for
Self Representation, Pro SE And Para Legal.
June of 2010 - Legal Research And Orientation Training, Para Legal
Training, Motion Writing And Formats, Hierarchy of the Courts.
December of 2004 - HIV/AIDS Education/Medication Adminstering,
Adherence, Public Speaking And Outreach/Confidentiality Law And Hipa.
June of 1996 - Laguardia community college - Education/Psychology.
June of 1986 - Marist college - Criminology/Sociology/Statistics
June of 1980 - G. E. D

### Special Skills

Litigations, writing, office Automation And transformation

### Free Time

Reading, taking long walks, Going to the Zoo, Being with my children.



# City of New York
## Department of Correction

# Certificate of Achievement

### This Is To Certify That:

## Robert Fleming

#### Has Successfully Completed

### LEGAL RESEARCH AND ORIENTATION

#### And is Awarded This Certificate In Evidence Thereof

June 9, 2010

_K.M.E. C/M_
DEPUTY COMMISSIONER OF PROGRAMS

_Signature_
GENERAL COUNSEL

# ACR HEALTH
Access Care and Resources for Health

Central Office (Syracuse)

627 W. Genesee St.
Syracuse, NY 13204
Telephone: 315.475.2430

Fax: 315.472.6515

Auburn
315.282.0005

Canton
315.386.4493

Oswego
315.343.7778

Syracuse
315.475.2430
Toll-Free
1.800.475.2430

Utica
315.793.0661

Watertown
315.785.8222

Toll-Free
1.888.475.2437

December 13ᵗʰ, 2013

Dear Robert Fleming:

This letter recognizes your attendance in course sessions of ACR Health Peer Educator Training an HIV/STI/Hepatitis prevention initiative.

**"Comprehensive Peer Educator Training"**

Attended ____35____ out of ____35____ hours

**This training included the following topics:**

- Defining Peer education and Advocacy
- Effective communication skill building
- Overview of HIV/AIDS, Sexually Transmitted diseases and A,B,C's of hepatitis
- HIV behavioral determinates and co-factors to HIV risk behaviors
- Prevention interventions
- Risk/Harm-Reduction strategies

**Congratulations on your achievement and welcome to our team!**

Erin Bortel
Director of Prevention Services

Serving 9 counties in the Central, Northern and Mohawk Valley Regions of New York State
Cayuga • Herkimer • Jefferson • Lewis • Madison • Oneida • Onondaga • Oswego • St. Lawrence

# CERTIFICATE OF COMPLETION

*PROUDLY PRESENTED TO:*

## Robert Fleming

For the successful completion of the

*Comprehensive HIV/STI/Hepatitis Prevention
Peer Educator Training*

Presented December of 2013

Drew Pearson
HIV Prevention Specialist

Dale Woolson
Program Supervisor

ACR Health



# RIKERS CON JOB

**WITH JAIL VIOLENCE OUT OF CONTROL, A BOGUS TASK FORCE ONLY MADE THINGS WORSE** **BY GRAHAM RAYMAN**

*Photograph by Mark Hewko*

A shadowy jail "violence reduction" unit linked to a top Corrections Department official is under investigation for falsifying reports, beating inmates, and violating department regulations, the *Voice* has learned.

The plainclothes unit, known as the "violence-reduction task force" or "special search squad," allegedly operated outside the rules, Correction sources say. The unit was not properly cleared to perform sensitive investigative work, and its members were improperly assigned to the unit and entered jails without following security procedures.

The city Department of Investigation is probing a range of allegations, including filing false reports about the discovery of a weapon at the Manhattan jail known as the Tombs and punitive beatings of inmates in the George R. Vierno Center and the West Facility on Rikers Island. One of those inmates suffered broken facial bones. *ME*

The DOC's Assistant Chief of Security, Eliseo Perez, who was involved with the unit, retired after being formally interviewed about his alleged role in a July 11 beating of an inmate in GRVC. (In an odd reversal last week, with the investigation still pending, Perez withdrew his retirement papers.)

Perez's boss, Deputy Chief of Department Carmine LaBruzzo, the man who formed the unit earlier this year, is also facing scrutiny. LaBruzzo is the second ranking uniformed official in the DOC behind Chief of Department Michael Hourihane.

