h1p2fle1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     ROBERT FLEMING,
 3   13-A-4172
     Attica Correctional Facility
 4   Box 149
     Attica, NY 14011-0149
 5
                    Plaintiff,              New York, N.Y.
 6
              v.                            10 Civ. 3345(KPF)
 7
     CITY OF NEW YORK,
 8   NEW YORK CITY POLICE DEPARTMENT,
     "COLD CASE SQUAD,"
 9   DET. WENDELL STRATFORD #3420,
     DET. BRACCIN #4305,
10   DET. STEVE BRACCINI #4305,

11                    Defendants.
     ------------------------------x
12                                          January 25, 2017
                                            9:00 a.m.
13
     Before:
14
                      HON. KATHERINE POLK FAILLA,
15
                                            District Judge
16                                           and a Jury

17
                            APPEARANCES
18
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
19        Attorneys for Plaintiff
     BY:  TOBY E. FUTTER
20        STEPHEN SCHWEIZER
          ANDREW R. DUNLAP
21
     ZACHARY W. CARTER
22        Corporation Counsel of the City of New York
     BY:  PETER J. FOGARTY
23        DANIEL L. PASSESER
          Assistant Corporation Counsel
24

25   ALSO PRESENT:  KORTNEY TETRO, Paralegal, Quinn Emanuel
```

h1p2fle1

1         (Trial resumed; jury not present)

2         THE COURT:  Good morning, everyone.  I understand that

3    there is an issue the parties want to bring to my attention

4    before we bring the jury out, so --

5         MR. FOGARTY:  Yes, your Honor.  Good morning.

6         THE COURT:  Good morning.

7         MR. FOGARTY:  Plaintiff's counsel, Mr. Futter,

8    contacted us last night about in some of plaintiff's exhibits

9    of the photographs there are white pieces of paper that are

10   covering locks that were at the request of the Department of

11   Corrections, and he wanted to reference that in his closing.

12   We ask if your Honor could put that into the record as a

13   stipulation, and we have agreed on language.

14        THE COURT:  May I please have the language on which

15   the parties have agreed or is that in the --

16        MR. FOGARTY:  No, no, it's been agreed to.

17        THE COURT:  Where?  In what medium?

18        MR. FOGARTY:  In an e-mail on my phone, your Honor.

19        THE COURT:  Okay.  I think by now you are familiar

20   with our chambers' e-mail.  Why don't you e-mail it to us, and

21   we will retrieve it.

22        And I am understanding as well, Mr. Fogarty, that the

23   stipulation that is on page 4 of the joint pretrial order is

24   the other item that I am to be reading to the jury this

25   morning, is that correct?

h1p2fle1

1          MR. FOGARTY:  Yes, your Honor, that is in reference to

2     the cameras, yes.

3          THE COURT:  That is that one.  And I will also advise

4     the jury, pursuant to the parties' agreement last night, that

5     Detective Braccini will be joining us late because of a

6     work-related obligation he has this morning.

7          MR. FOGARTY:  Thank you very much, your Honor.

8          THE COURT:  Inasmuch as I was asked to read the

9     stipulation regarding the cameras, may I also read the

10    stipulation regarding the white pieces of paper?

11         MR. FOGARTY:  Oh, absolutely.  We want you to read

12    that stipulation.

13         THE COURT:  I am capable of doing that.

14         MR. FOGARTY:  Thank you.

15         THE COURT:  I shall do that.

16         Additionally, Mr. Dunlap, if you say pause, I will do

17    that, but are you prepared to discuss the verdict form or not?

18         MR. DUNLAP:  Your Honor, Mr. Futter has just informed

19    me via e-mail he expects to be here at five past nine.  If your

20    Honor would like to discuss the verdict form, I can do the best

21    I can.  I think it would be preferrable to wait five minutes,

22    if it won't terribly inconvenience the court.  I apologize for

23    the slight delay.

24         THE COURT:  The other alternative, of course, is that,

25    after the summations and after the jury charge, we can take the

h1p2fle1

1    five minutes then, assuming there aren't thousands upon

2    thousands of proposed corrections to the verdict form, and deal

3    with it then.

4            MR. DUNLAP:  That will be fine as well.  My

5    understanding, as a practical matter, is that we don't have

6    many, if any, changes to discuss.

7            THE COURT:  Let's hope it's not many.

8            MR. DUNLAP:  But I would like to verify that with

9    Mr. Futter before I make a final representation.

10           THE COURT:  Why don't we do this:  If we understand

11   that your concerns or changes are in the nature of being small,

12   let's not interrupt further the progress of trial.  Let's let

13   the defense put on whatever case they put on, me read my

14   stipulations, we will do the summations, I will do the charge,

15   and then we will just take five minutes and we will just send

16   in to the jury the verdict forms a few minutes after they

17   begin, because it is my expectation they will not begin

18   immediately.  They have to deal with the issue of the

19   foreperson, they may want to stretch their legs or things of

20   that nature.

21           MR. DUNLAP:  That's fine with us, your Honor.

22           THE COURT:  If there is something more substantive,

23   you all will let me know.

24           MR. DUNLAP:  Yes, your Honor.

25           THE COURT:  Anything else we should be discussing

h1p2fle1

1    today?

2            MR. DUNLAP:  Not from the plaintiffs.

3            THE COURT:  Mr. Passeser, yes.

4            MR. PASSESER:  I was just going to say nothing, your

5    Honor.

6            THE COURT:  I thank you for that.  Mr. Dunlap, may I

7    see you for a moment, please?

8            MR. DUNLAP:  Yes, your Honor.

9            (Recess)

10           MR. FUTTER:  Mr. Fleming wanted to address you.

11           THE COURT:  Mr. Fleming, yes sir.

12           MR. FLEMING:  Good morning, your Honor, court clerks

13   and staff, and the officers who brought me here, I apologize

14   for my two outbursts, and I humbly appreciate your accepting me

15   to come back with the representation of my counsel.

16           THE COURT:  Thank you, sir.  And I know there won't be

17   another outburst, because you know the consequences.

18           MR. FLEMING:  Yes, ma'am.

19           THE COURT:  Okay, sir.  We are in the home stretch for

20   both of us.  Thank you very much.

21           THE DEPUTY CLERK:  All rise, please.

22           (Recess)

23           (Continued on next page)

24

25

h1p2fle1

1          (Jury present)

2          THE COURT:  Please be seated.  Thank you very much.

3          Ladies and gentlemen, you will remember that at the

4     end of the trial day yesterday, the plaintiff rested, and we

5     addressed some legal issues.  I have just a few housekeeping

6     and legal matters to bring to your attention this morning.  I

7     will begin with the housekeeping matters.

8          Detective Braccini, one of the defendants in this

9     case, has a preexisting work commitment this morning.  He will

10    be joining us late.  But I didn't want you to be delayed

11    because of his work commitments.  So he understands, and he

12    will join us with this matter in progress.

13         Also, at the beginning of the trial, I mentioned to

14    you that evidence came in in one of three ways.  One way was by

15    the testimony of a witness, the second way was by exhibits that

16    are introduced and received into evidence, and the third way is

17    what I called stipulations.  And you may have heard the term

18    before, but in this context what I mean is an agreement between

19    the parties that certain facts are true.

20         There are two stipulations that the parties have

21    agreed to that I am going to read to you right now, so I will

22    just ask for your attention as I do that.  And if I am not

23    making eye contact with you, it is because I want to make sure

24    I read the stipulation precisely right.

25         So here is the first:

1              At the time of the interrogation, there were no

2    cameras in any of the George R. Vierno Center counsel visit

3    rooms nor any cameras in the George R. Vierno Center counsel

4    visit area that would capture someone entering or exiting that

5    area.

6              That is stipulation one.

7              Stipulation two is the following:

8              The parties stipulate that the white pieces of paper

9    in the photographs taken in January of 2017, comprising

10   plaintiff's exhibits, are covering locks, and they were placed

11   before the photos were taken at the request of the Department

12   of Correction in response to security concerns.  So if you are

13   wondering what those papers were, that's what they were, and

14   that's why they were posted.

15             Mr. Fogarty and Mr. Passeser, the defense case,

16   please.

17             MR. PASSESER:  The defendants will adopt the testimony

18   of Detective Braccini and Detective Stradford given on

19   plaintiff's case and rest.

20             THE COURT:  Thank you very much.

21             All right.  Ladies and gentlemen of the jury, the

22   parties have rested.  The evidence is all before you, and the

23   next phase of the case are the summations of the parties.  And

24   the way that that proceeds is that you will first hear from the

25   defense and then you will hear from the plaintiff, and that is

h1p2fle1                    Summation - Mr. Passeser

1    because the plaintiff has the burden of proof in this case.  As

2    I mentioned to you earlier, these are designed to assist you in

3    piecing together the evidence, but these summations are not

4    themselves evidence.

5            So, with that, Mr. Passeser, at your leisure.

6            THE COURT:  Good morning.

7            MR. PASSESER:  This did not happen.  You know it

8    didn't happen because it wouldn't have made sense for the

9    detectives to do it, it wouldn't have been possible for the

10   detectives to do it, and it isn't supported by a single shred

11   of medical evidence.

12           I am going to get into each of those individually;

13   but, before I do, I just want to remind you, as the judge just

14   did, that if it is a tie and you are not sure who to believe,

15   then it is a defense verdict, because the plaintiff has the

16   burden of proof.

17           Now, I am going to start with the detectives'

18   motivations.

19           These detectives had no interest in going to

20   plaintiff's side of the counsel visit room.  The last thing

21   they wanted to do was get in the same room with him.  They

22   already had been told that he was HIV positive, that he had

23   tuberculosis, that he was a spitter -- which they understood to

24   mean that he had spit at inmates or correction officers in the

25   past -- he had a cup of his own urine in there, and both

1    detectives had told you that they had had inmates throw urine

2    at them in the past.  Both detectives were more interested in

3    getting home without plaintiff's spit and urine on them than

4    they were in getting a confession.  And what they definitely

5    didn't want was to get plaintiff's blood on them because he was

6    HIV positive.  And when you hit somebody repeatedly in the

7    mouth to the point where you are knocking their teeth out, you

8    are very likely to get their blood on you.

9            Moreover, these detectives had a lot to lose if they

10   went in there and beat the plaintiff.  They both had very

11   impressive careers with the NYPD.  They had been promoted all

12   the way to first grade detective, which you heard is a rank

13   achieved by only a few hundred detectives in the whole city.

14   Detective Braccini was also being vetted by the F.B.I. for a

15   position while this interrogation was going on, so if they had

16   been -- if they had gone in there and used force on the

17   plaintiff, they would have been jeopardizing their careers,

18   possibly risking jail time, and all for what?  Why would they

19   do that?  They certainly would have been caught.  There was a

20   correction officer there the entire time watching, and they are

21   not going to let these detectives beat up one of their inmates,

22   because that would give risk liability for them.

23           So it simply doesn't make sense that the detectives

24   would go and do this.  These are experienced detectives who had

25   interrogated hundreds of suspects over decades.  Plaintiff

1   wants you to believe that they lost their cool, somehow got

2   over to plaintiff's side of the room, beat him, risking

3   everything, because he asked for a lawyer.  They both told you,

4   they have had plenty of suspects ask for lawyers.  This is part

5   of the job.  Do you think they were so offended by a request

6   for a lawyer that they knocked a man's teeth out?  They had far

7   too much to lose and not nearly enough to gain by doing

8   something like that.

9            So next let's talk about how it simply wasn't possible

10  for them to have done this.  There is a locked gate separating

11  the two sides.  You can see it in the photo of Defendant's

12  Exhibit F that was taken at around the time of the incident.

13  You can see the gate right over here on the corner.  And in

14  Plaintiff's Exhibit 5, taken more recently, you can all see the

15  exact same gate, with this piece of paper covering the lock,

16  separating one side of the room from the other.  So for the

17  detectives to have gotten over to the other side, a correction

18  officer would have had to unlock that gate and let them

19  through.

