UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

ROBERT FLEMING,

               Plaintiff,

       v.

DET. WENDELL STRADFORD #3420,
DET. STEVE BRACCINI #4305,

              Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 22, 2018

10 Civ. 3345 (KPF)

REDACTED
OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

    Plaintiff Robert Fleming brought this civil rights action in April 2010, seeking redress against the City of New York, the New York City Police Department ("NYPD"), and several NYPD officers for a variety of constitutional violations. By the time of trial in January 2017, his claims had been reduced to a single claim for excessive force at the hands of two NYPD detectives during an interview on October 23, 2008. The matter was tried to a jury, and the jury returned a verdict in favor of Defendants.

    Plaintiff has raised a host of post-trial claims for judgment in his favor as a matter of law or for a new trial. Several of these claims are predicated on fundamental errors of fact, while others are predicated on misconstructions of the relevant law. For the reasons set forth in the remainder of this Opinion, this Court sees no basis to disturb the jury's verdict, and will enter judgment in favor of Defendants.

## A.   Factual Background

In October 2008, Plaintiff was a detainee on drug possession charges at the George R. Vierno Center ("GRVC") on Rikers Island. On October 23, 2008, two detectives with the NYPD Cold Case Squad, Defendants Wendell Stradford and Stefano (Steve) Braccini, visited Plaintiff at GRVC in order to interview him about the 1988 rape and murder of Plaintiff's former girlfriend and her nine-year-old daughter. What happened during that interview is a matter of considerable dispute: Plaintiff claims that one of the Defendants beat him severely, causing lasting damage to his face, neck, and teeth. Defendants claim that they had no physical contact with Plaintiff for various reasons, including the prison facility's use of a partition and a locked door between Plaintiff and Defendants in the room where the interview was conducted.

Plaintiff's criminal prosecution is secondary to the issues in the instant lawsuit and is summarized here briefly for context. Plaintiff was indicted in January 2009 on two counts of murder in the second degree in New York State

---

[1]   Many documents have been filed in this litigation, and the Court has reviewed each and every one of them. With particular respect to Plaintiff's submissions concerning the trial and post-trial proceedings, the Court observes that many of the submissions contain duplicative arguments. While the Court addresses every argument raised by Plaintiff, it does not respond specifically to every submission.

For ease of reference, the Court will cite to the docket entry number of each document, and to the page numbers assigned by this Court's electronic case filing ("ECF") system. The Court also refers to documents according to the date on which each was docketed, even if that date differs from the date on which the document was submitted to the Court.

The Court has submitted this unredacted version of this Opinion to the parties. However, on the public docket of this case, the Court will file a redacted version that omits reference to sensitive information involving Plaintiff.

Supreme Court, Bronx County.  He was convicted after a jury trial and sentenced to consecutive terms of 25 years' to life imprisonment.  His conviction was upheld in 2016 by the Appellate Division, First Department, *see People* v. *Fleming*, 35 N.Y.S.3d 326 (1st Dep't 2016), and the Court of Appeals denied him leave to appeal later that same year, *see People* v. *Fleming*, 28 N.Y.3d 1027 (2016).  *See also People* v. *Fleming*, 28 N.Y.3d 1124 (2016) (denying motion for reconsideration).

During the pendency of his prosecution, Plaintiff filed a petition for habeas corpus relief in this District; the petition was dismissed in 2016 for Plaintiff's failure to exhaust his claims in state court.  *See Fleming* v. *Warden of Auburn Corr. Facility*, No. 14 Civ. 5284 (PGG) (JLC), 2015 WL 7769204 (S.D.N.Y. Dec. 2, 2015) (report and recommendation), *report and recommendation adopted*, 2016 WL 3387300 (S.D.N.Y. June 15, 2016), *appeal dismissed* (Sept. 22, 2016).  A second petition was filed in November 2017; it remains pending.  *See Fleming* v. *Noeth*, No. 17 Civ. 9104 (LGS) (filed November 20, 2017).

**B.    Procedural Background**

**1.    The Complaint and the Stay Order**

On April 20, 2010, Plaintiff filed a *pro se* complaint under 42 U.S.C. § 1983. (Dkt. #2).  He named as defendants Detectives Stradford and Braccini, as well as the New York City Department of Corrections.  In brief, Plaintiff alleged that he had declined to be interviewed by the two detectives on October 23, 2008, referring them instead to his appointed counsel for the drug possession charge for

which he was then being detained. (*Id.* at 3). According to Plaintiff, Detective Stradford rejected Plaintiff's request that questioning cease, and instead presented him with a *Miranda* waiver form. Plaintiff reviewed the form, but refused to initial the waiver of his right to counsel. It is then, claimed Plaintiff, that Detective Stradford administered several blows to Plaintiff's head, while Detective Braccini failed to intervene. (*Id.*).

On May 25, 2010, United States District Judge Richard J. Sullivan, to whom the case was then assigned, issued a referral order to United States Magistrate Judge Ronald L. Ellis for general pretrial purposes. (Dkt. #5). On August 18, 2010, Judge Ellis issued an order staying the case until the completion of Plaintiff's criminal proceedings. (Dkt. #6). Among other things, Defendants' obligation to answer or otherwise respond to the complaint was stayed until 45 days after Plaintiff advised the Court that his criminal proceedings had concluded. (*Id.*).

In a submission docketed in May 2011, Plaintiff sought a lifting of the stay, arguing principally that his criminal case could be disaggregated from the excessive force claims in his civil complaint. (Dkt. #12). Judge Ellis denied the request by Order dated May 25, 2011. (Dkt. #13).

### 2. The Reassignment and the Lifting of the Stay

In May 2013, the case was transferred to United States District Judge Analisa Torres, although the referral to Judge Ellis for general pretrial supervision remained in place. (Dkt. #21). On September 26, 2013, Judge Ellis issued an

4

order lifting the stay, citing Plaintiff's conviction and sentencing in his homicide prosecution. (Dkt. #22). Judge Ellis then scheduled a telephone conference with the parties to take place on December 10, 2013. (Dkt. #25).

The parties contemplated dispositive motion practice in early 2014. Defendants advised Plaintiff of their intention to file a motion to dismiss in a letter dated January 15, 2014, prompting Plaintiff to file papers in support of a motion for summary judgment while simultaneously announcing his intention to amend his complaint. (*See, e.g.*, Dkt. #38 (outlining history); Dkt. #26-28, 32-33, 36 (Plaintiff's post-conference submissions)). To regain control of her docket, Judge Torres issued a scheduling order on April 3, 2014. (Dkt. #39). In it, she required Plaintiff to file his amended complaint by May 5, 2014; specified a schedule for Defendants' motion to dismiss; and denied without prejudice Plaintiff's motions *in limine* and for summary judgment. (*Id.*).[2]

Plaintiff filed what he styled as the Third Amended Complaint on April 21, 2014. (Dkt. #43). This Complaint added as defendants the City of New York and the NYPD Cold Case Squad. However, in addition to factual allegations, Plaintiff also included arguments for summary judgment pursuant to Federal Rule of Civil Procedure 56; default judgment pursuant to Federal Rule of Civil Procedure 55; suppression of his interview statements pursuant to New York state law; and the applicability of the parol evidence rule to prove the content of certain unspecified writings. (*See, e.g.*, *id.* at 2-6). Similarly, in addition to the excessive force

---

[2]     Plaintiff filed a motion and affirmation in opposition to Judge Torres's order. (Dkt. #48).

allegations that had been raised in his initial complaint, Plaintiff now included claims for violation of the First Amendment (*id.* at 10-11); improper custodial interrogation in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments (*id.* at 8); denial of due process under the Fourteenth Amendment (*id.* at 10-11); various forms of estoppel under New York law (*id.* at 5-6, 15); and violations of New York's Criminal Procedure Law (*id.* at 13-14). Plaintiff also raised a variety of challenges to his criminal prosecution, apparently under the impression that the Court had the ability to vacate his convictions. (*See id.* at 24-26; Dkt. #43-1 at 1-10).

### 3. The Motion to Dismiss

Defendants filed a motion to dismiss on May 20, 2014. (Dkt. #50-53). Broadly speaking, Defendants contended that Plaintiff's claims were barred by *Heck* v. *Humphrey*, 512 U.S. 477 (1994), and the *Rooker-Feldman* doctrine; that the claims were not plausible under *Ashcroft* v. *Iqbal*, 556 U.S. 662 (2009), and *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544 (2007); that the NYPD Cold Case Squad was not a separate, suable entity; and that Plaintiff had failed to state a claim for municipal liability. (*See* Dkt. #52). Plaintiff filed his opposition papers on July 16, 2014; in them, Plaintiff argued that Defendants' failure to file an answer in the matter (which failure, of course, was the result of their filing the motion to dismiss) warranted the entry of a default judgment against them. (Dkt. #58). Defendants filed a reply memorandum on August 1, 2014. (Dkt. #61).

In a Memorandum and Order dated November 26, 2014, Judge Torres granted in part and denied in part Defendants' motion. (Dkt. #63). *See also Fleming* v. *City of N.Y.*, No. 10 Civ. 3345 (AT)(RLE), 2014 WL 6769618 (S.D.N.Y. Nov. 26, 2014). In particular, the Court rejected Defendants' various challenges to Plaintiff's excessive force claim, but dismissed without prejudice his deliberate indifference and deprivation of counsel claims. *Id.* at *4-5. The Court also dismissed Plaintiff's claims against the Cold Case Squad with prejudice based on Section 396 of the New York City Charter, and dismissed his claims against the City of New York without prejudice for failure to allege an official policy, practice, or custom. *Id.* at *6-7. Finally, Judge Torres rejected Plaintiff's efforts to vacate his conviction through this civil lawsuit. *Id.* at *8.

### 4. The Answer, Discovery, and the Putative Settlement of the Case

Defendants submitted their answer to the Third Amended Complaint on February 2, 2015. (Dkt. #75). Thereafter, Magistrate Judge Ellis scheduled a telephone conference with the parties for February 24, 2015. (Dkt. #74-75). During the conference, Judge Ellis ordered that discovery be produced on or before May 26, 2015, although this date was subsequently extended because, among other reasons, Plaintiff was delayed in providing the requisite medical authorization forms. (Dkt. #83-84, 87-88). Ultimately, Judge Ellis scheduled a post-discovery telephonic conference to occur on November 10, 2015. (Dkt. #94).