LaBruzzo's top aide, Captain Gerald Vaughn, has been questioned, along with half a dozen other task force members. Several of them have refused to cooperate with the investigation unless they were given immunity from prosecution, sources say.

"[LaBruzzo] basically created his own rogue gang-intelligence unit out of people who never would have been cleared to do investigations,"





*Provided to the Voice by a Correction source*

Deputy Chief of Department Carmine LaBruzzo (center), Captain Gerald Vaughn (right), and Officer Edwin Slowly (left), at the post–Super Bowl parade in February, were all involved in the "violence-reduction task force."

## Rikers Con Job *continued*

a Correction source tells the *Voice*. "This is at a time when the real gang-intelligence unit has been cut by 35 percent."

Another member of the unit, Deputy Warden Turhan Gumusdere, was linked to allegations of a cover-up of inmate fights and use-of-force incidents last year in the Robert N. Davoren Center, the jail that houses teenagers. That cover-up is part of a separate probe.

Diane Struzzi, a spokeswoman for the Department of Investigation, declined to comment when asked about the investigations.

In response to a *Voice* inquiry, Correction Department spokeswoman Sharman Stein gave this statement: "The DOC cannot and will not comment on allegations that are in the process of being investigated. Moreover, *The Village Voice* should not draw conclusions about assertions that are in the process of being investigated and thereby compromise an ongoing investigation."

THESE INVESTIGATIONS come during a difficult period in Commissioner Dora Schriro's tenure. Slashings, fights, attacks on Correction officers, and staff uses of force are all on the rise this year. At least 40 slashings were officially recorded at Rikers in the first six months of this year, a rate double that of last year. There were 84 major assaults on inmates.

A federal investigation into violence and misreporting of fights and other incidents is ongoing, and a major class action lawsuit alleging widespread continued staff violence against inmates was recently filed. In part, that lawsuit alleges that Schriro promoted to senior positions staffers who have histories of encouraging excessive force against inmates.

Meanwhile, some of the worst slashings recorded this year have taken place in high-security areas, where inmates aren't even supposed to come in contact, much less possess weapons and attack one another. These incidents suggest breakdowns in security.

On July 9, at GRVC, inmate Corey Parron was slashed by another inmate, Donald White, in a high-security unit where inmates are supposed to be moved using mitts to cover their hands and enhanced

restraints. White had somehow obtained a titanium scalpel blade, which he used in the attack. (Titanium blades don't show up in magnetometer scans, so the jails have introduced body-imaging machines.)

"His whole face was hanging off," a Correction source says. "This is one of the worst slashings that's happened in a long time."

Meanwhile, a lawsuit filed last week alleges that inmate Dwaine Taylor twice suffered a broken jaw at the hands of Blood gang members in 2011, and those attacks were condoned by staff—a practice that DOC officials claim had been stopped.

The city was recently fined $10,000 by a federal judge for failing to turn over hundreds of gang-intelligence reports to lawyers for Kadeem John, a former inmate severely beaten on Rikers. A videotape that would have shown John's beating wasn't preserved, and the man responsible was released, even though Correction officials had a report that identified him within two days of the assault.



With violence up at the jails, Correction Commissioner Dora Schriro has had a rough year, and now she has to contend with more fallout over whether she can control her subordinates.

## A RIKERS OFFICIAL IS ACCUSED OF CREATING HIS 'OWN ROGUE GANG-INTELLIGENCE UNIT
### OUT OF PEOPLE WHO NEVER WOULD HAVE BEEN CLEARED TO DO INVESTIGATIONS.'

And now, the revelations about the rogue unit raise questions about Schriro's ability, in an already known for its minefield-laden political landscape, to keep her subordinates in line.

MOST OF THE members of the shadow unit had worked in the George R. Vierno Center with LaBruzzo, a former warden there.

In creating the unit, LaBruzzo bypassed personnel rules, Correction sources say. The jobs were never posted as required. The transfers were never formally approved, and they were improperly working outside of their official assignments.

Members of the unit—some of them facing disciplinary charges or investigations of their own—were not formally cleared to do investigative work. They walked into jails without getting prior approval and didn't, in some cases, even sign security logbooks.

When the unit tried to set up shop in the Rikers offices of the multi-agency gang/narcotics unit, known as High Intensity Drug Trafficking Areas, commanders there objected. HIDTA—which includes the NYPD, Nassau, Suffolk, parole, and probations—manages huge amounts of highly sensitive information and conducts interviews with confidential informants.