20           Now, you heard plaintiff testify that he was permitted

21  to walk down to the counsel visit area unescorted, and the

22  reason he was permitted to do that is because of this locked

23  gate.  If it didn't exist and inmates were walking around on

24  this side unescorted, they could just walk out of the prison.

25  This side of the gate, the counsel visit room, where the

1    visitors come in, where Detective Braccini and is

2    Detective Stradford came in, you can exit the prison from

3    there.

4            So why would the correction officers unlock that gate,

5    risk liability for themselves, to allow these detectives to go

6    to the other side and beat an inmate?  You would have to

7    really, you would have to really believe, if you want to

8    believe plaintiff's version, that the correction officer who

9    let them through and didn't mention anything about this beating

10   happening, is in on this conspiracy to cover up this incident.

11           Third, if it did happen the way plaintiff said it did,

12   there would be medical evidence.  Plaintiff's entire medical

13   file from Rikers Island is in evidence, and you can look

14   through that in the jury room if you would like, but you saw

15   some excerpts from it throughout the trial.

16           You saw that plaintiff saw a psychologist for

17   treatment on October 28, 2008, five days after the incident,

18   and never complained of any injuries.  That's D332 if you want

19   to look at it in the jury room.

20           You also saw that he saw a doctor on October 30, 2008,

21   a week after the incident, to get his medication, and at that

22   time he did have a complaint.  He complained of difficulty

23   reading and was referred to an optometrist.  But, again, no

24   mention of a busted lip, no mention of loose teeth, no mention

25   of facial swelling or bruising.

1          Finally, you saw that he saw a doctor a month after

2     the incident on November 23, 2008, and that's D333 -- I'm

3     sorry, that's D415, and he had, quote, no complaints.

4          He was never diagnosed with any injuries from this

5     incident.  There is no reference to any injuries from this

6     incident in any of his extensive medical records, unless you

7     want to count an unspecified wound care from seven months later

8     in May.

9          So of course the explanation for that from plaintiff

10    is, well, all the doctors and nurses on Rikers Island, they are

11    also in on this conspiracy to cover it up.  So now we have got

12    the police officers, the correction officers, and months of

13    doctors and nurses not mentioning this incident.

14         But we are not done.  Let's look at all the different

15    versions of plaintiff's version of events that he told.

16         He didn't even mention anything about his teeth the

17    first time he filed this lawsuit, and then later it became a

18    bridge, and then later it was his top and his bottom teeth that

19    were missing; or, you could choose to believe that he didn't

20    say that or that that was a typo in his handwriting when he

21    said bottom teeth.  And then later at the deposition he said he

22    also had a broken face, or you could believe his version that

23    he never said that and the court reporter is also in on this

24    conspiracy trying to cover this up by mistranscribing what he

25    said.

1              Every time he tells a story, it changes -- no, I'm

2      sorry.  He testified it doesn't change, it just varies, and

3      that's because this did not happen.

4              There is no chance that the plaintiff went to the

5      clinic a week after the incident with a broken face or loose

6      teeth or a busted lip and it is not reflected anywhere in the

7      medical records.  There is no chance that when he saw a

8      psychiatrist five days later he never mentioned that he had

9      just been beaten up by two detectives who came to interrogate

10     him.

11             Now, look, the reason I am focusing on the fact that

12     his alleged injuries are not supported by the medical evidence

13     is not just because the lack of medical records prove that it

14     didn't happen -- though it does -- it is important to realize

15     that his testimony at the deposition about having a broken face

16     or his writing a complaint saying he lost his top and bottom

17     teeth, it's important to realize that those things aren't true

18     because it shows he is willing to lie to you; and if he is

19     willing to lie to you about the nature and extent of his

20     injuries, why wouldn't he been willing to lie to you about what

21     happened that day?  And that's exactly what he did.

22             I spent enough time on why the alleged beating didn't

23     happen.  I want to talk for a second about plaintiff's

24     testimony that he signed a blank piece of paper about

25     two-thirds of the way down on the page and that the detectives

1    then fabricated seven pages of handwritten notes to put on top

2    of it, then the plaintiff -- the notes happened to end right

3    before plaintiff's signature which happens to be about

4    two-thirds of the way down the page.

5         Plaintiff is asking you to believe the most

6    complicated, convoluted version of events, when a much more

7    simple explanation exists.  Plaintiff wants you to believe that

8    two NYPD detectives, with over 50 years of combined experience,

9    lost their cool when a suspect asked for a lawyer, beat him,

10   risked getting HIV and tuberculosis, and then got correction

11   officers, medical personnel, and a court reporter to all

12   participate in covering it up.

13        But that's not the truth.  The truth is that

14   Detectives Stradford and Braccini never hit the plaintiff.

15   They never even touched the plaintiff.  They were never in the

16   same room as the plaintiff, and they never wanted to be.

17        Thank you.

18        THE COURT:  Mr. Futter.  Thank you.

19        MR. FUTTER:  Ladies and gentlemen:

20        Thank you again on behalf of Mr. Fleming for your time

21   and for your attention.  What you are doing is such an

22   important job.  Two days ago, before you really knew anything

23   about the case, I stood here and I told you that you would hear

24   evidence that told you where Mr. Fleming was beaten, when

25   Mr. Fleming was beaten, who beat him, how he was beaten, and

1    why he was beaten.  I also told you that you would hear about

2    Mr. Fleming's physical and emotional injuries.

3              When I am finished, the judge will instruct you on the

4    law and you must follow the judge's instructions, but what I

5    believe her Honor will tell you is that Mr. Fleming's claim for

6    excessive force against Detective Stradford is proven if it was

7    more likely than not that Detective Stradford beat Mr. Fleming

8    and that beating caused Mr. Fleming's injuries.

9              What I believe her Honor will also tell you is that

10   Mr. Fleming's failure to intervene claim against

11   Detective Braccini is proven if you find that it was more

12   likely than not that Detective Stradford beat Mr. Fleming and

13   Detective Braccini was there.  He could have said something or

14   done something, basically try to intervene in any way.

15             I am going to take you through the evidence using a

16   series of quotes.  I have some copies here for the jury.

17             Permission to pass.

18             THE COURT:  I would like to see the document before it

19   is passed to the jury, and I would like you to show it to the

20   other side, please.  Thank you.

21             (Pause)

22             THE COURT:  Sir, you are representing these are

23   excerpts from the trial transcript in this case?

24             MR. FUTTER:  I am, your Honor, from the transcript,

25   your Honor, or from the exhibits themselves.

1          MR. PASSESER:  Your Honor could we have a sidebar?

2          THE COURT:  Yes.

3          (At the sidebar)

4          MR. PASSESER:  We were told there would be no

5    demonstrative exhibits, and I have never seen this before.  It

6    is many pages long, 59 pages long, and I have not had an

7    opportunity to review any of it.

8          MR. FUTTER:  I am not sure that we agreed that there

9    were no demonstrative exhibits.  What we agreed yesterday was

10   that there would be no summaries or charts.  These are neither.

11   These are simple slides from the transcript or copies of

12   exhibits.

13         THE COURT:  We are going through them now.

14         The first page is okay.  The second page is okay.  The

15   third page is okay.  The fourth is okay; the fifth; the sixth

16   and seventh; the eighth and ninth; the tenth and eleventh; the

17   twelfth, not.  You are putting in your opening statement?  When

18   did that become evidence in this case?

19         MR. FUTTER:  That's defendants' opening statement.

20         THE COURT:  Why are you doing that?  I told the jury

21   that statements of counsel are not evidence.

22         MR. FUTTER:  I am not intending this to be evidence.

23   This is merely what defendants told you they would show.  They

24   have not shown what they told you they would show.  We do the

25   same thing with the plaintiff's opening statement.  We say,

1    this is what we told you that we would show, and this is how we

2    showed it.

3              THE COURT:  Mr. Passeser?

4              MR. FUTTER:  Just one further point, your Honor.  It

5    goes immediately to the burden of proof.

6              MR. PASSESER:  If you give a document to the jury, I

7    think they will interpret it as evidence.

8              MR. FUTTER:  We are okay not giving this to the jury.

9    It is not intended to be evidence for them to consider during

10   jury deliberations.  We can take it back from them.  The only

11   reason they might want it temporarily, if they are taking

12   notes, they may want to record the details of where they can

13   find this evidence -- evidence, again -- or these references in

14   the transcript again.

15             MR. PASSESER:  I just said that same thing again in

16   summation.  You just can't say, Defendants just told you.  You

17   have to give them the thing.

18             MR. FUTTER:  I will be here referencing what you just

19   said, as well, and saying, You have just heard X.  In fact, Y

20   is the case.  I will be referencing both their opening

21   statement and the statement Mr. Passeser just made in closing.

22   My argument for doing that is that they have not done what they

23   are telling them that they have done, and here is the evidence

24   showing why they have not done what they told you they have

25   done.  It's directly to burden of proof.

1           THE COURT:  The point, sir, is I think you had a very

2      parsimonious construction of charts and summaries.  If you were

3      going to do this, you should have let us know yesterday.  We

4      are delaying the jury because of it, which is not appreciated.

5           MR. PASSESER:  The issue, again, on 23, is another

6      excerpt from defendant --

7           MR. FUTTER:  Yes.  There are perhaps three references

8      to their opening statement.  Each time we will say, Defendants

9      promised you they will show x.  They haven't shown X.  Here is

10     why.

11          THE COURT:  I will allow 13, 14, 15, 16, 17, 18, 19,

12     20, 21, 22, 23 -- sir, how are you going to get through this in

13     30 minutes?

14          MR. FUTTER:  That was an estimate yesterday.  I

15     believe it is probably more like 35 at this point.

16          THE COURT:  All right.  Because I will be cutting you

17     off, based on your representation, as we get to 35, just so you

18     know that if it starts trending towards 40, because this is

19     what you committed to me yesterday, sir.

20          MR. FUTTER:  Can we agree, your Honor, it is 35 when I

21     resume?

22          THE COURT:  Yes.

23          24, 25, 26, 27, 28, 29, 30 and 31, 32, 33, 34, 35, 36,

24     37, 38, 39, 40.  I don't appreciate my questions being used.

25          MR. FUTTER:  Noted, your Honor.

h1p2fle1                         Summation - Mr. Futter

1              THE COURT:  41, 42.

2              Again, I don't appreciate 43 either.

3              MR. FUTTER:  I wasn't aware, your Honor.  My

4    apologies.

5              THE COURT:  That's not acceptable right now.

6              44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56,

7    57, 58, and 59.

8              But, let's be clear, I don't know how you are going to

9    get through this in 35 minutes.

10             MR. PASSESER:  Can I clarify if there are any other

11   demonstrative exhibits that plaintiff intends to use?

12             MR. FUTTER:  I have an enlarged version of one of the

13   exhibits, an enlargement, no other alteration.

14             MR. PASSESER:  That's it?

15             MR. FOGARTY:  This is being allowed for the jury to

16   see or to just read?

17             THE COURT:  I will let them have it during the

18   address, but I am reminding them that this document, this

19   itself, is not evidence, and you are taking it back when it is

20   done.

21             MR. FUTTER:  Yes, your Honor.  It is intended solely

22   as an *aide-mémoire*, so they can reference it.

23             THE COURT:  The point is, sir, that there is a charge

24   that is given for things like that, and I would have given them

25   a charge if only you had told us that you were planning to do

h1p2fle1                    Summation - Mr. Futter

1    this.

2              MR. FUTTER:  Yes, your Honor.

3              MR. PASSESER:  Thank you.

4              THE COURT:  Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

h1p2fle1                         Summation – Mr. Futter

1            (In open court)

2            THE COURT:  Ladies and gentlemen of the jury, thank

3    you for your patience.  We had some issues to address at

4    sidebar.

5            Counsel, you may proceed.

6            MR. FUTTER:  Your Honor, I have the time as 10 to 10.

7            THE COURT:  Yes, sir.

8            MR. FUTTER:  Ladies and gentlemen, yes, thank you for

9    your patience.