By letter dated November 16, 2015, counsel for Defendants advised the Court that the parties had agreed on that day to settle the matter without further

litigation, and that counsel had forwarded the appropriate settlement documents to Plaintiff for his signature. (Dkt. #95). That same day, Judge Torres issued a conditional order of discontinuance (referred to colloquially as a "30-day order"). (Dkt. #96). But reports of the settlement were premature: Plaintiff returned his copy of the Court's 30-day order with a letter "rescind[ing]" his acceptance of Defendants' "arbitrary and irrational" settlement offer (Dkt. #97), and the case was restored to the Court's docket (Dkt. #99).[3]

### 5. The Completion of Discovery and the Summary Judgment Motions

The matter was referred again to Magistrate Judge Ellis, who convened a telephone conference for January 14, 2016. (Dkt. #100). At the conference, Judge Ellis confirmed that discovery had concluded and, thus, that the bases for referral to him had been satisfied. (Dkt. #102). Plaintiff filed, and then withdrew, a motion for summary judgment in February 2016. (Dkt. #105-07). Defendants filed their own summary judgment motion on March 1, 2016. (Dkt. #108-12; *see also* Dkt. #104 (scheduling order)). Plaintiff filed an affirmation in opposition, and then a cross-motion for summary judgment. (Dkt. #113-16; *see also* Dkt. #123 (second cross-motion, docketed May 2, 2016)). Defendants filed their reply on April 29, 2016 (Dkt. #117), and filed additional materials in response to a Court order on June 30, 2016 (Dkt. #129-30).

---

[3] Among other things, Plaintiff announced his demand for judgment in the amount of $100,000,000 and punitive damages in the amount of $50,000. (Dkt. #97 at 21). This was a substantial increase from his demand of declaratory and injunctive relief and punitive damages in the amount of $50,000 in his initial complaint. (Dkt. #2 at 5).

By Order dated September 30, 2016, Judge Torres denied Defendants' motion for summary judgment. (Dkt. #135). Of note, the Court found a disputed issue of material fact as to whether Detective Stradford ever struck Plaintiff; it further found the absence of corroborating medical records not to be dispositive of the issue, inasmuch as (i) the records did not "directly contradict[]" Plaintiff's allegations of injury and (ii) the Court could not find that "Fleming's deposition testimony [was] so full of improbabilities or inconsistencies so as to justify the Court's rejection of Plaintiff's version of the facts." (*Id.* at 5-6).

## 6. The Reassignment of the Case and the Appointment of Counsel

This case was reassigned to the undersigned in the fall of 2016. (Dkt. #136). By Order dated October 12, 2016, the Court scheduled a telephone conference with the parties to occur on November 4, 2016. (*Id.*; *see also* Dkt. #160 (transcript of conference)).

At the conference, the Court introduced itself to the parties and discussed the single claim of excessive force that was proceeding to trial. After hearing from Plaintiff about his understanding of the case, the Court engaged in the following colloquy:

> THE COURT: I want to make sure that you understand what this case can and cannot do, and what this case is and what this case is not.
>
> The case that I have, the 10 CV 3345 case, is a civil rights case that you brought against the City of New York and two of its agents for conduct that happened while you were incarcerated at Rikers Island. Now that the case has come to me, sir, it's come to me in the following form. I have a case that deals with a single incident; that is, an incident,

9

an encounter that you had with two officers of the New York City Police Department on October 23rd of 2008. It is your allegation, sir, that during that encounter, during that questioning, they used excessive force and caused injury to you and thereby deprived you of your constitutional rights.

Your adversaries, represented by [the Law Department], indicate that they did not touch you and that they did not cause any injuries, and that they, therefore, did not deprive you of your constitutional rights. So the trial that I plan to have on this case is limited to this incident and whether or not you were subjected to excessive force.

Now, sir, this is a "yes" or "no" question. Do you understand what I've just said?

MR. FLEMING: Yes, I do, ma'am.

THE COURT: Terrific, sir. Now, let me tell you what this case is not because, as you might imagine, sir, courts have limits on their jurisdiction. A judge in one place cannot decide all things in all other places, and judges have to also give a certain degree of deference to decisions by other judges in other jurisdictions.

So my case, sir, is a civil case. You are asking for compensatory and punitive damages caused by the excessive force, or not, that you were subjected to. So at this trial, you're going to be telling the jury that you were subjected to this excessive force and you believe that there is money that can compensate you for these damages.

Here's what my case is not about, sir. My case does not impact the criminal prosecutions to which you have been subjected. So I don't have the ability and, therefore, I wouldn't be doing this. I don't have the ability to affect the criminal sentences or criminal convictions that have been imposed on you. ... And so I just want to be clear that if you are asking me, sir, for things like the vacatur or the removal of your criminal convictions or your release from custody or — you may have heard the term expungement — the expungement of your convictions, I can't do that, sir, because that's not what I've been given.

> All I've been given is your civil rights lawsuit about this one incident.  Do you understand that, sir?
>
> MR. FLEMING:  Can I respond to that?
>
> THE COURT:  You can, sir.
>
> MR. FLEMING: I mean, I understand, but I need to respond.

(Dkt. #160 at 4-6).

Plaintiff's subsequent discussions with the Court suggested a degree of confusion with legal precepts — for instance, referring to the Court's role as one of "*amicus curiae*," perceiving Judge Torres's summary judgment decision as a finding in his favor as a matter of law, and, perhaps most significantly, reasoning that the settlement offer he had refused from the Law Department amounted to an admission on Defendants' part that his criminal convictions should be vacated.  (Dkt. #160 at 7-8, 10-11).  In consequence, the Court inquired whether Plaintiff would like the Court's assistance in obtaining *pro bono* counsel to aid him at his trial.  Initially, Plaintiff rejected the Court's offer, noting his prior *pro se* representation in various facets of his civil and criminal cases.  (*Id.* at 11-14).

The Court announced its intention to schedule a trial date in January 2017; obtained confirmation that such a trial date would be convenient for both sides; and began to discuss with the parties the logistics of the trial.  (Dkt. #160 at 14-18).  In response to inquiries from Plaintiff, the Court then addressed certain evidentiary issues, such as the relevance (if any) of the parol evidence rule to Plaintiff's claim at trial and the possible introduction of other acts evidence.  (*Id.* at 19-28).  At the conclusion of the conference, Plaintiff asked the Court if he

11

would be permitted to speak with potential counsel before the entry of any appearance on his behalf; the Court agreed to discuss the matter with the District's Office of Pro Se Litigation. (*Id.* at 31-32).

One week later, the Court issued an Order advising the parties as follows:

> During a November 4, 2016 telephonic pre-trial conference, the Court informed Plaintiff, currently proceeding *pro se*, that per his request, the Court would explore whether *pro bono* counsel might be available to represent him at trial. The Court has looked into the matter and has learned from the law firm of Quinn Emanuel Urquhart & Sullivan, LLP, that it is interested in so doing. In light of Plaintiff's previously expressed concerns regarding past representation by other counsel, the Court believes it best that Quinn Emanuel attorneys meet with Plaintiff to discuss the prospects of representation. Accordingly, the Court expects that Quinn Emanuel will meet with Plaintiff in the month of November, and advise the Court by December 5, 2016, whether such representation is mutually desirable for Plaintiff and Quinn Emanuel.

(Dkt. #140).

The docket reflects, and the Court's recollection confirms, that Plaintiff initially rejected Quinn Emanuel's offer of representation, but later changed his mind. (*Compare* Dkt. #141, 147, 149, *with* Dkt. #143, 144 ("We are pleased to inform the Court that Quinn Emanuel and Mr. Fleming spoke by telephone on Wednesday November 23, then met on Tuesday November 29, 2016, following which Mr. Fleming agreed to retain Quinn Emanuel and signed a retainer agreement to that effect. We have today filed the appropriate notices of appearance."); *see also* Dkt. #204 at 59 (Court observing that four times Plaintiff

had sought to proceed *pro se*, before changing his mind and continuing with counsel)).

### 7. The Reopening of Discovery

On December 20, 2016, counsel for Plaintiff moved to reopen discovery. (Dkt. #153-54; *see also* Dkt. #156 (Defendants' opposition letter)). In particular, counsel sought (i) to depose each Defendant; (ii) "any records in [Defendants'] files regarding their use (or alleged use) of excessive force against inmates in interrogation situations, such as warnings, cautions, or evidence of disciplinary action"; (iii) "records of any official investigations, inquiries, or reviews regarding use of excessive force during interrogations at Rikers Island Correctional Center during 2007 or 2008"; (iv) blueprints or other schematics for the relevant interrogation room at Rikers Island; and (v) records regarding any surveillance of the interrogation room at Rikers Island. (Dkt. #154).

The Court scheduled a telephone conference for December 23, 2016, to resolve the matter (Dkt. #155), at which time it granted in part Plaintiff's motion (Dkt. #182 (transcript of conference)). The parties had previously agreed to schedule depositions of each Defendant.[4] On the separate issue of Defendants' disciplinary histories, defense counsel related that there were no responsive

---

[4]   Plaintiff misperceives the Court's statement in this regard that, "On the issue of the depositions of the individual defendants in this case, I will to my own detriment reset the deadline to motions *in limine* ... until January 13th and I will therefore allow for depositions in the second week of January." (Dkt. #182 at 4). The Court meant, and the parties to the conversation understood the Court to mean, that by allowing the depositions to take place and the schedule for motions to be extended, the Court was shortening the amount of time it had to rule on those motions.

materials for the ten years prior to the 2008 incident, but that there were potentially responsive materials that postdated the incident. Accordingly, the Court agreed to conduct an expedited *in camera* review of certain personnel and disciplinary files, after which it ordered the production of additional materials to Plaintiff's counsel. (Dkt. #182 at 5-7; *see also* Dkt. #157 (order following review)). On the broader issue of discovery into practices at Rikers Island generally for the time period of 2007 to 2008, the Court found as follows:

> Knowing the case as I do and knowing the allegations, I have said to Mr. Fleming on occasion that what I believe this case pertains to is what happened on a particular day. I don't believe that any sort of more expansive, more comprehensive evaluation of investigations regarding the use of excessive force during interrogations would be of assistance to me, particularly because this case involves two officers who are not themselves resident at Rikers Island who may or may not have engaged in misconduct.

> I find it difficult to reason from the facts of this case that there would be a broader policy or practice of allowing law enforcement officers who are not resident at Rikers Island to come in and exhibit or apply excessive force to folks there. And even if there were that information, I'm not sure that I would allow it at trial.

> So on several grounds, including the lateness of the request and the [short time] until trial and the fact that I think this would be stuff that I would very likely exclude on [Federal Rule of Evidence] 403 grounds, I am not going to require the production of it.

> I say to the folks who have come on board [i.e., the Quinn Emanuel attorneys], I know that there was some time trying to understand and get the facts of this case, but the application for additional discovery was made very, very recently. I think I will be burdening the defense counsel enough without having to go into this issue, which I'm not sure would be worth it.

(Dkt. #182 at 8-9).