"They said: 'Who are these guys? Do you know how much classified information is in here?'" a Correction source says.

LaBruzzo is one of several high-ranking Correction officials "promoted to positions of increased responsibility" by Schriro, despite histories of excessive force, according to the Nunez class action lawsuit filed earlier this year by Legal Aid's Prisoners' Rights Project. "Between 1996 and 2003, LaBruzzo was charged with six use-of-force incidents," the lawsuit says.

There also have been allegations that when LaBruzzo was warden at GRVC, staff indulged in punitive beatings of inmates to keep them under control.

"The mantra was 'Hold it down. Hold it down,'" a Correction source says.

In February, Bronx prosecutors indicted one of LaBruzzo's aides at GRVC, Deputy Warden Edwin Diaz, for attacking an inmate who had punched a female officer in 2008, and then



## BRIGHTEN UP YOUR PARTY...
### with our festive party lights!

## JUST BULBS
### The Light Bulb Store.
## 212.888.5707
220 E. 60th St. (bet. 2nd & 3rd Aves.)
New York, NY 10022
www.JustBulbsnyc.com

Winner of the OTTV East Side Entrepreneur of the Year

### PARTY • DESIGNER • ANTIQUE • PLANT • CAR • ENVIRONMENTAL • MUCH MORE!

villagevoice.com | NEWS | MUSIC | CONTENTS | FEATURE | VOICE CHOICES | ARTS | EATS & DRINKS | FILM | MUSIC | VILLAGE VOICE | AUGUST 8–AUGUST 14, 2012

Multiple officers, allegedly possibly including Perez and Vaughn, then repeatedly punched and kicked his body and face.

Lightfoot was first taken to the clinic at GRVC, then to Bellevue Hospital, where he had surgery for facial fractures, including two fractured eye sockets and a broken nose. He transferred again to the North Infirmary Command, where inmates with serious injuries are held. Even though his family says he will need further surgery and the possible insertion of a metal plate, he is now at RNDC.

Meanwhile, the Correction staffers involved came up with their own claims about what led to the beating. They asserted that Lightfoot had cut an officer with a weapon of some kind, but people familiar with the incident view that claim with skepticism.

"First, they said he punched an officer with something in his hand, and then they said he got cut on his arm," a Correction source says. "It's a crock."

Lightfoot's brother, Kareem Burton, 35, tells the *Voice* that after the beating, he didn't get immediate medical care. Instead, Lightfoot, in extreme pain, was thrown into a GRVC cell for some time until he was finally treated. Burton says the family only found out about Lightfoot's injuries when a DOC staffer made an anonymous phone call

*[handwritten: my POINT EXACTLY]*
*[handwritten: PERJURY]*
*[handwritten: SAME THING HAPPENED TO ME !!! 2008)]*
*[handwritten: EXACTLY]*

papers and was replaced temporarily. But then he withdrew his retirement, even as the investigation continues.

Correction officers' union president Norman Seabrook says he backs Perez. "There appears to be no real leadership in managerial positions in the department, and Mr. Perez has always been a leader and someone you need," he tells the *Voice*. "This is someone who my members respect."

Seabrook said he believed the claim that Lightfoot assaulted an officer. "Whatever force was used to terminate the incident was necessary," he says. "I don't think there was excessive force used."

But Lightfoot's lawyer, Sanford Rubenstein, said the case is yet another example of why an outside monitor is needed. "After the killing of Christopher Robinson, and convictions of Correction officers in that case, now we have a serious issue involving this inmate beaten horribly," he says. "The fact that it is alleged that the assistant chief of security was instrumental in this beating gives even more reason for the Justice Department to appoint a federal monitor to oversee what goes on there. Obviously, the prison administration is not doing its job in keeping inmates safe."

Investigators are also looking into allegations of other beatings of inmates by the rogue task force, including inmate

## 'THEY AREN'T SAYING WHO WAS IN CHARGE.
## JUST SAYING A SPECIAL UNIT CAME IN, AND MY BROTHER GETS BEAT TO A PULP, AND NO ONE HAS ANSWERS.'



to them. When they called the DOC for more information, they were stonewalled.