10           I believe I was just explaining that I have some

11   slides here.  Her Honor is going to instruct you regarding the

12   appropriate use of those slides.  I am going to be referring to

13   them, because what these slides contain are references to the

14   transcript or to exhibits.

15           THE COURT:  And let me just remind the jury that while

16   evidence can consist of testimony and exhibits, the actual

17   document that I am holding in my hand right now is not itself

18   evidence.

19           Thank you.

20           MR. FUTTER:  So when was Mr. Fleming beaten?  There is

21   no real dispute about this.  Mr. Stradford's cross-examination,

22   page 21, he admitted that he went to Rikers on October 23.

23           The Braccini cross-examination, page 152 -- and,

24   please, if you do want to take notes of any of these so you can

25   go back and find them in the transcript, feel free.  Braccini

h1p2fle1                    Summation – Mr. Futter

cross-examination, page 152, he admitted that, on October 23,

with Detective Stradford, he went to Rikers.

Detective Stradford also admits that he had set up an

alert so that he would know as soon as Mr. Fleming was

arrested.  You can see that if you look at the Stradford

cross-examination, page 24.

Defendants also don't deny which room they were in.

If you look at Plaintiff's Exhibit 3, you can see the attorney

visiting area that both defendants admit that they entered into

that day.

If you look at Plaintiff's Exhibit 4, you can see the

specific interrogation room that the defendants admit they

entered into that day.

So we know where it happened.

Who beat Mr. Fleming?  Plaintiff's evidence on this

point is clear.  If you look at the Fleming direct, page 197,

"What did Detective Stradford do in response to you being

adamant about your right to counsel?" question.

"A  Well, before I knew it, he was no longer in the room, and

next I know he was on my side of the room.  Next I know, he

started bucking me up in the face and around the head, you

understand, and in my mouth."

See also, Fleming cross-examination in response to

defendant's questions, page 242:

"Q  And in that deposition, we are referring about prior

1   testimony from Mr. Fleming, you then stated that

2   Detective Stradford hit you all over your body and primarily in

3   your mouth, correct?

4   "A  Around my face and in my mouth, sir, and upside my head."

5           See also the Fleming cross-examination, page 242:

6   "Q  And in that deposition, you stated that Detective Stradford

7   hit you more than five times with not just his fists and

8   sometimes with his knees, correct?

9   "A  Exactly."

10          You have also heard how Detective Stradford was

11  beating Mr. Fleming.  Mr. Fleming did his best to protect

12  himself with his hands.

13          Fleming direct, page 198 over to 199:

14  "Q  What did you do, Mr. Fleming, when Detective Stradford

15  started beating you?

16  "A  The only thing I could do under those circumstances was try

17  to cover myself, you know, like that, you know, with my hands."

18          Defendants have said in their opening statement, if

19  you look at page 16 of the transcript, and again just now in

20  slightly different words, that "the last thing these detectives

21  wanted to do was to get close to plaintiff."  Apparently this

22  was because he might spit at them or throw his urine at them,

23  even though defendants have not presented a scrap of evidence

24  that Mr. Fleming had a history of doing either of those things,

25  or apparently defendants didn't want to get close to

1    Mr. Fleming because of his medical condition.

2              But if you look at the Stradford cross-examination, at

3    page 45, and then the Stradford direct, 109/110, you will see

4    that Detective Stradford, despite apparently not wanting to get

5    too close to Mr. Fleming because of his medical condition, knew

6    he had sores on his face and then was quite happy to lend him

7    his reading glasses.

8              If you look at Plaintiff's Exhibit 3, and that was the

9    entrance to the attorney visiting area, you will see a door

10   that defendants have admitted was not locked.  This is the

11   first door they need to walk through in order to get to the

12   attorney visiting rooms.  It is not locked.  You can see that

13   from the Stradford cross-examination, page 242:

14   "Q  Do you remember anybody having to unlock that door in order

15   for you and Detective Braccini to pass through on October 23,

16   2008?

17   "A  No, I don't."

18             Let's look at the door to the detectives' side of the

19   interrogation room, Plaintiff's Exhibit 4.  You look at

20   Plaintiff's Exhibit 4, you see a doorknob.  There is no lock

21   there.

22             If you look at the Stradford cross-examination, page

23   242, Detective Stradford said there was no lock there back in

24   2008, either.

25   "Q  Do you remember, Detective, there being any lock on the

1    door through which you entered into your side of the

2    interrogation room?

3    "A  No, I don't know."

4         Let's look at the door to Mr. Fleming's side of the

5    room.  If you look at Plaintiff's Exhibit 6, you have got the

6    entrance to defendant's side of the room on one side and the

7    entrance to Mr. Fleming's side of the room on the other side of

8    that photo.  Then compare it to the Stradford cross-examination

9    page 36.

10   "Q  You don't remember there being any lock on the door we were

11   just speaking about, the one Mr. Fleming used to get into his

12   side of the interrogation room, do you?

13   "A  I would have no idea what's on that side of the cubicles."

14        Detective Stradford could not tell you whether

15   Mr. Fleming's side of the interrogation room was locked.

16        So we have got three doors that defendants cannot tell

17   you were locked.  Let's move to the gate in the hallway.

18        If you look at Plaintiff's Exhibit 4, you can see the

19   gate on the right-hand side of that photo.  Defendants told you

20   in their opening statement, this is page 16 of the transcript,

21   that you will see photos that show a locked gate between where

22   the detectives were and the entrance to plaintiff's room.  How

23   is a photograph going to show you whether a door is locked?  It

24   can't.  So what other evidence do you have that that gate was

25   locked?

1          Before we get to that, though, you have got credible
2     evidence that that gate wasn't even there back in 2008.
3          Mr. Fleming said the gate was not there, and let's
4     look at everything else that's changed in the attorney visit
5     room.
6          If you look at the Stradford cross-examination, page
7     248, he admitted that the room has changed as compared to how
8     it was in 2008.
9          If you look at the Stradford cross-examination page
10    148, he said it is a different color, so it's been painted.
11         If you look at the Stradford cross at page 36 rolling
12    over to page 37, he says there is now an intercom there.
13         If you look at the Stradford cross-examination, page
14    148, he said a flap has been added to that aperture to make it
15    more secure.  That aperture is now lockable or at least it can
16    be closed.
17         If you look at the Stradford cross-examination at page
18    35, the detectives also said that plexiglass has been installed
19    in that room since 2008.
20         On the basis of these changes, you have credible
21    evidence to conclude that the gate wasn't even there back then.
22         Even if the gate was there, what have the defendants
23    done to prove to you that it was locked?  They keep telling you
24    it was locked.  What actual evidence do they have of that?
25    None.

1          Look at the Stradford cross-examination at page 148:

2          "Could the door separating the two" sides of the room

3    "have been opened?" That's a question.

4    "A  It's a door, yes, that could be opened."

5          Look at the Braccini cross-examination, page 161:

6    "Q  And you are sure she" -- referring to the female

7    corrections officer -- "could have told you how to get to where

8    Mr. Fleming was correct, sir?

9    "A  She probably could have, yes."

10          If you look at the Stradford cross-examination, page

11    29, you have also got Detective Stradford telling you how

12    cooperative prisons were when he wanted something from them.

13    He testified at page 29 that prisons would provide him with

14    telephone access to inmates if he wanted it.

15          Stradford cross, page 29 again:

16    "Q  Prisons would provide you with physical access to inmates

17    if you wanted it, correct?

18    "A  Yes."

19          Stradford cross-examination, pages 30-31:

20          He was asked, "To be clear, what has never happened to

21    you in your experience and career as a detective is that a

22    prison has refused to cooperate with you.

23    "A  That's correct."

24          If you go to Stradford cross-examination, page 29,

25    this is crucial.  He was asked, "Is it the case, Detective,

1   that if you asked for it, prisons would provide you with

2   anything that doesn't impede the function of the prison?

3   "A  Yes."

4          Anything that doesn't impede the function of the

5   prison, like turning a blind eye for five minutes while he

6   takes ten steps through three doors and roughs somebody up.

7   Because ten steps is all it would have taken.

8          If you look at the Stradford cross-examination, pages

9   39 and 40, Detective Stradford there says it would take four or

10  five steps to cross his side of the room, which would take him

11  a few seconds, perhaps as many as 10.

12         You can see on Plaintiff's Exhibit 5 that if it takes

13  four or five steps and a few seconds to get here, it's only

14  going to take, if that gate is not there or it is open, another

15  four or five steps and ten seconds to get around the other

16  side, in a prison that would cooperate, that had never refused

17  to cooperate, in a prison that would provide anything that

18  didn't impede the functioning of the prison.  So you can

19  clearly see how it was possible for Mr. Fleming to be beaten.

20         Let's turn to why it happened:

21         Stradford cross, page 20:

22         "The purpose of the Cold Case Squad is to solve old

23  and unsolved cases, would you agree?

24  "A  Yes.

25  "Q  Part of your purpose as a detective on the Cold Case Squad

1    was to solve old and unsolved cases?

2    "A  Yes."

3            And you know they had an unsolved case from 1988 that

4    they wanted to solve.

5            Stradford cross at page 24.  You know that before he

6    even turned up at Rikers, Detective Stradford thought

7    Mr. Fleming -- had decided Mr. Fleming was guilty of that 1988

8    case.

9            MR. PASSESER:  Objection.

10           THE COURT:  To the prior statement, sir?

11           MR. PASSESER:  To this argument being made, given the

12   evidence that was admitted at trial.

13           THE COURT:  Agreed.

14           Counsel, watch where you are walking.

15           MR. FUTTER:  Stradford cross at page 24:

16   "Q  You heard Detective Stradford say that he turned up at

17   Rikers on October 23 with the intention of getting plaintiff to

18   confess to that unsolved 1988 case, didn't you?

19   "A  Yes."

20           You also heard, Braccini cross, at page 152, that

21   Detective Braccini and Detective Stradford are friends; that

22   they worked together for about a decade; that they still see

23   each other socially, sometimes as often as once a month.

24           You heard, Braccini cross, page 156, that one of the

25   reasons Detective Stradford brought Detective Braccini to the

h1p2fle1                    Summation – Mr. Futter

1   Fleming interrogation is because he wanted someone to

2   corroborate his story.

3           You also heard, Braccini cross, at page 164 over to

4   165, that Detective Braccini would not have wanted to put

5   Detective Stradford in a bad position, like telling anybody if

6   he had actually assaulted a prisoner.

7           So what happened when the detectives turned up, having

8   decided ahead of time that they are going to get a confession

9   out of Mr. Fleming?  Well, they tried to get plaintiff to waive

10  his right to counsel by giving him a paper copy of a *Miranda*

11  statement.  You have seen that paper copy of that *Miranda*

12  statement.

13          You look at the Fleming direct, page 197-198, you hear

14  what happened when Mr. Fleming received that *Miranda*.  He

15  started reading it, and then he threw the paperwork back at

16  Detective Stradford.  He said, "I don't want to sign no paper

17  without my counsel," and he, in his own words, said he was very

18  adamant about that.

19          You have seen Mr. Fleming in court.  You know he can

20  be adamant about something when he believes he is right or that

21  he is entitled to something.  But Detective Stradford doesn't

22  strike you as the kind of person who tolerates talk-back,

23  back-chat.  He is not going to let Mr. Fleming insist upon his

24  right to counsel and derail the interrogation and stop him from

25  getting that confession.

1           So if you look at Fleming direct page 197:

2     "Q  What did Detective Stradford do in response to you"

3     Mr. Fleming "being adamant about your right to counsel?

4     "A  Well, before I knew it, he was no longer in the room, and

5     next I know he was my side of the room and he asked me, What?

6     You think you a smart A?

7           "I said I -- and I just continue the same thing.

8           "Next I know, he started bucking me up in the face and

9     around the head, you understand, and in my mouth.

10    "Q  Sorry to interrupt, sir.  When you say a 'smart A,' do you

11    mean a smart ass?