## 8.      The Motions in Limine and Their Resolution

### a.      The Motions

The parties filed motions *in limine* on January 13, 2017.  (Dkt. #172-76; *see also* Dkt. #179, 181).  Only a few of these motions are relevant to Plaintiff's post-trial applications, and only they are discussed in this section.  Of note, Plaintiff moved to preclude introduction of evidence, argument, or jury consideration of his prior convictions, including in particular the two homicides that were the subject of the October 23, 2008 interview.  (Dkt. #176).  Defendants, by contrast, sought to introduce evidence of the murder convictions and of Plaintiff's written statements[5] implicating himself in those murders, reasoning in part that such evidence was proper impeachment material and in part that the introduction of such detailed confessions would undercut Plaintiff's arguments that he had been subjected to excessive force by Defendants.  (Dkt. #174).  Defendants also sought to preclude inquiry by Plaintiff into their respective disciplinary histories or prior lawsuits.  (*See id.* at 10-12).

### b.      The January 17, 2017 Conference

On January 17, 2017, the Court held a conference at which counsel for all parties appeared.  (Dkt. #187).  While the majority of the motions were resolved,

---

[5]      At trial, Detective Stradford testified that he took notes of the interview, which he permitted Plaintiff to review, annotate, and sign.  (Dkt. #206 at 43, 47-48 (Tr. 105, 109-10)).  Plaintiff also prepared two written statements, the first of which he tore up and ate before Defendants could review it.  (*Id.* at 45-46 (Tr. 107-08)).

certain of them were tabled so that the parties could obtain or evaluate additional evidence. (*See, e.g.*, *id.* at 8-9 (references to NYPD Patrol Guide)). Among other motions, the Court addressed Defendants' application to preclude inquiry into their disciplinary histories and prior litigations. As to the former category, counsel for Plaintiff acknowledged receipt of additional disciplinary information that had been produced as a result of the Court's *in camera* review, and disclaimed any intent to use that information at trial. (*Id.* at 9). As to the latter category, however, counsel for Plaintiff indicated an intent to question Detective Braccini about the substance and resolution of a prior litigation involving a claim of excessive force that had begun in federal court and ended in state court. *See Felder* v. *City of N.Y.*, No. 04 Civ. 2564 (AKH) (S.D.N.Y.); *Felder* v. *City of N.Y.*, 938 N.Y.S.2d 226 (Table) (Sup. Ct. N.Y. Cty. Sept. 13, 2011). (*Id.* at 10). Counsel agreed to provide additional information concerning the lawsuit to the Court, since it had not been discussed in the papers. (*Id.* at 10-11).

The bulk of the Court's time was spent resolving the parties' disputes concerning the degree to which the details of Plaintiff's convictions could be introduced. The Court prefaced its discussion of these issues thusly:

> I guess the issue that has caused me the most concern this weekend is the degree to which the specific facts of the offense that was the subject of the questioning need to come out into the record, the degree to which the convictions need to come out into the record and how I am going to cabin in this trial so that both sides are treated fairly at this trial.
>
> Let me say this. There are a couple of things that are just sort of principles with which perhaps we can all agree.

16

And one is that in any trial there is a degree of artificiality that's occasioned by the use of the Federal Rules of Evidence. So, in trying to say we want this to be the truth, I don't mean to say we're [past] that point. We are not [past] that point. It's that the rules of evidence embody the resolution of the number of policy choices including the concerns that sometimes information might come out that … is just so either irrelevant or prejudicial or something untrustworthy that it just shouldn't make it into the record.

Here is another thing to consider though. In my conversations with Mr. Fleming which all predate — well, with one exception — predate your representation of him. Mr. Fleming has been, one might use the term "hell-bent" on getting before the jury the fact of his convictions and how inappropriate they are. And he does — he did on some level believe that this case was an opportunity to vindicate and deal with his criminal convictions. It is not. He should not be mentioning his convictions. He should not be suggesting that somehow anything in this trial has any bearing at all on his convictions.

Let me now move to my next point. … I conceived of this trial as a representation or discussion of a single snapshot in the photo album that is the … plaintiff's case … where he is questioned on another offense and something either happens or doesn't happen. But once the plaintiff starts talking about motivations, why these officers might have done things, and once he starts getting into more granularity or detail, then I think the defendants' arguments for the introduction of the confession or the interview notes have more traction.

(*Id.* at 11-12). Counsel for Plaintiff agreed with the Court's framing of the case, and committed to explaining to Plaintiff the ways in which he might inadvertently open the door to the introduction of this information at trial. (*Id.* at 12-13). In return, the Court admonished defense counsel concerning the manner into which Plaintiff could be questioned concerning his prior convictions. (*Id.* at 13-17).

17

The parties then discussed the degree to which Plaintiff could be questioned regarding his written statements to Defendants during their interview of him at Rikers Island. (Dkt. #187 at 17-24). Defendants proposed to redact the statements for introduction to the jury; Plaintiff responded that high-level questions concerning the preparation of the statements would be a less prejudicial means of permitting Defendants to make their arguments concerning voluntariness. (*Id.*). The Court agreed to let the parties attempt to reach accord on a redacted statement, and deferred a final decision. (*Id.* at 24). At the conclusion of the conference, Defendants raised, off the record, a separate motion *in limine* to permit them to introduce evidence of certain of Plaintiff's medical conditions. (*See* Dkt. #187 at 31; *see also* Dkt. #181 at 3).[6]

### c. The Supplemental Briefing Concerning the Motions

The following day, Plaintiff, through counsel, responded to the open motions *in limine*. (Dkt. #181). Of significance here, Plaintiff continued to oppose defense efforts to introduce his written statements, even in a redacted form, to the jury. (*Id.* at 3-6). Instead, Plaintiff agreed to "limited, high-level questions regarding the statement," and proposed several acceptable questions. (*Id.* at 4 n.4 and Appendix 1). Separately, on the issue of Defendants' motion concerning medical information, Plaintiff related that he did "not object to Defendants

---

[6]    As noted, this portion of the conference was conducted off the record because of the sensitivity of the information discussed. According to the Court's notes of this portion of the conference, counsel for Defendants indicated their intent to elicit at trial the detectives' knowledge of Plaintiff's **[redacted]**, which, counsel argued, was probative of the issue of Defendants' willingness to come into physical contact with Plaintiff.

seeking to elicit information on *Defendants' beliefs regarding Plaintiff's medi[c]al status*, but object[ed] to Defendants seeking to elicit such testimony from Plaintiff directly on the basis that it is irrelevant (unless Defendants' belief testimony is challenged), and invasive to Plaintiff's personal privacy." (*Id.* at 3 (emphasis added)). Finally, Plaintiff offered additional information concerning the *Felder* litigation, and announced that counsel was "still attempting to obtain the full file of the *Felder* proceeding." (*Id.* at 2).

### d. The January 20, 2017 Conference

The Court resolved the remaining motions in a telephone conference held with counsel for both sides on January 20, 2017. (Dkt. #193). Ultimately, it declined to let in redacted copies of Plaintiff's written statements, concluding that they raised more potential questions in jurors' minds than they answered:

> So, again, I do understand, and I have empathy for defense counsel in trying to appropriately defend their clients in this case, but I think that whatever probative value is to be gained can be gained using the questions of the type that were suggested by me and were suggested by plaintiff's counsel, that go to length and evenness of handwriting and things of that nature, and things where you can show the witness and get some answer from him, but not actually have to show these materials to the jury.

(*Id.* at 23). Here, too, the Court reminded the parties that certain arguments or testimony at trial could open the door to the introduction of the statements. (*Id.* at 22).

With regard to the issue of information concerning Plaintiff's medical conditions, counsel for Defendants agreed that the testimony concerning

19

Defendants' belief as to Plaintiff's conditions would be elicited through Defendants, and that they did not anticipate asking Plaintiff about those conditions. (Dkt. #193 at 15-16; *see also id.* at 16 (counsel for Plaintiff agreeing that the medical condition issue "is not a concern at this time")).

Finally, as to the *Felder* litigation, the Court expressed concern that allowing questioning of Detective Braccini about the litigation would be improper, inasmuch as the specific claims against him appeared to have been dismissed and the settlement in question appeared to have been made by the City of New York for a claim of negligent training or supervision. (Dkt. #193 at 5-7). The Court indicated a disinclination to permit questioning, but did not definitively resolve the issue: "I need to see something suggesting that Detective Braccini was in the case and it was something that he did that was the basis of this settlement before we start allowing questions on it." (*Id.* at 11). On the morning of the first day of trial, before jury selection had begun, counsel for Plaintiff advised the Court that Plaintiff would not be inquiring into the *Felder* matter.

### 9. Trial

#### a. Day 1

Trial in the matter began on Monday, January 23, 2017.[7] After jury selection and openings, Plaintiff called as his first witness Detective Stradford. To advance Plaintiff's theory of the case — that Stradford beat Plaintiff when Plaintiff

---

[7] For the first day of trial, the trial transcript cites are identical to the ECF-assigned page cites.

declined to speak with Defendants about the 1988 case[8] without first consulting with his attorney — counsel for Plaintiff got Stradford to admit that the detective was "pretty skilled at getting people to confess to unsolved cases" (Dkt. #204 at 21); that he had "turned up at Rikers on October 23 with the intention of getting Mr. Fleming to confess to that unsolved 1988 case" (*id.* at 24); and that, because of Plaintiff's imminent transfer to an inpatient drug-treatment program, he perceived "some sense of urgency about being able to speak to Mr. Fleming on October 23" (*id.* at 26). Stradford also testified that he had frequently obtained "cooperation" from prison officials in the conduct of his investigations. (*Id.* at 28-31). Counsel for Plaintiff then reviewed with Stradford various photographs of the interview room showing the means of ingress and egress. (*Id.* at 31-41). Finally, counsel asked a line of questions on the issue of whether Plaintiff had been "wounded when he left the interrogation room on October 23, 2008, because you beat him when he insisted on his right to an attorney." (*Id.* at 46). Stradford denied ever touching Plaintiff.

On cross-examination, Stradford explained that he and Detective Braccini had expected to interview Plaintiff in a "gang trailer" — a mobile unit maintained by the NYPD that was adjacent to GRVC — but were advised by law enforcement on the morning of the interview that the trailer could not be used because Plaintiff was **[redacted]** and was known to be a "spitter." (Dkt. #204 at 48-49).

---

8      Pursuant to the Court's resolution of the *in limine* motions, the jury heard no evidence concerning the nature of the 1988 case.

Stradford also recalled that a corrections officer not affiliated with the NYPD accompanied Defendants to the interview and remained present throughout the interview. (*Id.* at 49).