"He could have died," Burton says. "He has boot marks on his face, his bone structure is messed up, his breathing, his back. They just disfigured him. You can't even recognize him."

Burton says the task force came into the facility without identifying themselves. "All they said was that it was a special unit, no names, no nothing," he says. "They aren't saying who was in charge. Just saying a special unit came in, and my brother gets beat to a pulp, and no one has answers."

Lightfoot filed a complaint with the Inspector General. The IG interviewed Lightfoot and formally interviewed members of the task force, including Perez. Perez put in his

*[handwritten: deliberate indifference]*

Askia Hinton, who was roughed up and threatened twice around the same time as the other incidents, once in GRVC and once after he had been transferred to the West Facility.

In the second beating, task force members entered the jail without formal permission and never filed a use-of-force report. Hinton has complained to the Inspector General about the alleged assault.

Hinton's mother, Tina, tells the *Voice* her son has repeatedly been targeted for beatings in the three years that he has been held at Rikers.

On July 11, Hinton was transferred from GRVC to the West Facility. In an account he gave to his mother, he said he was beaten up in GRVC and then punched in the head and the ribs after he arrived at the West Facility.

*[handwritten: proof]*
*[handwritten: proof x3]*



SUPERIOR DESIGN Associates    Delivering For The Trade    800 218.____

Entertainment Center Starting at $5,000    Bathrooms Starting at $15,000

Kitchens Starting at $25,000

KITCHENS · CABINETS · BATHS
BUILT-INS · LIBRARIES · WOODWORK
www.superiordesignassociates.com

East Village
Village Style
111 East 7th st btwn 1 Ave. + Ave. A
212 260 6390                                    1st Ave

NoRelation
204 1st Ave. btwn E 12th + E 13th
212 228 5201                                    1st Ave
Williamsburg 11211

Vice Versa
718 782 8847

Atlantis Attic
771 Metropolitan Ave btn Humboldt St + Graham Ave
718 218 8670                                   Graham Ave
Bushwick 11237

Urban Jungle
118 knickerbocker btwn Flushing Ave + Thames st
718 381 8510                                   Morgan Ave
Park Slope 11215

Vice Versa
550 5th Ave corner of 15th st

For the Best Authentic Vintage and Thrift in Manhattan and Brooklyn



**Rikers Con Job** *continued*

falsifying records to cover up the assault. Diaz's union has strenuously defended him, and Diaz pleaded not guilty.

In July 2011, Schriro assigned Deputy Warden Eric Ramos to run the Central Punitive Segregation Unit, even though he had previously been repeatedly accused of involvement in or ordering brutal beatings of inmates at GRVC, including a 2008 incident in which he allegedly ordered an inmate to claim his injuries were self-inflicted.

According to the Nunez complaint, Legal Aid lawyers wrote Schriro a letter last year "detailing Ramos's history of misconduct and admitted contempt for the department's written policy" and urged he not be transferred there. The Nunez complaint claims that following Ramos's appointment to the bing—or solitary confinement—inmate complaints about beatings and threats "increased dramatically." He remains in the post.

Schriro also promoted Mark Scott to Assistant Chief of Security before he was recently replaced by Perez for reasons that remain unclear. In 1997, Scott, as security captain in the bing, was suspended for 42 days for striking a prone inmate repeatedly with a baton "as though he were spear fishing." The Nunez complaint says.

The complaint says a city administrative judge found that Scott also failed to notify superiors about the incident and submitted a false report about the assault. Since then, he has been promoted several times to the highest reaches of the DOC.

In 2008, Scott was deputy warden at RNDC when 18-year-old Christopher Robinson was murdered as part of "The Program," in which the staff deputized gang members to keep order. That incident sparked a massive investigation of the practice and lead to indictments of four officers and a dozen inmates. But Scott was made warden at another jail, the George Motchan Detention Center, and then promoted again to assistant chief of security, under LaBruzzo.

Scott was replaced in that post two months ago by Eliseo Perez, who has been caught up in the investigation surrounding the task force.

Another member of the task force,

villagevoice.com

SOME OF THE WORST SLASHINGS RECORDED THIS YEAR HAVE TAKEN PLACE IN HIGH-SECURITY AREAS,

# WHERE INMATES AREN'T EVEN SUPPOSED TO COME IN CONTACT.



The slashing of Corey Parron, 21, the day before at a jail on Rikers Island triggered a visit from the task force, which led to the brutal beating of inmate Jahmal Lightfoot. Lightfoot had nothing to do with the slashing.