12    "A  Yes, I do.

13    "Q  Did he call you any other names when you insisted upon your

14    right to counsel?

15    "A  He called me a smart ass and just started hitting me and

16    some other things he say, but I can't recollect everything he

17    said because it's been so long."

18          So Detective Stradford starts beating Mr. Fleming

19    until Mr. Fleming agrees to participate in the interrogation.

20          And what is Detective Braccini doing while this is

21    going on?  Look at the Fleming direct at page 198-199:

22    "Q  To the extent that you are aware, what was

23    Detective Braccini doing while a beating was occurring?

24    "A  Well, in the instance, I'm yelling 'help,' and

25    Detective Braccini, he never come anywhere near where we at."

1    In other words, Mr. Fleming was crying out for help and

2    Detective Braccini just stood there.

3            So we need to talk about injuries.  As I said earlier,

4    I believe her Honor will instruct you that you need to find

5    that Mr. Fleming was injured and that the beating caused those

6    injuries.

7            Before we go any further, though, I want to look back

8    at what the defendants promised you in their opening statement.

9    If you look at their opening statement, page 18, they say,

10   "Plaintiff is claiming as a result of this incident that he

11   suffered a sore neck, a busted lip, and a broken face, and that

12   his teeth were knocked out.  But you will get a chance to

13   review plaintiff's medical records.  And when you review

14   plaintiff's medical records, you will see the absence of any of

15   these injuries."

16           And yesterday they took you through those medical

17   records to show you an absence of those injuries.  But what

18   kind of medical records did they take you through?

19           If you look at the Fleming redirect, page 256, at line

20   12, they are asking Mr. Fleming about cuts to his face, a

21   busted lip or broken teeth, in a medical record signed by a

22   psychology extern.  They are looking for physical injuries in a

23   psychology report.

24           Look at the Fleming redirect at 257.  They are asking

25   Mr. Fleming about a busted lip or broken teeth in a document

1    signed by an optometrist.

2              If you look at the Fleming redirect at page 259, they

3    are asking Mr. Fleming about evidence of a busted lip or broken

4    teeth in a psychiatry report.

5              So, yes, you do see an absence of Mr. Fleming's

6    injuries in his medical records if you go looking in the wrong

7    place.  What happens, what do you find, when you look in the

8    right place?

9              Defendants are telling you, this is their opening

10   statement, page 18, "You will see that plaintiff had no

11   complaints at all."

12             Look at the Fleming redirect, page 261.  Look at

13   Exhibit D83.  You see a reference there in May 2009, this is a

14   little over six months after the alleged interrogation and

15   beating occurred, you have got a document that refers, it's got

16   a title "Chronic Medical Problems," and underneath you have got

17   a reference to "dental."  As of May, six months after the

18   interrogation, Mr. Fleming had chronic dental medical problems.

19   Defendants told you that you wouldn't find any evidence of his

20   injuries.  It's right there.

21             And that's not it.  Look at page 263 of the Fleming

22   redirect.  You have got a document there, number 286, Nursing

23   follow-up; wound care; nursing follow-up, wound care; nursing

24   follow-up, wound care," and again, and again.  This is all on

25   May 15.  There is another one on June 8.  There is another one

on June 11.  Defendants promised you that you would not find

any evidence of the injuries in the medical records.  It is

right here.

        Not only are those medical records there, but when we

asked Mr. Fleming what are those references to, he told you

straight out, this is Fleming redirect, 263, "Wound care would

be like anything that you are being observed for, for any, any

internal or external injuries or lesion, so that thereafter you

could be scheduled for whatever appointment you need to be

scheduled for."

"Q  Do you have any recollection, sir, of what the specific

wound care entries refer to," the entries on document D86?

"A  They were basically dealing with overall my face, my lip,

and my teeth."

        Defendants have utterly failed to deliver what they

promised you would see.  They have utterly failed to show that

the evidence would show the plaintiff had no complaints at all.

        Plaintiff says he lost his teeth because, on October

23, Detective Stradford more or less punched him out.  Then the

medical records we have just looked at confirm that Mr. Fleming

had a chronic dental problem and needed his teeth extracted

about six months later.

        And, remember, if you look at the Stradford

cross-examination, page 204, Detective Stradford confirmed

that, during the interrogation, when he walked into the room,

1    Mr. Fleming had all of his teeth.  October 23, he has all of

2    his teeth.  Defendants tell us that.  But the medical records

3    show us that, as little as six months later, he is having to

4    have all of his teeth extracted and a bridge inserted instead.

5            So Mr. Fleming says that he lost all of his top teeth

6    over the space of six months because they were punched out by

7    one of the defendants.  How do defendants explain this?

8            You look at the Fleming cross-examination, page 228,

9    and defendants would have you believe that Mr. Fleming loses

10   all of his top teeth in the space of six months because of

11   cavities.  Give me a break.  Cavities.

12           And then there are Mr. Fleming's emotional injuries,

13   the Fleming direct, page 200:

14   "Q  Mr. Fleming, did you suffer any emotional injuries as a

15   result of the beating?

16   "A  Yes.  I was very distraught, depressed, and sad, because

17   the fact of me being beaten to the fact that I had bruises on

18   my head and my lip and my teeth were messed up.

19   "Q  How long did that distraught last?

20   "A  It lasts 'til today, because I am going through this every

21   day."

22           It is no small thing to have a police officer assault

23   you, especially when, as you heard, you are in a weakened state

24   because you are a recovering drug addict seeking treatment;

25   especially when the reason you are assaulted is because you are

1    insisting upon your right to counsel, a right that's very

2    important to you.

3            Consider the embarrassment of having somebody knock

4    out your teeth.

5            Consider, too, the fear that, because you are in

6    prison, this could happen to you again at any time and you

7    can't control that.

8            So, ladies and gentlemen, because Detective Stradford

9    beat Mr. Fleming on October 23, 2008, because

10   Detective Braccini just stood by and let him, and because

11   Mr. Fleming suffered lasting physical and emotional injuries as

12   a direct result of the beating, when you complete the verdict

13   form that her Honor will give you, you should find in favor of

14   the plaintiff.

15           Thank you again for this important and selfless work.

16           THE COURT:  Thank you very much to all counsel for

17   their work in this case.

18           I will now proceed to deliver the charge.  It is

19   approximately 25 to 30 minutes long.  If anyone needs a break,

20   they can raise their hand.  We won't put it on the record, but

21   if you need the break, tell me.  Seeing nothing, that is fine.

22           I am going to have my law clerk pass out to you copies

23   of the charge.

24           Let me explain just a few housekeeping matters, again,

25   because people may want to have the charge with them in the

1    jury room, I do pass it out.  You can, if you are so inclined,

2    read along as a read it to you.  For other people, for me, for

3    example, I prefer to listen and then look at it later.  But

4    whatever works for you.

5            Here, too, I am more focused on reading to you exactly

6    what is in this document than in making eye contact with you,

7    so if I don't, take no offense of that.  And at some point in

8    the charge, two things will happen -- one of them for sure, one

9    of them almost certainly:

10           At some point I will take a break and stand up.  It is

11   an occupational hazard of a district judge that your back hurts

12   after a while; so if I get up, take no offense of that.

13   Consider it the seventh inning stretch of the charge, and you

14   are welcome to stand up if you have similar issues.

15           Also, almost certainly, there is a typographical error

16   in the charge.  Blame me, I'm okay with it, but you will see me

17   look up and wince, and you will know that's why.  We, as a

18   group, try our best to get you an error-free charge.

19           Thank you very much, Mr. Ghafary.  You may hand it out

20   and hand it to the parties as well.

21           Let's begin.

22           Members of the jury, you have now heard all of the

23   evidence in the case as well as the final arguments of the

24   parties, which do not constitute evidence.  We have reached the

25   point where you are about to undertake your final function as

1    jurors.  You have paid careful attention to the evidence, and I

2    am confident that you will act together with fairness and

3    impartiality to reach a just verdict in this case.

4            My instructions to you today will be in four parts.

5    First, I will give you general instructions, including

6    instructions about your role as jurors.  Second, I will give

7    you instructions concerning evaluation of the evidence.  Third,

8    I will describe the plaintiff's claim in this case, and, more

9    importantly, the law to be applied to the facts that you find

10   to be established by the evidence.  The fourth and final

11   section of these instructions will relate to your

12   deliberations.

13           Because my instructions cover many points, I have

14   given you a copy of my instructions so that you may follow

15   along.  In addition, you may take your copy of the instructions

16   with you for reference during your deliberations.  You should

17   not single out any instruction as alone stating the law;

18   instead, you should consider my instructions as a whole when

19   you retire to deliberate in the jury room.

20           As members of the jury, you are the sole and

21   exclusive judges of the facts.  You pass judgment upon the

22   evidence.  You determine the credibility of the witnesses.  You

23   resolve any conflicts in the testimony.  You draw whatever

24   reasonable inferences you decide to draw from the facts as you

25   have determined them, and you determine the weight of the

1    evidence.

2            My role is to instruct you as to the law.  It is your

3    duty to accept these instructions of law and to apply them to

4    the facts as you determine them, just as it has been my duty to

5    preside over the trial and to decide what testimony and

6    evidence was relevant under the law for your consideration.

7    On these legal matters, you must take the law as I give it to

8    you.  You must not substitute your own notions or opinions of

9    what the law is or ought to be.  Similarly, if any party has

10   stated a legal principle different from any that I state to

11   you in my instructions, it is my instructions that you must

12   follow.

13           You should draw no inference or conclusion for or

14   against any party by reason of lawyers making objections or my

15   ruling on such objections.  Counsel have not only the right,

16   but the duty, to make legal objections when they think that

17   such objections are appropriate.

18           Nothing I say is evidence.  If I commented on the

19   evidence at any time, do not accept my statements in place of

20   your recollection or your interpretation.  It is your

21   recollection and interpretation that govern.

22           Also, do not draw any inference from any of my

23   rulings.  The rules I made during trial are no indication of

24   any view on my part.  You should not seek to find any such view

25   or opinion on my part, nor should you otherwise speculate as to

1    what I may think.

2         Further, do not concern yourself with what was said at

3    any sidebar conferences or during my discussions with counsel.

4    Those discussions related to rulings of law.

5         At times I may have admonished a witness or directed a

6    witness to be responsive to questions or to keep his voice up.

7    At times I may have asked a question myself.  Any questions

8    that I asked, or instructions that I gave, were intended only

9    to clarify the presentation of evidence and to bring out

10   something that I thought might be unclear.  You should draw no

11   inference or conclusion of any kind, favorable or unfavorable,

12   with respect to any witness or any party in the case by reason

13   of any comment, question, or instruction of mine.  Nor should

14   you infer that I have any views as to the credibility of any

15   witness, as to the weight of the evidence, or as to how you

16   should decide any issue that is before you.  That is entirely

17   your role.

18        Finally, the personalities and the conduct of counsel

19   are not in any way in issue.  If you formed opinions of any

20   kind about any of the lawyers in the case, favorable or

21   unfavorable, those opinions should not enter into your

22   deliberations.

23        You are to evaluate the evidence calmly and

24   objectively, without prejudice or sympathy.  You are to be

25   completely fair and impartial.  Your verdict must be based

1  solely on the evidence developed at this trial or the lack of

2  evidence.

3        The parties in this case are entitled to a trial free

4  from prejudice and bias.  Our judicial system cannot work

5  unless you reach your verdict through a fair and impartial

6  consideration of the evidence.  This case should be decided by

7  you as an action between parties of equal standing in the

8  community, of equal worth, and holding the same or similar

9  stations in society.  The defendants are not to be favored or

10  disfavored because they are law enforcement officers, nor is

11  the plaintiff to be favored or disfavored because of his status

12  and background.

13        In determining the facts, you must rely upon your own

14  recollection of the evidence.  What is evidence?  Evidence

15  consists only of the testimony of witnesses, the exhibits that

16  have been received, and the stipulations of the parties.