In the middle of cross-examination, counsel for Plaintiff announced an urgent need to speak with his client, and the jurors were excused. (Dkt. #204 at 52-53). As the Court prepared to leave the bench to permit Plaintiff and his counsel to confer, Plaintiff objected, shouting: "You can end this right now or you can reassign me for him, because that information about my **[redacted]** is not supposed to be in here. That's a violation of my HIPAA law. I know that." (*Id.* at 54). Plaintiff also disputed his designation as a "spitter," which he noted would have foreclosed his housing in the general population of the facility. (*Id.*). He continued:

> I know the law and the rules, the provisions, and all of that, and he hasn't objected to nothing that that man said back here, and that is inappropriate. That's ineffective assistance of counsel. And that's why I want to represent myself, because I know what questions to ask. I know how to object to those erroneous, arbitrary, and irrational statements that they make that you didn't give him an admonishment of not objecting.

(*Id.* at 54-55). The Court advised Plaintiff that the issue of the medical conditions had been litigated pretrial, and, further, that the Court "would have allowed the question if you were representing yourself." (*Id.* at 56). Plaintiff repeatedly asked the Court to discharge his counsel, disrupting the proceedings to the point that he had to be restrained by the U.S. Marshals Service. (*Id.* at 57-58). In order to

permit Plaintiff to calm down, and thus prevent further damage to his credibility and his case, the Court adjourned the proceedings for the day. (*Id.* at 59-61).

### b. Day 2

The following day, Plaintiff's counsel communicated Plaintiff's desire to proceed for the rest of the trial *pro se*, with counsel sitting beside him at the front table of the courtroom. (Dkt. #206 at 2 (Tr. 64)). Plaintiff also expressed a desire to discuss the events of the preceding day "and other issues" with the Court. (*Id.* at 3 (Tr. 65)). He began by accusing the Court and both sets of attorneys of having "committed fraud under a contract that you guys did on January 17 in my absence, in discontinuing the city or the 42nd precinct Cold Case Squad as Defendants." (*Id.* at 4 (Tr. 66)). The Court reviewed with Plaintiff the prior decisions on the motions to dismiss and for summary judgment, which decisions confirmed that those defendants had been dismissed back in 2014. (*Id.* at 5-10 (Tr. 67-72); *see also id.* at 10 (Tr. 72) (Plaintiff "acquiesc[ing] to that")). Plaintiff also acknowledged that he had signed a HIPAA release form during the pendency of the litigation to permit disclosure of his medical information to Defendants. (*Id.* at 10-11 (Tr. 72-73)).

Plaintiff then engaged the Court in a discussion of his understanding of the rules against hearsay evidence. (Dkt. #206 at 13-14 (Tr. 75-76)). According to Plaintiff, by not immediately objecting to the introduction of the information, his counsel had permitted a violation of *Crawford* v. *Washington*, 541 U.S. 36 (2004); this decision, the Court advised Plaintiff, concerned the Confrontation Clause of

the Sixth Amendment. Plaintiff advanced other complaints that were grounded in criminal law (and thus inapposite to the civil trial then ongoing), including claims that defense counsel's conduct amounted to "prosecutory abuse," and that he had been deprived of his constitutional right to the effective assistance of counsel. (*Id.* at 16-18 (Tr. 78-80)).

Plaintiff then proceeded to discuss his right to represent himself at trial. (Dkt. #206 at 19-22 (Tr. 81-84)). In response to questioning from the Court concerning the reasons for the switch and the possibility of prejudice to Defendants, Plaintiff stated, among other things:

> And I promise you that I will conduct myself with candor, and I know what that means. I respect and appreciate the judicial body, even though sometimes I know I am not going to agree, right? However, I need to represent this issue in my best behalf because I know everything about it. The lawyers don't know.
>
> ***
>
> I am trying to let you know that even in this type of arena, you said don't mention anything about the [homicide] case. I won't mention anything about the case. It has been predicated on the statements being elicited on the case of the 2008 is what the case was supposed to have been dealt with. Then they went somewhere else into the other issue. I will keep myself in the boundaries of the statement of the 2008 issue of the excessive force, what was done, how it was done, who did it, where, who else saw it, that's it.

(*Id.* at 26-27 (Tr. 88-89)).

After hearing from defense counsel and taking a recess, the Court granted Plaintiff's motion to proceed *pro se.*

> I am concerned about Mr. Fleming's ability to abide by my rulings, and I am concerned about Mr. Fleming's ability to refrain from outbursts similar to yesterday.
>
> ***
>
> I also am very concerned, because a lot of statements that were made to me this morning were irrelevant, were far longer than they needed to be, and some of them, many of them reflected misperceptions of the law as they apply to this case.
>
> And so here is what I will do, Mr. Fleming. … I will permit you to represent yourself under the following conditions, and this is contingent:
>
> Number one, your counsel, however you consider them, need to remain at the table, if nothing else, to minimize the disruption to the jury of seeing you here alone when yesterday they saw you with counsel.
>
> Number two, we will try this with respect to the questioning of Detective Stradford, who was the witness on the stand when all of these incidents took place. If I find that you cannot comply with the rulings in this case; if I find that your questioning is irrelevant, if you question Detective Stradford about cases … what you are asking about is what he did, not what law he read when he was doing it. So don't be quoting case law to him.

(Dkt. #206 at 31-32 (Tr. 93-94)). Plaintiff was specifically admonished that further violations of the Court's orders could result in dismissal of his case. (*Id.* at 33 (Tr. 95)). After additional discussions with Plaintiff regarding the ground rules for his questioning on redirect examination, the Court brought in the jury and advised it that Plaintiff was now representing himself. (*Id.* at 39 (Tr. 101)).

Defense counsel concluded the cross-examination of Detective Stradford, focusing on the circumstances under which Plaintiff's written statements were prepared. (Dkt. #206 at 42-48 (Tr. 104-10)). In responding to the last questions

asked by his counsel, Stradford testified that he had no physical contact with Plaintiff whatsoever on October 23, 2008, and that he had indeed never been on the same side of the interview room with Plaintiff. (*Id.* at 54 (Tr. 116)).

Plaintiff then conducted his redirect examination of Detective Stradford. He began by asking Stradford to recount his career from graduation through his appointment to the Cold Case Squad. (Dkt. #206 at 55-56 (Tr. 117-18)). He next asked about Stradford's knowledge of the law of chain of custody, observing that Stradford's answer to questioning the preceding day had been "evasive." (*Id.* at 57-58 (Tr. 119-20)). Plaintiff then discussed with Stradford the layout of the interview area at GRVC and modifications to that area that had been made after the events at issue. (*Id.* at 59-67 (Tr. 121-29)). Frequently during the questioning, the Court was required to admonish Plaintiff not to testify in lieu of the witness. (*See, e.g., id.* at 65, 66, 69, 75 (Tr. 127, 128, 131, 137)).

Plaintiff asked Stradford concerning his knowledge of the Sixth Amendment right to counsel, and of the substance of his discussions with Plaintiff on October 23, 2008, concerning the latter's right to counsel. (Dkt. #206 at 69-76 (Tr. 131-38)). In that portion of his examination, Plaintiff veered even more dramatically from the ground rules the Court had set:

> Q. So that means that you would enter a facility, like if it's me, and you would give me a Miranda not knowing exactly how it goes and whether or not I understand it, you would still question me, sir, and even when I mention to you that, after reading the other two when it said I have the right to counsel, and counsel would be provided to me and I relented to sign it, and you got angry, you remember that?

[DEFENSE COUNSEL]:  Objection.

THE COURT:  I'm going to allow that. Do you — he gave you a series of events. Did that happen?

THE WITNESS:  No, not the way he said it. It's a lie.

Q.  OK. So I wouldn't use that word, because when I relented to sign it, Mr. Stradford, because of the fact that the jury can see that I'm a very boisterous person, right, and he was standing for my right, did you or did you not come outside of your character and call me a jackass and a smartass?

[DEFENSE COUNSEL]:  Objection.

THE COURT:  Forget the windup on the facts, because I'm not saying whether they happened or they didn't happen, at any point in the interview. Did you refer to him in the two terms he's just used?

THE WITNESS:  No.

Q.  When I told you, like the judge is saying me now, that I am prohibited from reading the law but I extenuatingly expressed to you about my Miranda rights and you came around the outer side of your place and come in there and assaulted me and told me I was a smartass and why I think that I shouldn't be charged for this crime?

[DEFENSE COUNSEL]: Objection.

THE COURT:  Sustained.

MR. FLEMING:  OK.

Q.  I'm going to ask you a blunt question. Aren't you sitting up there and lying?

THE COURT:  Oh. No, no, no, no, no. We're done.

MR. FLEMING:  Right now.

THE COURT:  We're going to take a break.

(*Id.* at 76-77 (Tr. 138-39)). Plaintiff again erupted before the Court as the jury was excused, yelling, cursing, and requiring restraint by the Marshals. (*Id.* at 77-79 (Tr. 139-41)).

In a conference with counsel outside of the presence of the jurors, the Court advised counsel for Plaintiff that Plaintiff's options were to resume the trial with counsel or to have the case dismissed:

> I will let him go forward with you as his counsel. … I am not going to allow him the opportunity to represent himself, because he's scaring my jury. He is. And I know he is frustrated, but having committed to me this morning that he would not have the eruption he did, and while I appreciate that he may not enjoy having the judge watch over his questions, I have obligations, to both sides, and under the Federal Rules of Evidence, and to my jury.

(Dkt. #206 at 80 (Tr. 142)). Plaintiff agreed to let Quinn Emanuel resume its representation of him, and the case continued. Counsel for Plaintiff concluded the redirect examination, focusing on Plaintiff's arguments that Defendants could access his portion of the interview room. (*Id.* at 84-87 (Tr. 146-49)). Counsel also made Plaintiff's point that a designation as a "spitter" would likely have occasioned precautionary measures from the GVRC staff. (*Id.* at 87-88 (Tr. 149-50)).

Counsel for Plaintiff then called Detective Braccini, whom Plaintiff had accused of failing to intervene as Detective Stradford struck him. Among other things, counsel emphasized that the two Defendants were friends, and that Braccini did not know much about the 1988 case at the time of the interview. (Dkt. #206 at 90-92 (Tr. 152-54)). Braccini also echoed Stradford's testimony

that "the objective of interviewing every suspect is to ultimately get a confession." (*Id.* at 94 (Tr. 156)).  Braccini recalled a female correction officer being present during the interview, and acknowledged that she would have been able to tell him how to get to Plaintiff's side of the interview room.  (*Id.* at 99 (Tr. 161)).  Braccini disclaimed any violence directed at Plaintiff on October 23, 2008, and, by extension, any failure to intervene to prevent violence.  (*Id.* at 99-100 (Tr. 161-62)).