Deputy Warden Turhan Gumusdere, was in charge of security at RNDC last year—during the period when violent incidents were allegedly being covered up—and was a named defendant in the landmark Shephard class action lawsuit, which led to a court-appointed monitor in the jails.

Approximately seven other Correction staffers were assigned to the unit, including two pulled out of the depleted gang-intelligence unit.

ONE LEG of the investigation being conducted by the DOI involves alleged false reports filed by members of the task force that claimed they found a scalpel blade used in a particularly gruesome slashing in an ultra-high-security unit at the Manhattan Detention Complex, known as the Tombs.

Under the security setup in the unit—which contains some of the most violent people in the system—inmates are not supposed to have contact, and they are supposed to be moved with mitts and shackles. But somehow, two Blood sect leaders, Sean "Coolie Weezy" Henry and Elijah "Nuke" Mack, were able to get out of their cells and slash each other, suggesting a major security breach.

The task force showed up unannounced at the Tombs. Correction Department records show that on July 11 at 12:45 p.m., Violence Reduction Task Force Officer William Williams III claimed to have found a "scalpel blade wrapped in black electrical tape on the floor against the wall" in a vestibule on the ninth floor of the Tombs.

Correction sources say that, in fact, an inmate just entering the facility, Jarrett

Frost, admitted he had a scalpel, but not the one used in the slashing. Members of the unit, including Vaughn, seized the blade and then allegedly filed reports claiming they had found the weapon responsible for the slashing in a common area, sources and records show.

But an enterprising investigator and the jail warden checked the video. The video showed that the officer who claimed to find the blade never bent down and picked anything up.

Frost had just been sent to the facility and hadn't even been assigned a cell yet when he was searched by the task force, so that blade could not have possibly been used in the slashing, an attorney close to the case says.

"The task force were going around wherever they wanted to go and doing whatever they wanted to do," the attorney says.

The Inspector General ordered formal interviews of the task force members with their lawyers and began asking about how the task force came into existence. Frost also cooperated with the investigation.

IN ANOTHER INCIDENT linked to the controversial unit, members of the shadow task force were involved in the beating of robbery suspect Jahmal Lightfoot, 26, at GRVC on the evening of July 11. That incident centers on Assistant Chief of Security Eliseo Perez's alleged role in approving the assault.

According to Correction sources and records, the beating followed a slashing at the facility. Records show that inmate Donald White slashed Corey Parron on July 9.

Members of the task force arrived there and conducted a search. In his account, the five-foot-11, 150-pound Lightfoot claimed he was singled out during the search because his pants were hanging down. Captain Vaughn, he claims, began cursing the inmates.

There was some kind of verbal altercation, and according to a Correction source and one of Lightfoot's relatives, Perez told officers to take him in a room and "knock his teeth out."

Lightfoot says he then was taken into a holding pen and ordered to place his hands behind his head. An officer took a swing at him. He dodged the punch.

---



*...give me the Banjo!* ...Mark Twain

**mandolin bros.** mandoweb.com

629 Forest Ave • S.I. NY 10310 • 718-981-3585 • mandolin@mandoweb.com
COME SEE OUR LARGE SELECTION

GET BIKINI & SPEEDO READY FOR SUMMER
Non-invasive Body Slimming Laser
Lose 6-10 inches in 2 weeks...permanently
For men & women • Instant results in 2 weeks
Slimming to body parts at a time...in just 6 sessions

Painless $99 Intro (with plug of 6)

WE WILL BEAT ALL COMPETITORS BY 10% WITH AD PROOF

180 7th Ave South
FREE CONSULTATION
212-229-0399

**LASER UNLIMITED**
AS MANY AS NEEDED IN A YEAR!
$890 1 YEAR UNLIMITED
Full Leg, Brazilian, Full Arm, Back, Chest, or Full Face
$690 1 YEAR UNLIMITED
Bikini area, 1/2 Leg, Full Stomach, or 1/2 Arm
$499 1 YEAR UNLIMITED
Underarm, Sideburns, Lip, Chin, Shoulder, Hands, Feet
$899 1 YEAR UNLIMITED
FRACTIONAL: Reduce Acne Scars, Stretch Marks, Large Pores, Fine Lines