17        Let me speak a bit more about stipulations.  A

18  stipulation is simply an agreement between the parties.  At

19  trial, the parties introduced stipulations that contained facts

20  that the parties agree were true.  You must accept as true the

21  facts contained in these stipulations.  However, it is for you

22  to determine the weight, if any, to be given those facts.

23        You have heard references to depositions, and portions

24  of depositions have been read to you during the trial.  A

25  deposition is a procedure where the attorneys may question a

h1p2fle1                    Charge

witness or an adversary under oath before a court reporter

prior to trial.  This is part of the pretrial discovery

process, and each side was entitled to take depositions.  You

may consider the testimony of a witness given at a deposition

according to the same standards you would use to evaluate the

testimony of a witness given at trial.  The statements and

arguments made by the lawyers are not evidence.  Their

arguments are intended to convince you as to what conclusions

you should draw from the evidence or lack of evidence.  Now,

those arguments are important.  You should evaluate them

carefully.  But you must not confuse them with the evidence.

As to what the evidence was, it is your recollection that

governs, not the statements of the lawyers.

        You should also bear in mind that a question put to a

witness is never evidence.  It is the answer to the question

that is evidence.  One exception to this is that you may not

consider any answer that I directed you to disregard or that I

ordered to be stricken from the record.  You are not to

consider such answers.  Some evidence may be admitted for a

limited purpose only.  If I instructed you that an item of

evidence has been admitted for a limited purpose, you must

consider it only for that limited purpose and for no other

purpose.

        To constitute evidence, exhibits must first be

received into evidence.  Exhibits marked for identification but

1    not admitted are not evidence, nor are materials brought forth

2    only to refresh a witness's recollection.

3           As I mentioned to you at the beginning of the trial,

4    your decision in this case must be made solely on the evidence

5    presented at trial.

6           There are two types of evidence that you may properly

7    use in reaching your verdict.  One type of evidence is called

8    direct evidence.  Direct evidence of a fact in issue is

9    presented when a witness testifies to that fact based on what

10   he or she personally saw, heard, or observed.

11          The second type of evidence is called circumstantial

12   evidence.  Circumstantial evidence is evidence that tends to

13   prove a disputed fact indirectly by proof of other facts.

14   Circumstantial evidence is of no less value than direct

15   evidence, for it is a general rule that the law makes no

16   distinction between direct evidence and circumstantial

17   evidence.

18          There is a simple example of circumstantial evidence

19   that is often used in this courthouse:  Assume that when you

20   came into the courthouse this morning, the sun was signing and

21   it was a nice day outdoors.  Assume that the courtroom windows

22   were covered and you could not look outside.  Assume further

23   that, as you were sitting here, someone walked in with an

24   umbrella that was dripping wet.  Somebody else then walked in

25   with a raincoat that was also dripping wet.

1           Now, because you could not look outside the courtroom

2    and you could not see whether it was raining, you would have no

3    direct evidence of that fact.  But, on the combination of facts

4    that I have asked you to assume, it would be reasonable and

5    logical for you to conclude that it was raining.

6           That is all there is to circumstantial evidence.  You

7    infer on the basis of reason, experience, and common sense,

8    from one established fact the existence or nonexistence of some

9    other fact.

10          The matter of drawing inferences from facts in

11   evidence is not a matter of guesswork or speculation.  An

12   inference is a deduction or conclusion that you, the jury, are

13   permitted to draw -- but are not required to draw -- from the

14   facts that have been established by either direct or

15   circumstantial evidence.

16          You do not leave your common sense, good judgment, or

17   life experiences behind you when you walk into the courtroom.

18   You carry that background into the jury room during your

19   deliberations.  While you are considering the evidence

20   presented to you, you are permitted to draw, from the facts

21   that you find to be proven, such reasonable inferences as would

22   be justified in light of your experience.  Please remember,

23   however, that you may not use your experience and common sense

24   to fill in or create evidence that does not exist.  You use

25   them only to draw reasonable inferences from proven facts or to

weigh and evaluate the evidence provided during the trial.

There are times when different inferences may be drawn from facts that are proved by direct or circumstantial evidence.  The plaintiff may ask you to draw one set of inferences, while the defendants may ask you to draw another. It is for you, and you alone, to decide what inferences you will draw.

This case in particular demonstrates how important your assessment of credibility is.  You have heard very different versions of a series of events.  It is now your job to decide how believable each witness was in his testimony. You are the sole judges of the credibility of each witness and of the importance of his testimony.

How do you determine what the truth is?  You should use all of the tests for truthfulness that you would use in determining matters of importance to you in your everyday life. You should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, the impression the witness made when testifying, and any other matter in evidence that may help you decide the truth and the importance of each witness's testimony.  You should also consider the opportunity the witness had to see, hear, and know the things about which he testified, the accuracy of his memory, the witness's candor or lack of candor, his intelligence, as well as the reasonableness and probability of

the witness's testimony and the degree to which it accords with

other credible evidence in this case.  In other words, what you

must try to do, in deciding credibility, is to size a witness

up in light of his testimony, the explanations given, and all

of the other evidence in the case.

You have heard evidence of discrepancies in the

testimony of certain witnesses, and the parties have argued

that such discrepancies are a reason for you to reject the

testimony of those witnesses.  I instruct you that evidence of

discrepancies may be a basis to disbelieve a witness's

testimony.  On the other hand, discrepancies between a

witness's testimony and his prior statements, or between the

witness's testimony and that of others, do not necessarily

mean that the witness's entire testimony should be

discredited.

People sometimes forget things, and even truthful

witnesses may be nervous and contradict themselves.  It is also

a fact that two people witnessing an event will see or hear it

differently.  Whether a discrepancy pertains to a fact of

importance or only to a trivial detail should be considered in

weighing its significance.  But willful falsehood is always a

matter of importance and should be considered seriously.  By

"willful," I mean that the witness made a statement knowing

that it was false or recklessly disregarding that possibility.

It is for you to decide, based on your total impression of the

1   witness, how to weigh the discrepancies in the witness's

2   testimony.

3           If you find that a witness has testified falsely as to

4   any material fact or if you find that a witness has been

5   previously untruthful when testifying under oath or otherwise,

6   you may reject that witness's testimony in its entirety or you

7   may accept only those parts that you believe to be truthful or

8   that are corroborated by other independent evidence in the

9   case.

10          In addition, in deciding whether to believe a witness,

11  you should specifically note any evidence of hostility or

12  affection that the witness may have toward one of the parties.

13  Likewise, you should consider evidence of any other interest or

14  motive that the witness might have in cooperating with a

15  particular party.  You should also take into account any

16  evidence that a witness may benefit in some way from the

17  outcome of the case.  Such interest in the outcome may create a

18  motive to testify falsely and may sway a witness to testify in

19  a way that advances his own interests.  It is your duty to

20  consider whether the witness has permitted any such bias or

21  interest to color his testimony.  In short, if you find that a

22  witness is biased, you should view his testimony with caution,

23  weigh it with care, and subject it to close and searching

24  scrutiny.

25          (Continued on next page)

1            THE COURT:  Of course, the mere fact that a witness is

2    interested in the outcome of the case does not mean that he has

3    not told the truth.  It is for you to decide, from your

4    observations and applying your common sense and experience and

5    all the other considerations mentioned, whether the possible

6    interest of any witness or of any party has intentionally or

7    otherwise colored or distorted his testimony.  You are not

8    required to disbelieve an interested witness; you may accept as

9    much of his testimony as you deem reliable and reject as much

10   as you deem unworthy of acceptance.

11           It is for you, the jury, and for you alone, not the

12   lawyers, or the witnesses, or me as the judge, to decide the

13   credibility of witnesses who appeared here and the weight that

14   their testimony deserves.

15           You should, as always, use common sense and your own

16   good judgment.  After making your own judgment, you will give

17   the testimony of each witness whatever weight you think it

18   deserves.  You may, in short, accept or reject the testimony of

19   any witness in whole or in part.

20           The weight of the evidence is not necessarily

21   determined by the number of witnesses testifying to the

22   existence or nonexistence of any fact.  You may find that the

23   testimony of a small number of witnesses as to any fact is more

24   credible than the testimony of a larger number of witnesses to

25   the contrary.  The law does not require a party to call as

witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters at issue in this trial.  Nor should you draw any inference from the presence or absence of expert witnesses on either side.  Neither party has an obligation to put forward expert testimony of any sort.

There are several persons whose names you have heard during the course of the trial but who did not appear here to testify.  I instruct you that each party had an equal opportunity, or lack of opportunity, to call any of these witnesses.  Therefore, you should not draw any inference or reach any conclusions as to what they would have testified had they been called.  Their absence should not affect your judgment in any way.

Finally, you should attach no significance to the fact that certain witnesses were called to testify by the plaintiff or by the defendants.  Likewise, no significance should be attached to the fact that a document or other exhibit was introduced by one party or another.  All parties are entitled to rely on any evidence introduced in this case.

Before I instruct you on the issues you must decide, I want to define for you the standard under which you will decide whether a particular party has met its burden of proof on a particular issue.  The standard that applies in this case is the preponderance of the evidence.

1            And what does "a preponderance of the evidence" mean?

2    To establish a fact by a preponderance of the evidence means to

3    prove that the fact is more likely true than not true.  "A

4    preponderance of the evidence" means the greater weight of the

5    evidence.  It refers to the quality and persuasiveness of the

6    evidence, not to the number of witnesses or documents.  In

7    determining whether a claim has been proved by a preponderance

8    of the evidence, you may consider the relevant testimony of all

9    witnesses, regardless of who may have called them, and all the

10   relevant exhibits received in evidence, regardless of who may

11   have introduced them.

12           If you find that the credible evidence on a given

13   issue is evenly divided between parties -- that it is equally

14   probable that one side is right as it is that the other side is

15   right -- then you must decide that issue against the party

16   having this burden of proof.  That is because the party bearing

17   the burden of proof on a particular issue must prove more than

18   simple equality of evidence -- the party must prove the element

19   at issue by a preponderance of the evidence.  On the other

20   hand, the party with this burden of proof need prove no more

21   than a preponderance.

22           And this concept of preponderance of the evidence is

23   often illustrated with the idea of scales.  You put on one side

24   all of the credible evidence favoring the plaintiff and on the

25   other side all of the credible evidence favoring the defendant

H1PAFLE2ps                    Charge

1    you are considering.  So long as you find that the scales tip,

2    however slightly, in favor of the party with the burden of

3    proof -- that what the party with the burden of proof claims is

4    more likely true than not true -- then that element will have

5    been proved by a preponderance of the evidence.  If the scales

6    do not tip at all, or if they tip in favor of the party who

7    does not have the burden of proof, then that element will not

8    have been proved by a preponderance of the evidence.

9            Some of you may have heard of proof beyond a

10   reasonable doubt, which is the proper standard of proof in a

11   criminal trial.  That requirement does not apply to a civil

12   case such as this and you should put it out of your mind.

13           Members of the jury, I am now going to instruct you on

14   the substantive law to be applied to this case.

15           The plaintiff in this case is Mr. Robert Fleming.  The

16   defendants in this case are Detective Wendell Stradford and

17   Detective Steve Braccini; and during the relevant time period,

18   each defendant was employed by the New York City Police

19   Department.

20           The plaintiff has asserted a claim under a federal

21   statute, Section 1983 of Title 42 of the United States Code.

22   Section 1983 does not itself establish or create any federally

23   protected right.  Rather, it provides a remedy for individuals

24   who have been deprived of their federal constitutional rights

25   under color of state law.  The plaintiff alleges that the

H1PAFLE2ps                    Charge

defendants deprived him of his constitutional right to be free

from the use of excessive force; in particular, the plaintiff

claims that Detective Stradford beat him in the course of an

interview at Rikers Island, and that Detective Braccini failed

to intervene in order to stop Detective Stradford from beating

him.  The defendants contend that no force was used in their

encounter with the plaintiff.  You have heard references at

trial to a person's right to counsel.  The right to counsel is

not at issue in this case.