On cross-examination, Detective Braccini was permitted to testify as to his understanding, at the time the interview with Plaintiff began, that Plaintiff was **[redacted]**.  (Dkt. #206 at 108-09 (Tr. 170-71); *see also id.* at 114-15 (Tr. 176-77) (recounting concerns occasioned by prior incident in which another inmate **[redacted]** during an interview)).[9]  He then discussed the specifics of the interview and of Plaintiff's statements prepared during that interview.  (*Id.* at 109-18 (Tr. 171-80)).  Braccini testified that he never saw Detective Stradford "make any physical contact with" Plaintiff, and, indeed, never saw Stradford on the same side of the interview room as Plaintiff.  (*Id.* at 118-19 (Tr. 180-81)).  Counsel for Plaintiff then engaged in a brief redirect examination.  (*Id.* at 119-23 (Tr. 181-85)).

Plaintiff then took the stand.  After describing his background and his family information, he began to discuss his incarceration at Rikers Island in 2008.  (Dkt. #206 at 125-26 (Tr. 187-88)).  He explained to the jurors that, with

---

[9]    The Court instructed the jury that this testimony was not being admitted for its truth, but rather for its effect on Defendants.  (Dkt. #206 at 108 (Tr. 170)).

respect to his narcotics possession charges, he had accepted a plea that required his participation in **[redacted]**.  (*Id.* at 126 (Tr. 188)).  When he was summoned to the interview room on October 23, 2008, Plaintiff believed that he would be speaking with his attorney, but encountered Defendants instead.  (*Id.* at 126-29 (Tr. 188-91)).  It was Plaintiff's recollection that the door to his side of the interview room was unlocked.  (*Id.* at 129 (Tr. 191)).  After discussing Plaintiff's stay at Rikers Island and certain **[redacted]** issues, Defendants expressed a desire to interview Plaintiff regarding the 1988 incident.  Plaintiff handed Detective Stradford his attorney's business card and expressed a desire to speak with her first; Stradford demurred "that it wouldn't be advisable for [Plaintiff] to talk to [his] lawyer because it would only delay this interrogation."  (*Id.* at 133 (Tr. 195)).  Stradford then proceeded to review with Plaintiff his *Miranda* rights; Plaintiff began to initial the individual rights, but refused to initial the right concerning the appointment of counsel.  (*Id.* at 134-35 (Tr. 196-97)).  At that point, according to Plaintiff, Stradford came over to his side of the interview room, called him a "smart ass," and proceeded to beat him while Detective Braccini stood by and did nothing.  (*Id.* at 135-37 (Tr. 197-99)).  In order to put a stop to the beatings, Plaintiff wrote a statement at the direction of Defendants.  (*Id.* at 137-38 (Tr. 199-200)).

According to Plaintiff, there were cuts to his face, head, and lip, and several of his teeth needed to be removed.  (Dkt. #206 at 138-39 (Tr. 200-01)).  And while there were no contemporaneous medical records reflecting these injuries, Plaintiff

explained that he had been transferred to "Closed Custody," where he was unable to receive medical assistance. (*Id.* at 139-40 (Tr. 201-02)). Plaintiff did not receive medical attention for his teeth until the middle of 2009. (*Id.* at 141 (Tr. 203); *see also id.* at 142 (Tr. 204) (Plaintiff removing his dental bridge to show the jury)).

On cross-examination, counsel for Defendants reviewed with Plaintiff the relevant medical records, which, as previewed during his direct testimony, lacked any reference to a "swollen face," a "busted lip," "broken bones," "missing teeth," or a "broken face." (Dkt. #206 at 151 (Tr. 213); *see also id.* at 151-62 (Tr. 213-24) (review of additional medical records)). Counsel then reviewed with Plaintiff prior statements he had made concerning the incident, suggesting that Plaintiff had changed his story over time. (*Id.* at 167-81 (Tr. 229-43)). Next, counsel reviewed with Plaintiff the circumstances of his interview with Defendants and the written statements that he had prepared. (*Id.* at 182-86, 191-92 (Tr. 244-48, 253-54)).

Counsel for Plaintiff then conducted the redirect examination of his client. Plaintiff testified, among other things, that he would not have brought his physical injuries to the attention of a psychology extern or an optometrist, both of whom he saw shortly after the incident. (Dkt. #206 at 193-97 (Tr. 255-59)). Counsel also directed Plaintiff's attention to an entry in his medical records for wound care. (*Id.* at 201-02 (Tr. 263-64)). There was, thereafter, a brief re-cross-examination. (*Id.* at 202-03 (Tr. 264-65)).

After Plaintiff rested, Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50. The Court reserved judgment on the motion. (Dkt. #206 at 209-11 (Tr. 271-73)).

### c. Day 3

The following day, January 25, 2017, the parties presented their closing arguments to the jury, and the Court instructed the jury concerning the relevant law. (*See* Dkt. #208). After several hours of deliberations, the jury returned a verdict in favor of both Defendants. (Dkt. #186).

### 10. The Discharge of Plaintiff's Counsel and the Post-Trial Motions

After the trial, and pursuant to agreement with their client, counsel for Plaintiff moved to withdraw. (Dkt. #190-91; *see also* Dkt. #189 (letter advising the Court of forthcoming motions)). The Court granted the two attorneys' motions by endorsements on February 2, 2017. (Dkt. #195-96). During this time period, Plaintiff also sought to file an appeal *pro se*; the Court advised Plaintiff that any appeal would be premature in the absence of a judgment, and that judgment would be entered at a later date. (*See* Dkt. #199, 202).

On February 7, 2017, the Court docketed an application styled by Plaintiff as a "Motion contending merits for a claim on retrial." (Dkt. #200). The following week, Plaintiff filed a letter motion contesting "counsel's action of depriving plaintiff & defendant of opportunity to secure suppression of exculpatory statement, along with avoiding the opportunity to establish that plaintiff's excessive force claim occurred exclusively during the 10/23/08 uncounseled

interrogation was not justified." (Dkt. #203 (modified by Court to be in lower-case lettering)).  The arguments in each of these applications were then reiterated in Plaintiff's third set of post-trial motions, which was filed on April 11, 2017.  (Dkt. #215).  Defendants responded to these motions on May 17, 2017 (Dkt. #217); Plaintiff filed his reply brief on June 6, 2017 (Dkt. #221); and the Court rejected Defendants' request for a sur-reply brief on June 23, 2017 (Dkt. #222, 223).[10]

After briefing had concluded in the matter, Plaintiff continued to submit letter motions, including one he styled as a motion attacking Defendants' factual presentation (Dkt. #224 (filed July 6, 2017)); an order to show cause for his production at a conference (which conference had <u>not</u> been scheduled by the Court), coupled with a supplemental brief on issues of qualified immunity, New York State's law on the right to counsel, and the preservation (or not) of errors that allegedly occurred during trial (Dkt #225 (filed July 11, 2017)); a rebuttal memorandum to Defendants' brief in opposition to Plaintiff's post-trial motions (Dkt. #227 (filed August 8, 2017)); and a "judgment motion" that reiterated several of the arguments in Plaintiff's prior briefs and sought judgment in his favor (Dkt. #228 (filed August 9, 2017)).  Given the proliferation of unauthorized supplemental briefs, the Court issued an endorsement on August 10, 2017, announcing its position that briefing on the matter had concluded.  (Dkt. #230).

---

[10]     Presumably because of a delay in mail delivery, Plaintiff did not receive Defendants' opposition brief on the date of its filing.  By motion filed on May 22, 2017, Plaintiff sought entry of a default judgment.  (Dkt. #218).  The Court denied the motion by endorsement dated May 24, 2017, on the grounds that Defendants' brief had been timely filed.  (Dkt. #220).

The Court then issued a supplemental endorsement on October 23, 2017, clarifying that while briefing had closed, Plaintiff's post-trial motions had not been closed, but would be decided in due course.  (Dkt. #237).

In several of Plaintiff's post-trial submissions, he included in the caption, as Defendants, the City of New York and the NYPD Cold Case Squad, both of which had been dismissed from the case in 2014.  (*See, e.g.*, Dkt. #200, 202).  In his April 11, 2017 post-trial motions, he included in the caption the Court and all four trial counsel.  (*See* Dkt. #215).  By Order dated April 11, 2017, the Court made clear that it did not consider these submissions to be valid efforts to amend the operative complaint in the case.  (Dkt. #216).  In an application received by the Court on May 2, 2017, Plaintiff sought, among other things, to amend the complaint to add these parties.  (Dkt. #244).  In the alternative, he sought summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56. (*Id.*).

## DISCUSSION

### A.  Overview of Plaintiff's Post-Trial Motions

Liberally reading Plaintiff's post-trial motion papers (including Docket Entries 200, 203, and 215) in order to raise the strongest claims that they permit, the Court understands Plaintiff to be making the following arguments in support of judgment as a matter of law in his favor or a new trial:

- The Court erred in reopening discovery;

- The Court violated Plaintiff's rights by precluding the introduction of evidence of disciplinary actions concerning Defendants;

- The Court erred in its resolution of Defendants' motions *in limine* concerning references to Plaintiff's criminal history and the introduction of certain written statements Plaintiff made to Defendants on October 23, 2008;

- Trial should have been limited to the issue of damages, because prior decisions resolving Defendants' motions to dismiss and for summary judgment amounted to a finding on Plaintiff's favor on the issue of liability as a matter of law;

- The Court erred in not permitting Plaintiff to proceed *pro se* during the trial, or in not permitting "hybrid representation" pursuant to which both Plaintiff and his counsel could present arguments during the trial;

- The Court improperly conducted *in camera* interviews without Plaintiff or his counsel present, and, relatedly, did not permit Plaintiff to attend all court proceedings in the matter;

- The Court erred in permitting Defendants to introduce evidence of Plaintiff's medical conditions, as well as the related report from law enforcement officers that Plaintiff was a "spitter";

- The Court erred in not admitting, and Plaintiff's counsel erred in not presenting, additional evidence and argument concerning the fact that the October 23, 2008 interview took place without the presence or consent of Plaintiff's counsel in his narcotics possession case;

- The Court should have precluded Defendants from introducing evidence of any "culpable conduct" on Plaintiff's part because of their failure to supply a bill of particulars prior to trial;

- The Court erred in precluding Plaintiff from introducing evidence of a "Riker's Con Job," which, according to Plaintiff, pertains to correction officers' propensity for covering up claims of excessive force, denial of medical

care, unlawful searches and seizures, and the officers' own lack of qualifications;

- The Court erred in its resolution of Defendants' requests that the jury be charged on the issue of qualified immunity;

- Plaintiff is entitled to a default judgment against Defendants, predicated either on their failure to submit timely answers or responses during the litigation, or on their failure to pay Plaintiff the $8,500 settlement figure on which they had agreed;

- Plaintiff received the ineffective assistance of counsel at trial, in derogation of the Sixth Amendment;

- The various errors outlined by Plaintiff are "mode of proceeding" errors that are preserved for judicial review;

- Plaintiff should be permitted to amend his complaint to add as Defendants the two defendants who were dismissed from the case in 2014, as well as the Court and the four lawyers involved in the trial; and

- Plaintiff is entitled to immediate release from incarceration.