**THERMAGE CPT** 1 TREATMENT NO DOWN TIME
$899 ANY AREA
Tighten skin, reduce lines
$499
Eye lift, crow's feet reduction, eye bag reduction

VILLAGE VOICE  | MUSIC | FILM | EATS & DRINKS | ARTS | VOICE CHOICES | FEATURE | NEWS | MUSTO | CONTENTS |

AUGUST 8–AUGUST 14, 2012

## Rikers Con Job *continued*

Hinton, according to his mother, claims he was visited by LaBruzzo, Vaughn, and a third DOC staffer at the West Facility and threatened. "LaBruzzo tells him, 'This is what happens to guys who run their mouths,'" Tina Hinton says.

She adds, "They told him, 'You can stay here and take it easy, and we'll ease up on you, or else.'"

Tina Hinton says her son has been targeted for other intimidation and beatings since March 2010. Correction sources say Hinton is a gang member who has repeatedly gotten into trouble for fighting.

IN SPRING OF 2011, LaBruzzo promoted William Clemons to run RNDC, which has had a long and controversial history of fights and gang plaudits.

His Deputy Warden was Turhan Gumusdere, another member of the task force. He was in charge of security last year at RNDC, when there was a suspiciously sharp drop in the number of inmate fights, leading to an ongoing investigation into whether incidents were covered up. New information obtained by the *Voice* suggests it was more extensive than DOC officials have thus far acknowledged.

Gumusdere installed a captain and placed him in charge of what was called an "enhanced security detail" with three other officers. Holmes's job was to respond to inmate fights and downplay as much as he could, Correction sources say. In return, he got loads of overtime, about $45,000 in 2011.

Gumusdere then ordered the officer who tracked statistics to stop reporting inmate fights preceding a use of force. That further reduced the numbers. Instead of counting numbers for both inmate fights and the use of force in the jails, only the use of force was counted. Another Correction source says fights would be chalked up to "horseplay" or were simply unreported. Reports to central command were delayed. With no paperwork, it was harder to investigate, and the cases had to be closed, Correction sources say.

Suddenly, Clemons and Gumusdere reported decreases in inmate fights of 70 percent from May to November 2011. Schriro not only praised Clemons, but also gave him an award and promoted him to supervising warden. Gumusdere was also promoted and rewarded with a $124,000-a-year job in the tiny Punitive Segregation Task Force. The captain

assignment.

Clemons's successor, Raino Hills, came in from a training unit to helm RNDC. He started examining the reports and found that not only were fights not being reported, but also there were close to 200 uninvestigated uses of force, Correction sources say. Something like 50 to 100 fights per month were not being reported, the sources say. He refused to sign off on the numbers and instead went to the commissioner's office and reported his concerns.

Meanwhile, Hills brought in an Officer Benson to track violence, and the numbers returned to what they had always been—the status quo. (In recent months, a series of reforms in the jail has done much to legitimately reduce fights, but it took years to implement changes that had been proposed since Christopher Robinson's death.)

Investigators went in and confiscated the reports in question. Clemons and Gumusdere denied knowledge of any tampering with statistics.

Schriro promoted Clemons again to assistant chief in charge of administration, even with the cloud of a pending

*[handwritten margin note:]* Official supervisory deliberate indifference encouraging egregious conduct, behavior and practices...



Jahmal Lightfoot's mother, Margaret Burton Lightfoot, 57, holds a photograph of her son, who was badly beaten by Correction staff last month.

*[handwritten margin note:]* This is the crux of my claim of police abuse excessive force, false reporting or not at all

investigation above him.

Meanwhile, a group of Correction captains had to be transferred out of RNDC because of, sources say, a series of questionable uses of force.

"It was such a disaster, they had to move a lot of captains, and yet the commanding officer got rewarded with two promotions by Schriro," a Correction source says.

DOC spokeswoman Sharman Stein said a report on the alleged downgrading of fights at RNDC is not yet completed. She added, "However, it is clear that the number of fights among adolescents did decrease during the time in question."