        I want to emphasize here that, although they are being

represented by the same attorneys, each defendant should be

considered by you separately.  You should consider the evidence

against each defendant and ask -- with respect to that

defendant -- whether the plaintiff has proved the elements of

his claim against that defendant by a preponderance of the

evidence.  Each defendant is entitled to a fair consideration

of the evidence relating to him, and is not to be prejudiced by

any finding you make for or against any other defendant.  If

you find that either or both of the defendants are liable to

the plaintiff, you must then decide the amount of damages, if

any, for which each defendant is responsible.

        Section 1983 of Title 42 of the United States Code

provides: "Every person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State or

Territory or the District of Columbia, subjects, or causes to

be subjected, any citizen of the United States or other person
within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution
and laws, shall be liable to the party injured in an action at
law, suit in equity, or other proper proceeding for redress."

To establish a claim under Section 1983, the plaintiff
must establish, by a preponderance of the evidence, each of the
following three elements:

First, that the acts that the plaintiff complains of
were committed by the defendant you are considering while that
defendant was acting under color of state law;

Second, that in committing these acts, the defendant
you are considering deprived the plaintiff of rights,
privileges, or immunities secured by the Constitution or laws
of the United States; and

Third, that the acts of the defendant you are
considering were the proximate cause of the injuries sustained
by the plaintiff.

I shall now examine each of these three elements in
greater detail.

The first element of the plaintiff's Section 1983
claim is that the defendant you are considering must have acted
under color of state law.  In this case, there is no dispute
that, at the time of the alleged incident, Detective Stradford
and Detective Braccini were employees of the New York City

1    Police Department, and were acting under color of state law.

2    Therefore, I instruct you that the first element of the

3    plaintiff's Section 1983 claim has been met as to each of the

4    defendants.

5         The second element that the plaintiff must prove by a

6    preponderance of the evidence is that the defendant you are

7    considering deprived the plaintiff of a federal right.  In

8    order for the plaintiff to establish this second element, he

9    must show the following by a preponderance of the evidence: (1)

10   the defendant you are considering acted in the manner that the

11   plaintiff alleges; and (2) that defendant's conduct caused the

12   plaintiff to suffer the loss of a federal right.

13        As I mentioned, Mr. Fleming contends that Detective

14   Stradford used excessive force against him, and that Detective

15   Braccini failed to intervene to prevent this use of excessive

16   force, in the course of interviewing Mr. Fleming at Rikers

17   Island on October 23, 2008.  The defendants deny that Detective

18   Stradford used any force against Mr. Fleming, and deny that

19   Detective Braccini failed to intervene to prevent the use of

20   any such force.

21        I will first instruct you with respect to the

22   plaintiff's excessive force claim against Detective Stradford.

23   The Fourteenth Amendment to the United States Constitution

24   protects pretrial detainees, as the plaintiff was in October

25   2008, from being subjected to excessive force.  A law

1    enforcement officer may only employ the amount of force, if

2    any, that is reasonably necessary under the circumstances.

3            The plaintiff must first show that any force used

4    against him by Detective Stradford on October 23, 2008, was

5    applied intentionally or recklessly.  An act is intentional if

6    it is done voluntarily and deliberately, and not because of

7    mistake, accident, negligence, or other innocent reason.  An

8    act is reckless if it is done in conscious disregard of its

9    known probable consequences.  In determining whether Detective

10   Stradford acted either intentionally or recklessly, you should

11   remember that there is no way of looking into a person's mind.

12   Therefore, you have to depend on what was done and what the

13   people involved said was in their minds and your common-sense

14   belief or disbelief with respect to those facts.

15           If the plaintiff demonstrates that Detective Stradford

16   intentionally or recklessly used force against him, he must

17   then demonstrate that the force used was objectively

18   unreasonable in light of the facts and circumstances

19   confronting Detective Stradford at the time, without regard to

20   Detective Stradford's underlying intentions or motivation.  In

21   other words, you must determine whether the amount of force was

22   that which a reasonable officer would have employed under

23   similar circumstances.

24           Whether a defendant had good intentions or bad

25   intentions has no bearing on whether the use of force was

1    reasonable or excessive.

2            In making this determination, you should take into

3    account the totality of the circumstances.  You should not make

4    this determination, however, by considering how the facts

5    appear when assessed with 20/20 hindsight.  Not every push or

6    shove by a police officer constitutes excessive force, even if

7    it may later seem unnecessary in the peace and quiet of this

8    courtroom.  Factors you may consider include, but are not

9    limited to, the relationship between the need for the use of

10   force and the amount of force used; the extent of the

11   plaintiff's injury; any effort made by Detective Stradford to

12   temper or to limit the amount of force used; the severity of

13   any security problem at issue; any threat reasonably (even if

14   mistakenly) perceived by Detective Stradford; and whether the

15   plaintiff was actively resisting.

16           If you find that the plaintiff has proven by a

17   preponderance of the evidence that the amount of force used by

18   Detective Stradford was greater than a reasonable officer would

19   have employed under the circumstances, then the plaintiff will

20   have established the deprivation of a federal constitutional

21   right.

22           You must also decide whether Detective Braccini is

23   liable under Section 1983 for any failure to intervene.  All

24   law enforcement officials have an affirmative duty to intervene

25   to protect the constitutional rights of citizens from

infringement by other law enforcement officers in their

presence.  I instruct you that an officer who fails to

intervene is liable for the preventable harm caused by the

actions of another officer, if the first officer either

observes or has reason to know that excessive force is being

used.  However, before an officer can be held liable for

failure to intervene, you must find that the officer had a

realistic opportunity to prevent the harm from occurring --

that is, that he had sufficient time to intercede and a

capability to prevent the harm.

Thus, before you can hold Detective Braccini liable

for failure to intervene, you must conclude that the following

elements have been met: first, that the plaintiff was subjected

to the use of excessive force; second, that Detective Braccini

observed those actions and knew they were unlawful; third, that

Detective Braccini had a realistic opportunity to intervene, as

I have just described that phrase; and, fourth, that Detective

Braccini failed to take reasonable steps to prevent the

violation of the plaintiff's constitutional rights.  If you

find that these four elements are satisfied by a preponderance

of the evidence, then you must find Detective Braccini liable

for any injuries that you conclude were a proximate result of

the excessive force of which he was aware and as to which he

failed to intervene.

The third element that the plaintiff must prove is

1    that the acts or omissions of the defendant you are considering

2    were a proximate cause of the injuries he sustained.  In this

3    case, the plaintiff alleges that the excessive force used or

4    allowed to be used by the defendants was the proximate cause of

5    the physical injuries that he suffered.

6         "Proximate cause" means that there must be a

7    sufficient causal connection between the acts or omissions of

8    the defendant you are considering and any injury or damage

9    sustained by the plaintiff.  An act or omission is a proximate

10   cause if it was a substantial factor in bringing about or

11   actually causing injury, that is, if the injury or damage was a

12   reasonably foreseeable consequence of the act or omission of

13   the defendant you are considering.  If an injury was a direct

14   result or a reasonably probable consequence of the defendant's

15   act or omission, then it was proximately caused by such act or

16   omission.  In other words, if the defendant's act or omission

17   had such an effect in producing the injury that reasonable

18   persons would regard it as being a cause of the injury, then

19   the act or omission is a proximate cause.

20        In order to recover damages for any injury, the

21   plaintiff must show by a preponderance of the evidence that

22   such injury would not have occurred without the defendant's

23   conduct.  If you find that the defendant you are considering

24   has proved, by a preponderance of the evidence, that the injury

25   about which the plaintiff complains would have occurred even in

the absence of the allegedly unlawful conduct, you must find

that the defendant did not proximately cause the plaintiff's

injury.

A proximate cause need not always be the nearest cause

either in time or in space.  In addition, there may be more

than one proximate cause of an injury or damage.  Many factors,

or the conduct of two or more people, may operate at the same

time, either independently or together, to cause an injury.

A defendant is not liable, however, if the plaintiff's

injury was caused by a new or independent source of an injury

that intervened between the act or omission of the defendant

and the plaintiff's injury, and that produces a result that was

not reasonably foreseeable by the defendant.  A defendant is

also not liable if the plaintiff's injury predates the act or

omission of the defendant, and was not aggravated by that act

or omission.

I will summarize for you very briefly the three

elements that the plaintiff must prove by a preponderance of

the evidence in order to prove his claim under Section 1983

against each defendant: first, that the defendant you are

considering acted "under color of state law," which is not

disputed in this case; second, that the particular defendant's

conduct deprived the plaintiff of a federal right -- in this

case, the right to be free from the use of excessive force;

third, that the particular defendant's acts or omissions

H1PAFLE2ps                    Charge

proximately caused the plaintiff's injuries.  If the plaintiff

fails to prove any of these elements with respect to the

defendant that you are considering, then you must find in favor

of that defendant.

I will now take the seventh-inning stretch that I

threatened you earlier with.  Excuse me.

(Pause)

THE COURT:  You're lucky you don't have back issues.

Thank you for your patience.

If you conclude that the plaintiff has met his burden

of proving that one or more of the defendants are liable for

injuries caused by the deprivation of the plaintiff's

constitutional rights under color of state law, then you must

determine the damages to which the plaintiff is entitled.

However, you should not infer that the plaintiff is entitled to

recover damages merely because I am instructing you on how to

calculate damages.  It is exclusively your function to decide

upon liability, and I am instructing you on damages only so

that you will have guidance should you decide that the

plaintiff is entitled to recovery.

A plaintiff who prevails is entitled to compensatory

damages for any physical injury or pain and suffering caused by

a defendant's misconduct, as well as emotional distress, fear,

personal humiliation and indignation, loss of enjoyment of

life, and expenses incurred past and future caused by a

defendant's misconduct.  These are called "compensatory

damages."  "Pain and suffering" means any mental suffering,

including emotional suffering, or any resultant physical

ailment caused by the wrongful acts of the defendant.  No

evidence of the monetary value of such intangible things as

pain and suffering has been, or need be, introduced into

evidence.  There is no exact standard for fixing the

compensation to be awarded for these elements of damages.

Any amount you fix should be fair in light of the

evidence presented at trial.  In determining such an amount,

you should be guided by dispassionate common sense.  The

damages you award must be fair compensation -- no more and no

less.  You may use sound discretion in fixing an award of

damages, drawing reasonable inferences from the facts in

evidence.  You should not award damages based on sympathy,

speculation, or guesswork.  On the other hand, the law does not

require that a plaintiff prove the amounts of his losses with

mathematical precision, but only with as much definiteness and

accuracy as circumstances permit.

Furthermore, you must be careful to impose any damages

that you may award on a claim solely upon the defendant or

defendants whom you find to be liable on that claim.  Although

there are two defendants in this case, it does not follow that

if one is liable, the other is liable as well.  Each defendant

is entitled to fair, separate, and individual consideration of

the case without regard to your decision as to the other

defendant.  If you find that only one defendant is responsible

for a particular injury, then you must impose damages for that

injury only upon that defendant.

          Nevertheless, you might find that both defendants are

liable for a particular injury.  If two or more persons unite

in an intentional or reckless act that violates another

person's right, then those persons are jointly liable for the

acts of each of them; the law does not require the injured

party to establish how much of the injury was done by each

particular defendant that you find liable.  Thus, if you find

that both defendants are liable and acted jointly, then you may

treat them jointly for purposes of deciding damages.  If you

decide that both defendants are jointly liable, then you may

simply determine the overall amount of damages for which they

are liable, without breaking that figure down into individual

percentages.

          Now let's turn to nominal damages.  If you return a

verdict for the plaintiff on his excessive force claim but you

find that he suffered no injury as a result of that particular

violation, then you must return an award of damages in some

nominal or token amount not to exceed one dollar.  This is

called nominal damages.