As set forth in the remainder of this Opinion, these arguments do not succeed, and the Court will enter judgment in accordance with the jury's verdict.

**B.    Applicable Law**

**1.    Motions for Judgment as a Matter of Law Pursuant to Rule 50**

Federal Rule of Civil Procedure 50 permits a litigant to move for judgment "as a matter of law" after a trial.  The rule "imposes a heavy burden on [the] movant, who will be awarded judgment as a matter of law only when a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the

party on that issue." *Cash* v. *Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted); *accord Bucalo* v. *Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012); *Elsevier, Inc.* v. *Grossman*, 199 F. Supp. 3d 768, 778 (S.D.N.Y. 2016), *order clarified sub nom. Elsevier, Inc.* v. *Grossmann*, No. 12 Civ. 5121 (KPF), 2016 WL 7077037 (S.D.N.Y. Dec. 2, 2016).

Rule 50's "burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash*, 654 F.3d at 333 (internal quotation marks omitted). In such circumstances, a court may set aside the verdict only if, viewing the evidence in the light most favorable to the non-movant, "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* (internal quotation marks omitted); *accord Stampf* v. *Long Island R.R. Co.*, 761 F.3d 192, 197-98 (2d Cir. 2014); *Zellner* v. *Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007).

### 2. Motions for New Trial Pursuant to Rule 59

Federal Rule of Civil Procedure 59 gives a court discretion to "grant a new trial on all or some of the issues" in a case after a jury trial has been held "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A court may, for example, grant a new trial "if substantial errors were made in admitting or excluding evidence, or in

charging the jury." *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 573 (S.D.N.Y. 2011); *see also Graham* v. *City of N.Y.*, 128 F. Supp. 3d 681, 709 (E.D.N.Y. 2015) ("Erroneous or inadequate jury instructions may constitute grounds for a new trial, provided the errors are 'prejudicial in light of the charge as a whole.'" (quoting *Lore* v. *City of Syracuse*, 670 F.3d 127, 156 (2d Cir. 2012))).

When deciding a Rule 59(a) motion, as distinguished from a Rule 50 motion, a district court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle* v. *Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). That said, "a court should rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt. Corp.* v. *Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998); *see also Raedle*, 670 F.3d at 418 ("However, our precedent counsels that trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge 'should rarely disturb a jury's evaluation of a witness's credibility,' and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." (internal citations omitted)). Instead, the Second Circuit has made clear that "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Hugo Boss Fashions, Inc.* v. *Fed. Ins. Co.*, 252 F.3d 608, 623 (2d Cir.

2001) (internal citation omitted); *accord Manley* v. *AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003).[11]

## C. There Is No Basis to Disturb the Jury's Verdict

### 1. There Are Underlying Factual Errors in Several of Plaintiff's Arguments

A constant of this litigation has been Plaintiff's attentiveness to the matter. It is also true that Plaintiff has striven to educate himself on the law that he believes to be relevant to his civil and criminal cases. Both actions are commendable. However, a number of Plaintiff's post-trial claims founder on misperceptions of the underlying facts or of the law. Rather than address each of these issues on the merits, the Court will outline the factual errors in this section and the legal errors in the next section.

For starters, Plaintiff repeatedly claims that he is entitled to judgment in his favor because Defendants defaulted, either in failing to file an answer, or in filing late submissions at other points in the case. (*See, e.g.*, Dkt. #215-1 at 2). However, there is no basis for default. Defendants filed an answer to the operative complaint (Dkt. #43), on February 5, 2015 (Dkt. #72), after resolution of Defendants' motion to dismiss and service of the operative complaint. The Court has reviewed the docket and has not found instances in which Defendants failed to respond to a submission or Court order requiring a response, or instances in

---

[11] Defendants have interpreted Plaintiff's claims to reflect a motion to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59(e). (Dkt. #217 at 8-10). Because no judgment has yet been filed, the Court views Plaintiff's arguments through the lenses of Rules 50 and 59(a).

which Defendants submitted a late response without prior Court permission. (*See, e.g.*, Dkt. #39 (order terminating Plaintiff's motions *in limine* and for summary judgment as premature without requiring defense response); Dkt. #135 at 3 (interpreting various of Plaintiff's motions for summary judgment as a single opposition to Defendants' motion for summary judgment and cross-motion for summary judgment); Dkt. #156 (Defendants' timely opposition to Plaintiff's motion to reopen discovery); Dkt. #217 (Defendants' timely opposition to Plaintiff's post-trial motions)).

Relatedly, Plaintiff seeks a finding that Defendants are in default of their agreement to pay him $8,500 to settle this litigation. (*See* Dkt. #203 at 3; Dkt. #215-3 at 2). However, it was <u>Plaintiff</u> who returned a copy of the order of discontinuance with a letter "rescind[ing]" his acceptance of Defendants' "arbitrary and irrational" settlement offer and demanding $100,000,000 in damages. (Dkt. #97). As Plaintiff must understand, had he accepted the settlement offer, this case would have concluded in November 2015 and there would have been no trial. And at no point prior to the jury's verdict did Plaintiff ever suggest that he had, in fact, accepted Defendants' settlement offer.

Plaintiff repeatedly mentions an *in camera* interview that was conducted by the Court outside of the presence of Plaintiff and his counsel, and claims that he was entitled, by constitution and state statute, to be present for this proceeding. (*See, e.g.*, Dkt. #215 at 2; Dkt. #215-2 at 1-3). Deferring to the next section the legal fallacies in this argument, the Court notes that no such interview took

place.  Rather, with the approval of counsel for both sides, the Court undertook

an *in camera* inspection of certain disciplinary materials regarding Defendants in

order to determine whether such materials should be produced to Plaintiff.  (Dkt.

#182 at 7).  After the inspection was concluded, the Court determined that

certain of the materials were relevant to the issues in dispute and ordered their

production to Plaintiff's counsel.  (Dkt. #157).[12]

Plaintiff also raises a number of challenges to the Court's disposition of

Defendants' motions *in limine* (i) to admit evidence of the criminal conduct (i.e.,

the double homicide) that was the subject of Defendants' October 23, 2008

interview, and (ii) to admit Plaintiff's written statements from that interview.  (*See,*

*e.g.*, Dkt. #200 at 3-4; Dkt. #203 at 5-6; Dkt. #215-2 at 4-5).  Significantly,

however, the Court resolved both of those motions in Plaintiff's favor:  Defendants

were <u>not</u> permitted to introduce evidence of the 1988 offense that prompted

Defendants' interview of Plaintiff, and were <u>not</u> permitted to show the jury — even

in redacted format — Plaintiff's written statements to Defendants on October 23,

2008.  What is more, even after Plaintiff circumvented the Court's decisions in

order to "have his cake and eat it too" — by announcing to the jury that he had

never prepared any statements, but had merely signed a blank sheet of paper

under duress (Dkt. #206 at 185-86 (Tr. 247-48)) — the Court did not permit

---

[12]  For this reason, Plaintiff's citations to various cases for the proposition that he had a right
to be present throughout his trial are inapposite.  Plaintiff was present throughout his
trial, and was represented by his counsel at the few pretrial proceedings at which he was
not physically present.

defense counsel to introduce the statements, which contained graphic descriptions of Plaintiff's conduct, but instead only permitted counsel to show them to Plaintiff and inquire about his signature and initials on them (*id.* at 188-89, 191-92 (Tr. 250-51, 253-54)).

Finally, Plaintiff raises several challenges to Defendants' invocation of qualified immunity in this case. (*See, e.g.*, Dkt. #200 at 1; Dkt. #203 at 2; Dkt. #215-1 at 2). However, though Defendants refused to waive their right to raise a defense of qualified immunity (Dkt. #193 at 24 ("On the facts alleged, I don't know that this is a case for qualified immunity, but we don't want to waive anything yet.")), the issue never arose at trial because the jury found that Defendants had not violated Plaintiff's constitutional rights.

The Court believes that Plaintiff's misapprehension of this fact spills over into his repeated references to a "bifurcated" trial. (*See, e.g.*, Dkt. #215-1 at 4).[13] Had there been a verdict in Plaintiff's favor, the Court might have allowed the jury to answer a series of special interrogatories that went to the issue of qualified immunity. *See Lore*, 670 F.3d at 162 ("If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues on special interrogatories." (quoting *Warren* v. *Dwyer*, 906 F.2d 70, 76 (2d Cir.), *cert. denied*, 498 U.S. 967 (1990))). However, since the jury returned a defense verdict, the trial was not bifurcated.

---

[13]    As discussed in the next section, the Court understands that the reference to bifurcated trials also derives from Plaintiff's erroneous belief that the Uniform Rules for New York State Trial Courts apply in this setting, which they do not.

## 2.    There Are Underlying Legal Errors in Several of Plaintiff's Arguments

Plaintiff's arguments are also beset by a variety of legal errors.  First and foremost is Plaintiff's refusal to accept that this matter is a civil, and not a criminal, lawsuit.  The Court made plain in its first communication with Plaintiff the limits on the Court's jurisdiction.  (*See* Dkt. #160 at 4-6 ("Here's what my case is not about, sir.  My case does not impact the criminal prosecutions to which you have been subjected.")).  Undeterred, Plaintiff requests that the Court vacate his New York State criminal convictions.  (*See, e.g.*, Dkt. #215-2 at 5).  He argues that he received the ineffective assistance of counsel at the instant trial in violation of the Sixth Amendment.  (*See, e.g.*, Dkt. #203 at 6).  And he argues for post-trial preclusion of certain of Defendants' affirmative defenses for failure to provide a bill of particulars.  (*See, e.g.*, Dkt. #215-1 at 3).

These arguments can be swiftly rejected.  The instant case involves a claim for deprivation of a constitutional right by one or more state actors, and is not — and cannot be — a challenge to Plaintiff's underlying convictions.  *See generally Heck* v. *Humphrey*, 512 U.S. 477, 486-87 (1994) (holding that a plaintiff cannot challenge a criminal conviction under § 1983 unless the conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus").  And Plaintiff surely recognized this when he decided recently to bring a second petition in this District for habeas corpus relief under 28 U.S.C. § 2254.  *See Fleming* v. *Noeth*,

43

No. 17 Civ. 9104 (LGS). Separately, the Sixth Amendment guarantee of the effective assistance of counsel does not extend to civil litigants. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defen[s]e."); *Turner* v. *Rogers*, 564 U.S. 431, 441 (2011) ("But the Sixth Amendment does not govern civil cases."); *James* v. *United States*, 330 F. App'x 311, 313 (2d Cir. 2009) (summary order) ("[The] Sixth Amendment right to counsel does not apply to civil cases." (citation omitted)).[14] Finally, as noted by Defendants (*see* Dkt. #217 at 26-27), there is no right to a bill of particulars in civil cases. *See* 5C Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus, A. Benjamin Spencer, and Adam N. Steinman, FEDERAL PRACTICE AND PROCEDURE CIVIL § 1375 (3d ed. Civil 2017).