*[handwritten:]* continued

Photograph by C.S. Muncy

DD5#
November 8, 1989

42ⁿᵈ Precinct
Det. Denton
Det. O'Malley
(BXHT)

This appears to be the first time that BESSIE TALLY is interviewed by police. BT states in sum and substance that he was at SELINA COOPER's apartment together with TONY BAYLOR and DEREK SMITH aka Head Moe (whom BT had picked out of a photo array the previous day) in the early morning hours of February 29, 1988. Talley states that he was smoking "reefer" and SC, TB and DS were smoking crack. At some point SC went to get daughter JOI LITTLE. When she came back, she and JL went into SC's bedroom to "put their nightgowns on." At some point, TB and DS went into the bedroom where SC and JL were. BT peeked into the room and saw SC and JL on their backs with their gowns around their necks. Neither one was moving. BT believes that they were dead. Observed TB having sex with SC and DS sexually assaulting JL and tying her up with a sheet "or something." SC's legs were "wide open." DS ran out of the bedroom past BT. BT left (it was starting to get light), BT went to work (he was the building Super?). Saw TB at approximately 8:00 am. Hadn't said anything earlier because he was afraid of TB.

- Never mentions that ROBERT FLEMING (or anyone else) was present

- Account corroborated by crime scene photos:

  Nightgowns
  Tied-up
  On backs with legs spread

• Other witnesses:
  Walter Murphy,
  Coreena —
  _____

**DD5#48**
**November 16, 1989**

42nd Precinct
Det. Denton
Det. Carley

BESSIE TALLY initially gives a statement, which is consistent with his earlier version of events. However when confronted with an apparent inconsistency regarding time, BT recants his earlier statement and states that he was never in Salina's apartment and his prior statement was a lie. Claims he had heard what had happened from people in the street (however he was unable to identify who those "people" were).

The police are clearly skeptical that BT was lying because BT had given details in his prior statements, which would have presumably been unknown to the public. The police ask if BT has been threatened by anyone. BT says no but that he "was scared."

- If police had really believed that BT had lied, why subsequently visit him (in NC) in 1998, 2000 & 2002.

**DD5#108**
**April 14, 1998**
BT residence, NC
Det. Principe
Inv. O'Malley

States that TB had told him what had occurred and then threatened him. After the threat, BT left New York.

DD5#181

April 23, 2002

**VIDEO STATEMENT**

Henderson, NC
Det. Harrison
Det. Kaplan
CCAS

BT appears sober, lucid and calm. States that he had known TB for several years b/c Baylor's aunt lived in 1690 Longfellow Avenue. On the date in question, he was at SC's apartment with TB and SC. States that SC went to get JL and at some point DS arrived at the apartment (this is different than BT's original statement where he states that he met up with DS and TB before going to SC's apartment).

Consistent that he was in the living room and TB and DS were in the bedroom. Peeked in and TB on top of Selina and DS fondling JL's vagina. SC was screaming.

Confronted by TB the next day/morning but not intimidated. Willing to cooperate futher/

- See DD5#176, Interview of Walter Murphy (BT told WM explicit details the morning after the murders.

**DD5#174**
**April 25, 2000**
Det. Mounts
Det. Margie Yee
BT residence, NC

Admits that he *was* in fact in SC's apartment when she was killed (in the living room) and adopts his 1989 statement. Gives an additional oral statement which is essentially consistent with the 1989 statement. Notes that TB's pants were not pulled down nor did he see his penis.

Advised that he had lied to police during the second interview and told then that he was not present during the murders because TB had threatened to kill him if he spoke with police. Had also threatened him when they left the apartment after the incident.

A short time later, BT moved down South. Stated he was willing to cooperate with the investigation and come back to New York if necessary.

- See DD5#17c Interview of Walter Murphy (BT told WM explicit detail the morning after the murders after the Could explain lack of TB DNA evidence

**DD5#179**
**February 12, 2002**
Det. Harrison

Det. Spoke with BT by phone. BT stated that he remembered the incident and reiterated the statement given above in DD5#174. Stated he was willing to come to NY to speak with ADA Borko.



US POSTAGE PITNEY BOWES

$ 002.87°
ZIP 13021
0001387039 APR 18 2014

AUBURN CORRECTIONAL FACILITY



USM SDNY P3



PRO SE OFFICE
APR 2 1 2014

Robert Fleming
13-A-4172
Auburn Corr. Fac.
P.O. Box 618
Auburn, New York 13024



To: Southern District of New York
500 Pearl Street, Room 200
New York, N.Y. 10007