          Whether or not you award the plaintiff compensatory or

nominal damages, you may also, in your discretion, make an

H1PAFLE2ps                    Charge

1    award of punitive damages.  Punitive damages are awarded, in

2    the discretion of the jury, to punish a defendant for extreme

3    or outrageous conduct, and to deter or prevent a defendant and

4    others like him from engaging in such conduct in the future.

5    You may award the plaintiff punitive damages if you find that

6    the acts or omissions of the defendant you are considering were

7    done maliciously or wantonly.  An act or failure to act is

8    maliciously done if it is prompted by ill will or spite towards

9    the injured person.  An act or failure to act is wanton if it

10   is done with a reckless or callous disregard for the rights of

11   the injured person.  The plaintiff has the burden of proving,

12   by a preponderance of the evidence, that the defendant you are

13   considering acted or refrained from acting maliciously or

14   wantonly with regard to the plaintiff's rights.

15          If you find by a preponderance of the evidence that

16   the defendant you are considering acted or refrained from

17   acting with malicious intent to violate the plaintiff's rights

18   or unlawfully injure him, or if you find that the defendant

19   acted or refrained from acting with callous or reckless

20   disregard of the plaintiff's rights, you may then award

21   punitive damages.  An award of punitive damages, however, is

22   discretionary -- that is, if you find the legal requirements

23   for punitive damages are satisfied, then you may decide to

24   award punitive damages, or you may decide not to award them.

25          In making this decision, you should consider the

1    underlying purpose of punitive damages.  As I noted, punitive

2    damages are awarded in the injury's discretion to punish a

3    defendant for outrageous conduct or to deter him and others

4    like him from performing similar conduct in the future.  Thus,

5    in deciding whether to award punitive damages, you should

6    consider whether the defendant you are considering may be

7    adequately punished by an award of actual damages only, or

8    whether the conduct is so extreme and outrageous that actual

9    damages are inadequate to punish the wrongful conduct.  You

10    should also consider whether actual damages, standing alone,

11    are likely to deter or prevent the defendant you are

12    considering from similar wrongful conduct in the future, if it

13    in fact was wrongful, or whether punitive damages are necessary

14    to provide deterrence.  Finally, you should consider whether

15    punitive damages are likely to deter or prevent other persons

16    from performing wrongful conduct similar to that which the

17    defendant you are considering may have committed.

18         If you decide to award punitive damages, you should

19    keep those same purposes in mind as you determine the

20    appropriate sum of money to be awarded as punitive damages.

21    That is, in fixing the sum to be awarded, you should consider

22    the degree to which the defendant you are considering should be

23    punished for his wrongful conduct, and the degree to which an

24    award of one sum or another will deter the defendant or persons

25    like him from committing wrongful conduct in the future.

1        Members of the jury, that almost completes my

2   instructions to you.  You are about to go into the jury room to

3   begin your deliberations.  If during those deliberations you

4   want to see any of the exhibits, you may request to see them

5   and we will either send them into the jury room or we will

6   bring you back out to the courtroom to see them.  If you want

7   any of the testimony read back to you, you may also request

8   that.  Please remember that it is not always easy to locate

9   what you might want, so be as specific as you possibly can in

10  requesting exhibits or portions of testimony.

11       You may take a copy of these instructions back with

12  you to the jury room when you deliberate.  If you want any

13  further explanation of the law as I have explained it to you,

14  you may request that.  If there is any doubt or question about

15  the meaning of any part of this charge, you should not hesitate

16  to send me a note asking for clarification or for a further

17  explanation.

18       Your requests for exhibits or testimony -- in fact,

19  any communications with the Court -- should be made to me in

20  writing, signed by your foreperson, and given to one of the

21  marshals.  In any event, do not tell me or anyone else how the

22  jury stands on any issue until after a unanimous verdict is

23  reached.

24       Several of you have taken notes periodically

25  throughout this trial.  I want to emphasize to you, as you are

H1PAFLE2ps                    Charge

1    about to begin your deliberations, that the notes are simply an

2    aid to memory.  Notes that any of you may have made may not be

3    given any greater weight or influence than the recollections or

4    impressions of other jurors, whether from notes or memory, with

5    respect to the evidence presented or what conclusions, if any,

6    should be drawn from such evidence.  Any difference between a

7    juror's recollection and another juror's notes should be

8    settled by asking to have the court reporter read back the

9    transcript, for it is the court record, rather than any juror's

10   notes, upon which the jury must base its determination of the

11   facts and its verdict.

12        For the plaintiff to prevail on his excessive force

13   claim, he must sustain his burden of plaintiff as I explained

14   it to you.  If you find that the plaintiff has succeeded as to

15   his claim against either defendant, you must return a verdict

16   in his favor as to that defendant.  If you find that he has not

17   succeeded as to a particular defendant, then your verdict must

18   be for the defendant you are considering.

19        Your verdict must be unanimous.  Each juror is

20   entitled to his or her opinion, but you are required to

21   exchange views with your fellow jurors.  This is the very

22   essence of jury deliberation.  It is your duty to discuss the

23   evidence.  If you have a point of view and after reasoning with

24   other jurors it appears that your own judgment is open to

25   question, then of course you should not hesitate in yielding

1    your original point of view, if you are convinced that the

2    opposite point of view is really one that satisfies your

3    judgment and conscience.  You are not to give up a point of

4    view, however, that you conscientiously believe in simply

5    because you are outnumbered or outweighed.  You should vote

6    with the others only if you are convinced on the evidence, the

7    facts, and the law that it is the correct way to decide the

8    case.

9            Juror No. 1, Ms. Rizzuto, will serve as your

10   foreperson, unless for any reason she wishes not to serve, in

11   which case your first task will be to select a foreperson.  The

12   foreperson has no greater voice or authority than any other

13   juror, but is the person who will communicate with the Court

14   when questions arise.  The foreperson will send out any notes,

15   and when the jury has reached a verdict, he or she will notify

16   the marshal that the injury has reached a verdict.  Then, when

17   you come into open court, the foreperson will be asked to state

18   what the verdict is.

19           I have prepared a verdict form for you to use in

20   recording your decisions.  You should answer every question

21   except where the verdict form indicates otherwise.  You should

22   also proceed through the questions in the order in which they

23   are listed.  After you have reached a verdict, the foreperson

24   should fill in the verdict sheet, the jurors should sign and

25   date it, and then the foreperson should give a note to the

H1PAFLE2ps

marshal outside your door stating that you have reached a

verdict.  Do not specify what the verdict is in your note.

I will stress that each of you must be in agreement

with the verdict that is announced in court.  Once your verdict

is announced by your foreperson in open court and officially

recorded, it cannot ordinarily be revoked.

Members of the jury, that concludes my instructions to

you.  I will ask you to remain seated while I confer with the

attorneys to see if there are any additional instructions that

they would like to have given to you or if there is anything I

may not have covered in my previous instructions to you.  In

this regard, I ask you not to discuss the case while seated in

the jury box because the case has not been formally submitted

to you.

Thank you for your patience.  I will see counsel at

sidebar.

(At the sidebar)

THE COURT:  I believe that, other than transposing a

word or two, I read exactly what was on the page.  Are there

any objections to the charge as given?

MR. FUTTER:  Not from plaintiff, your Honor.

MR. FOGARTY:  None from defendants, your Honor.

THE COURT:  Anything I omitted to discuss?

MR. FUTTER:  Not from plaintiff's point of view.

MR. FOGARTY:  Not from defendants' point of view, your

H1PAFLE2ps

Honor.

THE COURT:  What I will do when discharging the jury -- not discharging them -- sending them back to deliberate -- excuse me -- is, we will then talk about the verdict form.  I understood from defendants' counsel that there are no edits to my verdict form?

MR. FOGARTY:  No, your Honor.

THE COURT:  I did not know because Mr. Dunlap was unable to tell me whether we have had had any more concerns about the verdict form.

MR. FUTTER:  I don't believe so.

THE COURT:  OK.  I will send them back.  I will ask you both to confirm that, and then we will send it back to them after they have been done.  We will give them as well the list of exhibits and witnesses that was prepared.

MR. FOGARTY:  Yes, your Honor.  Thank you.

THE COURT:  Thank you all.

MR. FOGARTY:  Thank you.

(In open court; jury present)

THE COURT:  What we will do now is, we will swear in the marshal and we will then allow you to retire to deliberate. You can take back with you your jury instructions.  I will send to you, either with the marshal or very shortly thereafter, a list of the witnesses and the exhibits that were admitted into evidence.  And I will give you one or more copies of the

H1PAFLE2ps

verdict form.  So we'll send that back to you.  They may follow

you into the jury room by a minute or so, but they are coming.

        Mr. Lopez.

        THE CLERK:  Yes, your Honor.

        (Marshal sworn)

        (The jury retired to deliberate; time noted, 11:05

a.m.)

        THE COURT:  Mr. Futter, a question for you, sir.  Your

slides, I will call them, were they just taken?

        MR. FUTTER:  No, recovered, your Honor.

        THE COURT:  Thank you.  I thought as much, but I just

wanted to confirm that.

        Did you have an opportunity, Mr. Futter and

Mr. Schweizer, to look at the verdict form?

        MR. FUTTER:  Yes.  We conferred, and I think all

parties agree, no issues, it's fine.

        THE COURT:  I have in my hand, and the parties are

seeing it, the witness and exhibit list and two copies of the

verdict form.  I send two because I am superstitious.  It's the

same reason I impanel one extra juror.  I will give these to

Mr. Lopez to send back to the jury.

        Just a couple of housekeeping matters.  It has been my

experience, though it may not be yours, that sometimes the

jurors have questions very early on.  There may be a note about

a different foreperson being selected.  One time they wanted

1    blueberry muffins.  You know -- you laugh.  You laugh, but it

2    is true.  So let's -- I'll ask the parties to remain local at

3    least for the first 20 to 30 minutes.  And let me know if you

4    need the granola bars.  I still have them.

5            Secondly, before any verdict comes in, I want to thank

6    the attorneys, who did a very, very good job with the evidence.

7    And I thank you.

8            As I've noted to you in the robing room, we all came

9    to this case for different reasons and at a point after its

10   inception, other than of course Mr. Fleming, who has been with

11   this case since its beginning.  I know how difficult it was for

12   me to assimilate all of the facts and to be ready.  And I know

13   how ready you were at this trial.  And I thank you for it.  And

14   I thank you for the professionalism and courtesy that you have

15   had and displayed to each other during this trial, which makes

16   my life that much easier.

17           When the verdict comes in, there will be no displays

18   of emotion.  Whatever it is, however good or bad it is from

19   your perspective, because each of you will have a perspective,

20   no displays of emotion.  We all remain poker-faced.  And you

21   know why.  The jury has done their job.  They will have done

22   their job.  And they don't need to know whether it made anybody

23   happy or sad.

24           I'm going to step off the bench for a moment.  Does

25   anyone have any issue to bring to my attention at this time?

H1PAFLE2ps

1          MR. FUTTER:  Not plaintiffs, your Honor.

2          MR. FOGARTY:  Not from defendants, your Honor.

3          THE COURT:  Thank you again.

4          (Recess)

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H1p2fle3

1          (Jury not present; time noted: 12:15 p.m.)

2          THE COURT:  We have received enough exhibits or notes

3    and I have enough exhibits that I just want to put some things

4    on the record.

5          Court Exhibit 1 is the charge in this case.

6          Court Exhibit 2 is the list of witnesses and exhibits.

7          Court Exhibit 3 was a note that we received at 11:20

8    requesting Plaintiff's Exhibits 3 through 6 and Defendant's

9    Exhibit A through I, signed by Ms. Rizzuto, who was Juror No.

10   1.

11         Court Exhibit 4 that was a transmittal note from me

12   attaching those exhibits.