Plaintiff also holds erroneous views concerning the import of New York procedural rules in this setting. He makes repeated reference to New York's Civil Procedure Law and Rules, which do not apply to this Court. *See Melton* v. *McCormick*, 94 F.R.D. 344, 345 (W.D.N.Y. 1982) ("Because jurisdiction ... is based upon the existence of a federal question, however, and not upon diversity of citizenship, the court finds that the New York State procedural rules are not applicable to these motions, and the issues shall be governed solely by reference

---

[14]    In addressing this issue, the Court in no way accepts the factual premise of Plaintiff's argument that he received ineffective assistance of counsel at trial. The attorneys from the Quinn Emanuel firm worked tirelessly on a compressed trial schedule, and added considerable value to Plaintiff's case by both identifying evidence that Plaintiff had failed to obtain and crafting Plaintiff's arguments at trial. Though Plaintiff is understandably displeased with the jury's verdict, he cannot credibly be displeased with the excellent legal assistance he received. Quinn Emanuel's decision to provide these services on a *pro bono* basis accords with the finest traditions of the legal profession.

to the Federal Rules of Civil Procedure[.]").  Plaintiff claims to have had a "bifurcated" trial pursuant to § 202.42 of the Uniform Rules for the New York State Trial Courts, 22 N.Y.C.R.R. § 202.42, though he did not.  And Plaintiff claims that the errors he identifies in his post-trial briefs constitute "mode of proceedings" errors warranting a new trial.  A "mode of proceedings" error, however, is both a construct of New York State law and a doctrine applicable only to criminal proceedings.  *See, e.g.*, *People* v. *Rivera*, 23 N.Y.3d 827, 829, 831 (2014).

Plaintiff's conflation of New York and federal law extends to his arguments based on New York's indelible right to counsel.  (*See, e.g.*, Dkt. #203 at 1).  To review, at the time of the October 23, 2008 interview, Plaintiff was incarcerated on narcotics possession charges, for which he had been appointed counsel.  And while Defendants did not question Plaintiff concerning the narcotics charges for which he was counseled, they did question him concerning criminal charges at a time that he was counseled.  The state judge in Plaintiff's criminal case suppressed Plaintiff's statements to Defendants, finding a violation of New York's indelible right to counsel, pursuant to which a defendant in custody in connection with a criminal matter for which is he is represented by counsel may not be interrogated in the absence of his attorney with respect to that matter or an unrelated matter unless he waives his right to counsel in the presence of the attorney.  (*See* Dkt. #206 at 235-37 (Tr. 297-99) (citing *People* v. *Lopez*, 16 N.Y.3d 375 (2011); *People* v. *Harris*, 77 N.Y.2d 434 (1991))).

While Plaintiff now suggests that he wished to introduce additional evidence concerning the indelible right to counsel during his trial, his trial counsel disclaimed any intention of so doing during the trial itself. (*See* Dkt. #187 at 26 ("I don't really see how it's relevant to the present case."); Dkt. #206 at 237-38 (Tr. 299-300) (counsel agreeing to argue only that the interview took place without counsel being present)). Trial counsel was correct; as the Court found at the time it granted in part Defendants' motion to dismiss, Plaintiff's only remedy for a violation of his right to counsel was suppression of the statement, which he received. (Dkt. #63 at 12-13 (citing, *inter alia*, *Deshawn E. by Charlotte E.* v. *Safir*, 156 F.3d 340, 350 (2d Cir. 1998) ("[A]ny claim that a statement was unconstitutionally taken in the absence of counsel is properly remedied by suppression following a *Huntley* hearing.")). *Cf. Doe* v. *Conn. Dep't of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990) ("A violation of state law [does not] give[] plaintiffs a § 1983 claim[.]" (internal brackets and quotation marks omitted)). Plaintiff was not entitled to bring a standalone claim for a violation of his right to counsel, and the Court properly excluded argument in that regard at trial as irrelevant and likely to confuse the jury.

Plaintiff also confuses the import of parol evidence and the parol evidence rule, the latter of which, broadly speaking, "prevents the variations of the terms of a written contract by oral testimony." *Cruzan by Cruzan* v. *Dir., Missouri Dep't of Health*, 497 U.S. 261, 284 (1990). The Court understands Plaintiff to have made two applications for the use of parol evidence, both of which were properly denied.

*First*, Plaintiff sought to introduce the fact of the failed settlement discussions with defense counsel as an admission by Defendants of their liability in this action. (Dkt. #160 at 19-23). The Court rejected such testimony as irrelevant and precluded by Federal Rule of Evidence 408. *Second*, Plaintiff sought to introduce parol evidence concerning the voluntariness of his written statements to Defendants on October 23, 2008. (*See, e.g.*, Dkt. #215-3 at 7). However, since the statements themselves were not introduced, there was no need to discuss the degree to which they were voluntary. In any event, as noted, Plaintiff was able to testify that he signed blank forms under duress. (Dkt. #206 at 185-86 (Tr. 247-48)).

Plaintiff's final legal misperception concerns the import of the Court's prior decisions denying, at least in part, Defendants' motions to dismiss and for summary judgment. That is, despite specific instructions to the contrary from the Court, Plaintiff believes that the Court found in his favor, as a matter of law, on the issue of Defendants' liability. (*See, e.g.*, Dkt. #221; *see also* Dkt. #160 at 9-10 (explaining to Plaintiff the significance of the summary judgment opinion)). In granting in part and denying in part the motion to dismiss, the Court found only that, as to Defendants Stradford and Braccini, Plaintiff's allegations, taken as true, stated a claim for excessive force. (Dkt. #63 at 6-10). In denying Defendants' motion for summary judgment, the Court found only that a genuine dispute of material fact — suitable for jury determination — existed concerning whether Detective Stradford beat Plaintiff during the October 23, 2008 interview,

and whether Detective Braccini failed to intervene in any such beating. (Dkt. #135). The jury has resolved that dispute of material fact in Defendants' favor.

### 3. Plaintiff Has Not Validly Amended His Complaint

Plaintiff's post-trial motion arguments typically focus on the conduct of one party to the litigation, such as the Court. At times, however, Plaintiff conclusorily asserts that the Court and all four trial counsel conspired to violate his rights. There is no basis in law or logic for these assertions, and the Court does not address their merits in this Opinion. Additionally, and as noted above, Plaintiff added the names of the Court and the trial attorneys to the caption of his post-trial motions, and later sought leave to amend his complaint to include these parties. The Court denies the request.

Federal Rule of Civil Procedure 20 specifies that defendants can be joined in an action when:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2). Here, the claims against the Court and counsel are different from those asserted against Defendants Stradford and Braccini. More fundamentally, Plaintiff's claims against the individuals involved in the trial are equal parts conclusory and implausible. *See* Fed. R. Civ. P. 8(a) (requiring a pleading to contain "a short and plain statement of the claim showing that the

48

pleader is entitled to relief"); *see also Twombly*, 550 U.S. at 570 (noting that a plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face").

Plaintiff's allegations against the individual trial attorneys are nothing more than bare assertions of conspiracy. His allegations concerning the Court are more detailed, but no more successful. As an initial matter, the Court is immune from suit under the well-established doctrine of judicial immunity. *See generally Bliven* v. *Hunt*, 579 F.3d 204, 209 (2d Cir. 2009). Even absent that, Plaintiff has failed to allege any misconduct. (Dkt. #244). The proffered bases for the Court's addition to the caption (and, conversely, its removal from this action, if not from the bench entirely) include the Court's grant of Plaintiff's motion to reopen discovery (in other words, a decision in Plaintiff's favor); its *in camera* inspection and consequent order of production of certain disciplinary materials (another decision in Plaintiff's favor); and counsel for Plaintiff's decision not to cross-examine Detective Braccini on his disciplinary history (a decision in which the Court was not involved). The Court will not allow Plaintiff to drive it from this litigation by adding it to the caption in this case. His motion to amend his pleadings post-trial is therefore denied.

### 4. The Court Did Not Err in Reopening Discovery

Having addressed these preliminary matters, the Court now addresses the merits of each of Plaintiff's remaining claims. It begins with Plaintiff's claim that the Court erred in reopening discovery. (*See, e.g.*, Dkt. #215-3 at 2). Such a

49

claim is curious, inasmuch as the Court reopened discovery at the request of Plaintiff's counsel. (Dkt. #153-54). In any event, there was no error. A district court has discretion to reopen discovery in appropriate circumstances. *See generally Jackson* v. *Fed. Exp.*, 766 F.3d 189, 198-99 (2d Cir. 2014) (citing, *inter alia*, *Burlington Coat Factory Warehouse Corp.* v. *Esprit De Corp.*, 769 F.2d 919, 927 (2d Cir. 1985)); *see also* Fed. R. Civ. P. 26(b)(2)(C)(ii) (observing that courts "must" limit scope of discovery where "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action").

In considering the application of Plaintiff's counsel, the Court concluded that Plaintiff had conducted little if any discovery — very likely because of his incarcerated *pro se* status — and that a fairer trial would ensue if the parties were able to conduct limited discovery. (Dkt. #157, 182). There was no error in the Court's decision, and certainly no basis for either a new trial or a judgment as a matter of law in Plaintiff's favor.

**5.      The Court Did Not Err in Its Evidentiary Rulings**

Plaintiff also takes issue with several of the Court's evidentiary rulings. A district court has broad discretion to admit evidence that is relevant and probative under Federal Rule of Evidence 401, and to exclude evidence whose "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence" under Federal Rule of Evidence 403. *See generally Wells Fargo Bank, N.A.* v. *Konover Dev. Corp.*,

630 F. App'x 46, 49 (2d Cir. 2015) (summary order) (Second Circuit stating that it "will reverse only where the improper admission of evidence 'affects a substantial right of one of the parties' such that 'it is likely that in some material respect the factfinder's judgment was swayed by the error'" (citing *Costantino* v. *David M. Herzog, M.D., P.C.*, 203 F.3d 164, 174 (2d Cir. 2000) (internal quotation omitted)).