13         Court Exhibit 5 came to us at 12 p.m., and the request

14   is as follows:  "Please give us copies of the individual

15   medical reports entered into evidence yesterday, specifically,

16   psychiatrist report, optometrist," and then there is quote

17   marks, which I take to mean she is repeating the word "report,"

18   "and dentist" quote marks, which I again believe means

19   "report."  "The compilation we just received is too copious for

20   the jury to deal with!  Thank you!" signed by Ms. Rizzuto.

21         I suggested to the parties that what she was seeking

22   were the following pages of the exhibit: 332, 333, 415, 416,

23   and 983.

24         Mr. Futter, may I have your position?

25         MR. FUTTER:  Your Honor, we agree that that's very

H1p2fle3

likely to be what the jury are referring to; however, if that

list of three examples is not intended to be exclusive of the

reports referred to, plaintiffs would also provide the jury

with D83 through D91.  That was a document referred to in the

reexamination of Mr. Fleming yesterday and in plaintiff's

closing argument.  It is the wound care document, for want of a

better name.  It is a medical report.

THE COURT:  Yes, sir.  All right.  And may I hear from

the folks -- is there more than you wish to tell me,

Mr. Futter?

MR. FUTTER:  No.

THE COURT:  Folks at the back table?  Mr. Passeser?

MR. PASSESER:  We have no objection to including those

pages with the documents your Honor suggested.

THE COURT:  Well, that's interesting.  I asked this,

not being glib here, the word "specifically" to me means

"specifically."  So specifically, I want the psychiatrist

stuff, the optometrist stuff and the dentist stuff, I am

absolutely fine, and I bet you this jury is fine, too.

If they want the wound care section or the chronic

ailment section, they will ask me.  I will give it to them

promptly.  So why don't we have it at the ready.  But it is my

preference in my reading of this note that they are asking for

these three categories of reports, because of the word

"specifically" rather than the word "including."  Am I mistaken

H1p2fle3

1    in my interpretation of the note, Mr. Passeser?

2              MR. PASSESER:  No, we are fine with that

3    interpretation, as well, your Honor.

4              THE COURT:  Mr. Futter, am I mistaken in my

5    interpretation of the note?

6              MR. FUTTER:  Your Honor, as I noted before, it's hard

7    to tell whether the *exclusio* principle is applying here*, i.e.*,

8    whether the specific examples are to delimit of more general

9    examples provided earlier.  Plaintiffs submit, as a matter of

10   convenience and courtesy, that we provide them with the extra

11   reports at the same time.

12             THE COURT:  I will ask you to keep it nearby and, as

13   soon as I hear from them that they want it, we will send it

14   back.  It has been referred to repeatedly as the wound care

15   papers, and we will know exactly what they mean.  They know it

16   is, too.  All right.

17             May I have, Mr. Passeser, the materials that I handed

18   out to the parties a few moments ago.

19             (Counsel confer)

20             THE COURT:  I am going to write a transmittal note

21   that just indicates that I am responding to their most recent

22   request.

23             THE DEPUTY CLERK:  Court Exhibit 6.

24             THE COURT:  Yes.

25             (Pause)

H1p2fle3

```
1          THE COURT:  Counsel, let me just let you know here is
2    what I have written to the jury.  "Ladies and gentlemen of the
3    jury:  Attached are the documents that we understand to be
4    responsive to your request for individual medical reports."  I
5    used the construction "understand to be responsive" in case
6    they want something else.
7          Can I ask the parties to remain local for a little bit
8    longer in case they come out with a request for those other
9    materials.
10         MR. FUTTER:  Yes, your Honor.
11         MR. PASSESER:  Yes, your Honor.
12         (Recess pending verdict; time noted: 12:21 p.m.)
13         (In open court; jury not present; time noted: 1:30
14   p.m.)
15         THE COURT:  I have received what is been marked as
16   Court Exhibit 7, and I will read it to the parties.  "Judge
17   Failla, The jury has arrived at a unanimous verdict! Kathie
18   Rizzuto," then her signature.  I can show the parties later.
19   We are going to get the jury now.
20         If I may skip ahead for a moment, it would not
21   surprise me if the parties were to have posttrial motion
22   discussions.  What I thought, so no one is forced to commit to
23   anything today, is that I could hear from the parties perhaps a
24   week from now if anyone is interested in posttrial motions.  I
25   will certainly talk to you again later, but does anyone have a
```

H1p2fle3

1   problem with that, rather than having us commit to something

2   today, Mr. Passeser?

3           MR. PASSESER:  I think that's a fantastic plan.  Thank

4   you, your Honor.

5           THE COURT:  Okay.  Well, okay.  Let's go with

6   fantastic, then.

7           And, Mr. Futter, it doesn't have to be fantastic to

8   you.  Is it acceptable?

9           MR. FUTTER:  It's acceptable.

10          Just to clarify, your Honor, the idea is that any

11  motions we might raise now would be discussed, without any

12  waiver, in a week's time.

13          THE COURT:  That is what I am saying, sir.  If you

14  would be making a posttrial motion immediately following the

15  verdict, I am letting you propose a schedule one week from now.

16  So that may be a schedule that the parties can agree on

17  perhaps, and I will let you figure out what reasonable period

18  of time you seek.  I am not going to make you give me a motion

19  next week, sir.

20          MR. FUTTER:  Understood, and plaintiffs are agreeable.

21          THE COURT:  Thank you very much.

22          Mr. Lopez.

23          MR. FUTTER:  Your Honor, we had one other motion.  We

24  don't know whether it is appropriate to do it before or after

25  the jury come back in, but just jointly we were going to

H1p2fle3

 1    request that your Honor request that we be entitled to speak to

 2    the jurors after the verdict.

 3              THE COURT:  Let me tell you my protocol in that

 4    regard, and let me thank you for reminding me of that.  What I

 5    do is the following:

 6              I will take the verdict.  I will find my way of

 7    thanking the jury.  I tend to stumble.  I will let them go, and

 8    I will ask them to remain in the jury room for a moment while

 9    while I just check in with you to make sure nothing is lost or

10    forgotten.

11              I will then meet with them and I will offer them at

12    that time the opportunity to meet with you.  Sometimes they say

13    yes; sometimes they say no.  I go with whatever they go with,

14    but I will certainly make them aware of your joint interest in

15    meeting with them.

16              Gentlemen, is it your contemplation that you would be

17    meeting with them separately?

18              MR. FUTTER:  I don't --

19              THE COURT:  That has been what has happened in the

20    past.

21              MR. PASSESER:  I think separately, if they are willing

22    to stay, would be great.

23              THE DEPUTY CLERK:  All rise.  Jury entering.

24              (Jury present; time noted: 1:33 p.m.)

25              THE DEPUTY CLERK:  Please be seated.

H1p2fle3

1              May I proceed, your Honor?

2              THE COURT:  You may, sir.

3              THE DEPUTY CLERK:  Will the jury foreperson please

4    rise.

5              Has the jury agreed upon a verdict?

6              THE FOREPERSON:  Yes, we have.

7              THE DEPUTY CLERK:  May I have one of the verdict

8    forms, please?

9              I am just going to ask you to remain standing for a

10   couple of minutes.  Thank you so much.

11             (Pause)

12             THE COURT:  I understand.  Thank you.

13             THE DEPUTY CLERK:  If you can just hold on to that,

14   please.

15             THE COURT:  Mr. Lopez.

16             THE DEPUTY CLERK:  Yes, your Honor.

17             (Pause)

18             THE DEPUTY CLERK:  Thank you, your Honor.

19             THE COURT:  Thank you very much.

20             THE DEPUTY CLERK:  Question 1.  Has the plaintiff,

21   Robert Fleming, proved by a preponderance of the evidence, that

22   Detective Stradford used excessive force against him on October

23   23, 2008?  How do you find?

24             THE FOREPERSON:  No

25             THE DEPUTY CLERK:  Question 5.  Has Mr. Fleming proved

H1p2fle3

1    by a preponderance of the evidence that Detective Braccini

2    failed to intervene to prevent the use of excessive force

3    against him on October 23, 2008?  How do you find?

4             THE FOREPERSON:  No

5             THE DEPUTY CLERK:  Thank you.  You may be seated.

6             Ladies and gentlemen of the jury, listen to your

7    verdict as it stands recorded.

8             Question 1.  Has the plaintiff, Robert Fleming, proved

9    by a preponderance of the evidence that Detective Stradford

10   used excessive force against him on October 23, 2008?  No.

11            Question 5.  Has Mr. Fleming proved by a preponderance

12   of the evidence that Detective Braccini failed to intervene to

13   prevent the use of excessive force against him on October 23,

14   2008?  No.

15            So say you one, so say you all.

16            THE COURT:  Does either side wish the jury to be

17   polled?  I will begin with you, Mr. Futter.

18            MR. FUTTER:  If that's a reference to the matter we

19   were discussing before --

20            THE COURT:  No, what I mean to say is, would you like

21   me to ask the individual jurors if that is each juror's

22   verdict.

23            MR. FUTTER:  No, your Honor.

24            THE COURT:  Thank you.

25            THE COURT:  Mr. Fogarty or Mr. Passeser?

H1p2fle3

1          MR. PASSESER:  No, your Honor.

2          THE COURT:  All right.  Thank you.

3          All right, ladies and gentlemen, I thank you very

4    much.  Let me give you some concluding thoughts.  I begin and

5    end by thanking you and I thank you very much for your service

6    today.

7          Short trials are very interesting.  We were talking

8    about that in the back.  They are in some respect easier in

9    that they are shorter and they are in some respect harder

10    because they are more compressed.  You obviously saw how much

11    effort has been put into the trial by the individuals, the

12    attorneys, and the parties in this case, and I know you

13    appreciated the work that they did to bring the case to you as

14    efficiently as possible.  I have told them previously my

15    appreciation.  So this was I guess more of the Usain Bolt

16    sprint than the marathon, but it is a lot of work nonetheless.

17          I just want to offer you the following thought about

18    being thanked.  The gentleman, the judge who is currently

19    regarded as the greatest judge to emerge from the Southern

20    District of New York always told jurors that he would not thank

21    them and that the civic pride they obtained from doing their

22    job was enough; and he was, God rest his soul, a very smart

23    man.

24          All of that said, I can accept the possibility that

25    you are all feeling pride in your fulfilling your civic

H1p2fle3

responsibilities and still thank you for taking the time for

traveling here, for enduring our cafeteria food, and granola

bars and for spending the time that you did on deliberations,

making sure you arrived at what you believe to be a just

verdict.  So you still have my thanks.

In the category of the check is in the mail, you

should receive something from the court in about six to eight

weeks, we are told.  And if you do not, I believe you have

Mr. Lopez's number.  You can call him or call me and we will

work on that.

Finally, what I would like to do is the following.  I

would like to discharge you to the room that has become your

jury room, and if you would permit me a point of personal

privilege, I would like to come back and just meet with you and

thank you personally if you will allow me that time.  So what

we will do now, as we let you do that, I will talk to you for a

few minutes, and we will go on.

I hope, I hope that you will continue the tradition of

Failla juries in enjoying the relationships that you have made

even in this brief period of time, the experience that you have

had, and I hope that you also appreciate, I know that you

appreciated the seriousness of this job, of your job, and I

hope that you understand that if you are ever in the position

of Mr. Fleming or Detective Stradford or Detective Braccini,

that you know that a group of jurors just like you would take

H1p2fle3

1  the same amount of time and care in reviewing the evidence,

2  because that has been our experience, and it was shown again

3  today.

4        So we rise one last time as a sign of our respect for

5  you.  Thank you.

6        (Jury dismissed; time noted: 1:40 p.m.)

7        THE COURT:  Is there anything else we need to address

8  before I meet with the jurors?

9        MR. FUTTER:  Defendants, in respect to the issue we

10 were discussing before the jury came in, want to meet

11 separately, then I suppose plaintiffs do as well or must as

12 well.

13        THE COURT:  I will offer that.  Of course if they say

14 one time only, then it is together.

15        Thank you very much.  Again, thank you.  And thank you

16 to the supervisors who have been here through all of this.

17                              - - -

18

19

20

21

22

23

24

25