Beginning first with Plaintiff's claim that the Court improperly curtailed inquiry into the Defendants' disciplinary histories and prior litigations (*see, e.g.*, Dkt. #215 at 2; Dkt. #215-3 at 7), the record makes clear that the Court did no such thing. After an *in camera* review of certain disciplinary materials concerning Defendants, the Court ordered their production to Plaintiff's counsel; information that was not relevant to any of the issues in dispute was redacted. (Dkt. #157). It was Plaintiff's counsel who elected, as a strategic matter, not to inquire into this information. (Dkt. #187 at 9). Questioning of Detective Braccini regarding the *Felder* litigation was resolved somewhat differently, because the records in the federal and state versions of the case strongly suggested that no claims remained as to Braccini, and that the claim that the City settled was one against it for negligent training or supervision. (Dkt. #193 at 5-7). However, the Court left open the possibility of questioning if Plaintiff could produce "something suggesting that Detective Braccini was in the case and it was something that he did that was the basis of this settlement." (*Id.* at 11). Here, too, counsel for Plaintiff ultimately made the strategic decision not to inquire.

As at trial, the bulk of Plaintiff's evidentiary complaints are to the Court's admission of information concerning his medical conditions and related law enforcement reports that Plaintiff was a "spitter." A few points bear emphasis in this area. *First*, the information introduced was done with the consent of Plaintiff's counsel, and the metes and bounds of this testimony were fully discussed with both sides. (*See, e.g.*, Dkt. #181). *Second*, what was made clear to the parties and to the jury was that the evidence was <u>not</u> information derived from Plaintiff's medical records, but rather information that Defendants had obtained from law enforcement sources preliminary to arriving at Rikers Island for the interview. (Dkt. #206 at 108 (Tr. 170) ("I will allow it not for the truth of the matter asserted. I am not saying this happened or didn't happen. What we are saying is that I am allowing it for whether it was heard by Detective Braccini and what its impact on him was.")).

Plaintiff suggests that the evidence concerning his medical conditions was presented to the jury in violation of the Health Insurance Portability and Accountability Act of 1996 (or "HIPAA"), Pub. L. 104-191, 110 Stat. 1936. (*See, e.g.*, Dkt. #215-1 at 3; Dkt. #215-3 at 3-5)). It was not. Plaintiff executed HIPAA releases in the course of pretrial discovery. Moreover, as noted, the information introduced at trial was not Plaintiff's medical records, but rather what Defendants had heard concerning Plaintiff that might inform the manner in which they dealt with him. And Plaintiff cannot generate a grounds for new trial by raising, for the first time, claims under the Fourteenth Amendment, the Americans with

Disabilities Act, the Rehabilitation Act, or the constitutional right to privacy. They fail for the same reasons as his HIPAA claim: Plaintiff and his attorneys consented to this law-enforcement-derived information being produced to Defendants and introduced at trial. The information was introduced not for its truth, but for the more limited purpose of its effect on Defendants. The information was probative and not unduly prejudicial, and it was properly admitted at trial.

Plaintiff also takes issue with the Court permitting the introduction of law enforcement reports that he was a "spitter." (*See, e.g.*, Dkt. #215-3 at 4-5). Though Plaintiff has joined this complaint with his HIPAA-related claims, it is qualitatively different, inasmuch as it implicates no privacy issues. As the Court advised Plaintiff, he was able to address his disagreement with the substance of Defendants' testimony on cross-examination; his counsel was permitted to question Detective Braccini about the likelihood of having a "spitter" housed in the facility's general population, as Plaintiff was housed at GRVC. (Dkt. #206 at 87-88 (Tr. 149-50)).

Finally, Plaintiff takes issue with evidence that the Court did not admit, namely, evidence of a conspiracy of silence at Rikers Island that Plaintiff referred to as the "Rikers Con Job," after an article of the same name. (*See, e.g.*, Dkt. #215 at 3; Dkt. #215-3 at 7). Once again, Plaintiff is mistaken regarding the facts and the law. Plaintiff first raised this argument in his initial conference with the Court on November 4, 2016. (Dkt. #160 at 13). Not only had Plaintiff conducted

no discovery on this point, but the article's suggestion of facility-wide misconduct was much more suited for the *Monell* claim that had been dismissed in 2014 than for the excessive force claim that remained. When counsel for Plaintiff entered an appearance in December 2016, they recognized the insufficient state of the record on this point and sought to reopen discovery. However, after hearing from both sides, the Court concluded that it was too late in the day, and too attenuated in relevance, to merit inclusion in the limited list of topics for which discovery had been reopened. (Dkt. #182 at 8-9 ("So on several grounds, including the lateness of the request and the [short time] until trial and the fact that I think this would be stuff that I would very likely exclude on [Rule] 403 grounds, I am not going to require the production of it.")).

Even then, Plaintiff was able to get portions of the "Rikers Con Job" theory before the jury. During the examination of Detective Stradford, counsel for Plaintiff asked a number of questions on the point that Stradford had received "cooperation" from prison officials in Rikers Island in the conduct of his cold case investigations. (Dkt. #204 at 28-31). Plaintiff was also permitted to testify that one possible reason for the absence of medical records substantiating his injuries was that Rikers Island personnel had transferred him to "Closed Custody," where he was unable to receive medical assistance. (Dkt. #206 at 139-40 (Tr. 201-02)).

In sum, Plaintiff has identified no error in the Court's evidentiary rulings, much less an error warranting the extraordinary remedy of a new trial.

### 6. The Court Did Not Err in Its Resolution of Plaintiff's *Pro Se* Application

Another topic underlying several of Plaintiff's post-trial motions was the Court's treatment of his requests to proceed *pro se*. (*See, e.g.*, Dkt. #203 at 3; Dkt. #215-2 at 2-3; Dkt. #215-3 at 16). At times, Plaintiff intimates that he was coerced into accepting counsel for trial. The record puts the lie to any such argument. The Court made clear in its first conversation with Plaintiff that it was "not going to make you be represented by an attorney" (Dkt. #160 at 13), and that Plaintiff could meet with interested attorneys before agreeing to have one represent him (*id.* at 31). After meeting with attorneys from the Quinn Emanuel firm, Plaintiff consented to have them represent him at trial. (Dkt. #144). Concurrent with their appearance on the record, counsel asked the Court to disregard two prior submissions from Plaintiff in which he had sought to proceed *pro se*. (*Id.* ("Accordingly, as part of signing a retainer agreement with Quinn Emanuel, Mr. Fleming executed an addendum acknowledging that the letter motions 'placed the cart before the horse,' and requesting that they be rescinded and treated as void.")).

After the first day of trial, Plaintiff announced his desire to represent himself. (Dkt. #206 at 2 (Tr. 64)). Because his request occurred mid-trial, the Court's evaluation of his request was now altered:

> The few qualifications which this court has put on the clear language of the self-representation clause of § 1654 are consistent with its high purpose. One such qualification, enunciated in criminal cases, *see United States* v. *Bentvena*, 319 F.2d 916, 938 ([2d] Cir. 1963);

> *United States ex rel. Maldonado* v. *Denno*, 348 F.2d 12, 15
> ([2d] Cir. 1965), *cert. denied*, 384 U.S. 1007, 86 S.Ct.
> 1950, 16 L.Ed.2d 1020 (1966), but equally applicable in
> civil cases, is that the right to self-representation must be
> timely asserted.  The right is "unqualified" if invoked prior
> to trial but is "sharply curtailed" if first asserted after the
> trial has begun.  *Denno, supra*, 348 F.2d at 15.  An
> untimely request is committed to the discretion of the trial
> court, which may consider, among other factors, the
> reason for the request, the quality of the counsel
> representing the moving party, the party's prior proclivity
> to substitute counsel, and the potential disruption to the
> proceedings. *See Sapienza* v. *Vincent*, 534 F.2d 1007,
> 1010 ([2d] Cir. 1976).

*O'Reilly* v. *New York Times Co.*, 692 F.2d 863, 867-68 (2d Cir. 1982); *see generally Faretta* v. *California*, 422 U.S. 806 (1975) (addressing criminal defendant's right to proceed *pro se* or with counsel).[15]

Here, the Court evaluated the factors and allowed Plaintiff to proceed *pro se.* (Dkt. #206 at 30-36 (Tr. 92-98)).  However, the Court cautioned Plaintiff that further outbursts in court or improper questioning could result not only in the revocation of permission to proceed *pro se*, but in dismissal of the case itself.  (*Id.* at 33 (Tr. 95)).  As it happened, Plaintiff could not get through the redirect examination of Detective Stradford without violating the Court's directives:  He

---

[15] Plaintiff's suggestion that he was entitled to hybrid representation (*see* Dkt. #203 at 3) fares no better.  *See McKaskle* v. *Wiggins*, 465 U.S. 168, 183 (1984) ("*Faretta* does not require a trial judge to permit 'hybrid' representation of the type Wiggins was actually allowed."); *McCulloch* v. *Velez*, 364 F.3d 1, 5 (1st Cir. 2004) ("A party has a right to represent himself or to be represented by an attorney, but he cannot have it both ways. There is no right to hybrid representation in the federal courts."); *cf. United States* v. *Rivernider*, 828 F.3d 91, 108 (2d Cir.) ("A defendant has a right either to counsel or to proceed *pro se, Faretta* v. *California*, [422 U.S. 806, 834 (1975)], but has no right to 'hybrid' representation,' in which he is represented by counsel from time to time, but may slip into *pro se* mode for selected presentations."), *cert. denied sub nom. Ponte* v. *United States*, 137 S. Ct. 456 (2016).

asked improper questions; he attempted to testify through the witness; and he again burst into disruptive behavior that required excusal of the jury and restraint by the Marshals. (*Id.* at 58, 64, 66, 69, 71, 77 (Tr. 120, 126, 128, 131, 133, 139)). On these facts, the Court exercised its discretion properly in revoking Plaintiff's ability to proceed *pro se*, and offering Plaintiff the choice of resuming his representation by Quinn Emanuel or consenting to the dismissal of the case.

### 7. The Jury's Verdict Was Not Against the Weight of the Evidence

In light of Plaintiff's current *pro se* status, the Court has considered whether the verdict was against the weight of the evidence, or whether there is any basis for a new trial. As noted in the Court's summary judgment decision, this case boiled down to a credibility dispute between the parties concerning the events of October 23, 2008. The jury was presented with both sides' arguments, and ultimately found Defendants' version of events to be more credible. There was corroborative evidence for Defendants' testimony, including the photographs of the interview room and the absence of medical records supporting his claimed injuries. Put simply, there is no basis to disturb the jury's verdict.

**CONCLUSION**

Plaintiff's post-trial motions for judgment as a matter of law and for a new trial are DENIED. The Clerk of Court is directed to enter judgment in favor of Defendants, and to close this case.

SO ORDERED.

Dated:      February 22, 2018
           New York, New York

                                    KATHERINE POLK FAILLA
                                  United States District Judge

*Sent by First Class Mail to:*
Robert Fleming
DIN No. 13-A-4172
Great Meadow Correctional Facility
11739 State Route 22
P.O. Box 51
Comstock, NY 12821-0051